UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GENE E. MYERS, M.D.,

      Plaintiff,

v.                                       Case No: 8:19-cv-724-T-36CPT

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY and THE
UNUM GROUP,

      Defendants.

_____/

## O R D E R

This cause comes before the Court upon Defendants' Motion to Dismiss Plaintiff's Complaint (the "Motion"), (Doc. 21), Plaintiff's response in opposition, (Doc. 33), and Defendants' reply thereto, (Doc. 38). The Court, having considered the parties' submissions and being fully advised in the premises, will grant-in-part and deny-in-part the Motion.

## I.    FACTUAL BACKGROUND[1]

### A.  Introduction

Dr. Gene Myers ("Plaintiff") worked as an interventional cardiologist and practiced in Sarasota, Florida for more than thirty years. (Doc. 1 ¶7). Provident Life and Accident Insurance Company ("Provident") and The Unum Group (collectively, "Defendants" or "Unum") operate under the alter-ego name of "Unum."[2] *Id.* at ¶11. Unum is one of the dominant disability insurers

---

[1] The facts are derived from Plaintiff's complaint (the "Complaint"), (Doc. 1), the allegations of which the Court must accept as true in ruling on the Motion, *see Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983).

[2] Plaintiff refers to Provident and The Unum Group collectively as "Unum" throughout the Complaint. (Doc. 1 ¶11). Defendants challenge this collective reference only in attacking certain

and disability claim administrators in the country. *Id.* at ¶12. Since January of 2007, Unum has operated as a holding and parent company of Provident. *Id.* at ¶15. Unum is responsible for all claims handling for its subsidiaries, including Provident, and disability claims handling for several other insurance companies, including New York Life Insurance Company and John Hancock Mutual Life Insurance Company (the "Non-Unum Companies"). *Id.* at ¶¶15–16. Unum prescribed all claims handling procedures and operations for its subsidiaries and controlled companies, including Provident, and other companies for whom Unum administers disability claims, including the Non-Unum Companies. *Id.* at ¶17.

On or about December 1, 1988, Plaintiff purchased a non-cancellable disability income insurance policy, bearing policy number 6-335-879689 (the "Policy"), from Provident. *Id.* at ¶18. The Policy is an individual, long term "own occupation" disability income insurance policy. *Id.* at ¶19. Provident specifically marketed individual, long term "own occupation" disability income insurance policies like the Policy towards interventional cardiologists and advertised these policies such that a surgeon who was unable to perform surgery would be considered "disabled," even if he or she could earn more money, or work, in another occupation. *Id.* at ¶22. Indeed, an agent of Provident informed Plaintiff that the Policy would provide him with disability insurance coverage if injury or sickness prevented him from practicing interventional cardiology. *Id.* at ¶21.

### B.  Plaintiff's Injury and Claim

Interventional cardiology requires the physician to stand for many hours and wear a heavy leaded gown to protect the physician from radiation while performing certain procedures. *Id.* at ¶30. These heavy leaded gowns, together with the long hours required to perform procedures,

---

counts of the Complaint. Given the pervasive references to the entities collectively in the Complaint, the Court's use of "Unum" throughout this Order refers to both Provident and The Unum Group.

caused an irreparable injury to Plaintiff during a procedure in approximately 1998. *Id.* at ¶31–32. Specifically, while wearing a heavy leaded gown during an interventional coronary procedure at Sarasota Memorial Hospital, Plaintiff felt sudden pain in his lower back and experienced sciatic-type pain in his buttock and leg. *Id.* at ¶32.

Plaintiff immediately sought medical treatment for this injury from a chiropractor, Dr. William McComb ("McComb"), who identified the injury as acute herniate nucleus pulposus secondary to the heavy lead gown and Plaintiff's position at the time of the injury. *Id.* McComb provided therapeutic traction to help alleviate Plaintiff's condition and advised Plaintiff not to perform further procedures until his symptoms disappeared. *Id.* at ¶34. McComb advised Plaintiff to order a "split leaded gown," which consisted of a separate leaded blouse and leaded skirt that independently supported its own weight, rather than having the entire weight load suspended from the individual's shoulders. *Id.* at ¶35. Plaintiff followed this recommendation, but the effects of his injury resulted in continued and accelerated deterioration of the discs in his spinal cord. *Id.* at ¶36. Plaintiff's back injury worsened. *Id.* at ¶37. Plaintiff was forced to cut back on coronary interventional procedures in 2005. *Id.* He ceased performing all coronary interventional procedures and practicing interventional cardiology in 2009. *Id.*

Plaintiff filed for total disability on February 23, 2009. *Id.* at ¶38. In making his initial disability claim, Plaintiff completed a "Claimant's Statement" form and submitted a separate narrative statement due to the form's limited space, but he did not check any of the boxes indicating the reason for his disability, such as whether it stemmed from a "Motor Vehicle Accident," "Other Accident," "Sickness," "Pregnancy," or "Work-related Injury/Sickness." *Id.* at ¶40 (internal quotation marks omitted). Plaintiff was unaware of the significance of whether an injury or a sickness caused his disability, and he did not indicate whether the disability was due to sickness

or injury. *Id.* at ¶41. Unum never inquired regarding whether Plaintiff's disability was caused by a sickness or an injury during the entire claim process, nor did Unum ask Plaintiff to complete any additional sections on the claim forms. *Id.* at ¶42.

Unum was required to determine Plaintiff's occupation and whether he was able to perform the substantial and material duties of that occupation as part of its claims analysis. To determine Plaintiff's occupation, Unum requested Plaintiff's Current Procedural Terminology codes, known as "CPT codes," which are the American Medical Association's procedure-specific codes used for billing medical services and surgical procedures to third-party payers. *Id.* at ¶45. In a May 5, 2009 letter to Plaintiff, Unum requested Plaintiff's CPT codes for the 2007 calendar year. *Id.* at ¶46. Unum knew at this time that using CPT codes to determine a claimant's occupation was improper. *Id.* at ¶47. Plaintiff provided his CPT codes to Unum. *Id.* at ¶48.

In an October 6, 2009 letter to Plaintiff, Unum explained that its review of the CPT codes did not show that "these restrictions and limitations have had an impact" on Plaintiff's ability to perform his occupational duties. *Id.* at ¶48 (internal quotation marks omitted). In an April 29, 2010 letter to Plaintiff, Unum indicated that, as it had previously advised, it found no difference in the types of CPT billing procedures performed by Plaintiff for 2007 through 2009. *Id.* at ¶49. To evaluate Plaintiff's claim for disability prior to 2007, Unum needed (i) CPT codes from January 2004 to December 2006 to determine whether Plaintiff had a reduction in occupational duties; and (ii) "the financial information outlined in the same letter for that particular time frame." *Id.* at ¶49. The letter further advised:

> As advised in our letter of December 18, 2009, our clinician completed a review of [Plaintiff's] medical records going back to 2005. This review concludes that [Plaintiff] would have had restrictions and limitations related to his back and lower extremities dating back to April 2005. This would include prolonged standing,

4

repetitive bending as well as performing procedures extending longer than 30 minutes in which a lead vest is required.

*Id.* at ¶51.

Plaintiff did not timely provide Unum with the requested CPT codes from before 2007 in response to Unum's letter. *Id.* at ¶57. As such, Unum denied his claim for failure to produce the CPT codes. *Id.* Plaintiff continued working, thereby exacerbating his injuries, because he was unaware "at the time of these repeated denials of total disability" that Unum's use of CPT codes was improper. *Id.* at ¶58. Unum, at least as of December 18, 2009, recognized that Plaintiff was disabled from performing interventional cardiology because the restrictions and limitations recognized in Unum's letter would restrict Plaintiff from performing all coronary interventional procedures, which required prolonged standing, repetitive bending, and lasted anywhere from more than thirty minutes to four hours in duration. *Id.* at ¶52.

### C.  Request for Re-Analysis and Further CPT Code Use

After retaining new counsel, Plaintiff, through an August 25, 2014 letter from his new counsel, asked Unum to "re-analyze" his claim for disability without using CPT codes. *Id.* at ¶59. By filing a Civil Remedy Notice ("CRN") with the Florida Department of Financial Services on August 27, 2014, Plaintiff provided Unum with sixty days to remedy its improper acts and approve the claim for total disability, which Unum failed to do. *Id.* at ¶61. In an October 21, 2014 letter, Unum Appeal Specialist Melissa Walsh ("Walsh") again asked Plaintiff to provide the CPT codes that Unum requested in 2010. *Id.* at ¶62. The letter also stated that Plaintiff's claim reported his occupation as a simple cardiologist, which was false because Plaintiff had listed his occupation as an interventional cardiologist on the 2009 claim form. *Id.* at ¶70. The letter reiterated Unum's use of CPT codes, providing, in relevant part:

It was not until February 2010 that [Dr. Myers] informed our field representative that he believed he stopped performing up to full

5

> capacity during 2005. At that time, we only had his billing codes for 2007, 2008, and 2 months in 2009. Those codes documented Dr. Myers was working as an Interventional and Invasive Cardiologist. Interventional Procedures represented a small percentage of his billings for this period of time.

*Id.* at ¶73 (alteration in original).

On November 20, 2014, in response to Unum's request, Plaintiff provided Unum with requested CPT codes, business tax returns, medical records, personal tax returns, and profit and loss statements, notwithstanding Plaintiff's belief that the requested information was irrelevant to determining whether Plaintiff was disabled from his interventional cardiology occupation. *Id.* at ¶78. On March 10, 2015, Unum representative Dawn Doud advised Plaintiff via letter that Unum had completed its preliminary review, but needed even more CPT codes from 2009 through 2014 to complete its analysis. *Id.* at ¶80. Plaintiff provided these CPT codes to Unum on April 24, 2015. *Id.*

On June 5, 2015, Unum provided Plaintiff with its latest CPT code analysis, which included the 2009 through 2014 calendar years, and admitted that, for all of the procedures that Plaintiff performed, "he would have been restricted from due to his disability," as Unum advised of its understanding that "all of the procedures included in these charts involve standing and require the wearing of a lead vest." *Id.* at ¶81. Rather than making a determination on total disability, Unum continued to request additional information related to residual disability and income, not total disability. *Id.* at ¶82. On June 30, 2015, Plaintiff's counsel advised that Unum's continued use of CPT codes was improper and its failure to afford benefits under the Policy's total disability provisions greatly exacerbated Plaintiff's injury by forcing him to work while Unum reviewed, and ultimately denied, his claim. *Id.* at ¶84. Unum subsequently reviewed the Policy for another three months and provided Plaintiff with limited benefits under the residual disability provisions of the Policy in an effort to pacify him. *Id.* at ¶85.

On September 10, 2015, Unum advised Plaintiff that it found him to be totally disabled under a separate overhead policy issued by Provident (the "Overhead Policy"). *Id.* at ¶86. As such, Unum paid Plaintiff in full under the Overhead Policy. *Id.* Unum continued to use its CPT code analysis to deny total disability and find Plaintiff was merely residually disabled under the Policy for the periods of April 1, 2005 through January 1, 2006, and January 1, 2009 through September 1, 2011. *Id.* Unum paid residual disability benefits under the Policy in the amount of $575,683.54 to Plaintiff for these time periods. *Id.* Unum explained that the "Practice Analysis/CPT information" for the 2004 calendar year provided "a baseline of the substantial and material occupational duties" that Plaintiff performed before the onset of his restrictions and limitations, and, from the baseline, Unum analyzed the CPT codes for each year to classify Plaintiff in and out of his occupation to reach its conclusion. *Id.* at ¶90. Additionally, Unum advised in its September 10, 2015 letter that it had found no change in Plaintiff's medical condition over the years. *Id.* at ¶92.

Plaintiff's counsel subsequently pointed out that the statement regarding "no change" in Plaintiff's medical condition was false. *Id.* at ¶93. Plaintiff's counsel reiterated the flaws in using CPT codes and implored Unum to perform a Relative Value Unit ("RVU") analysis of Plaintiff's practice, which involves assigning a value to each CPT code in relation to the entire practice. *Id.* at ¶¶94–95. Unum agreed to retain an outside expert to conduct the RVU analysis and conceded that its statement regarding "no change" in Plaintiff's medical condition was incorrect, as Unum's physician had stated that Plaintiff's condition gradually worsened over time. *Id.* at ¶¶96–97. Unum retained accounting firm NawrockiSmith to conduct the RVU analysis. *Id.* at ¶99. Ernest Smith ("Smith") of NawrockiSmith conducted an in-person interview of Plaintiff in March of 2017. *Id.* at ¶102. In letters dated April 7, 2017, and July 10, 2017, Smith requested more information

unrelated to a determination of total disability, including W-2s and tax returns, payroll summary reports, and productivity reports for other doctors employed by Plaintiff's practice. *Id.* Plaintiff complied with Unum's continuous requests. *Id.*

Unum received a report from NawrockiSmith in September of 2017, yet asserted in October of 2017 that it needed more time to consider the report. *Id.* at ¶104. On October 16, 2017, before Unum made a decision on the claim, an Unum representative contacted Plaintiff to inquire whether he was interested in a lump sum settlement, which Plaintiff agreed to consider. *Id.* at ¶105.

### D.  Unum's Finding and Plaintiff's Appeal

By letter dated October 20, 2017, Unum advised Plaintiff that it had found him to be residually disabled from April 1, 2005 to January 1, 2006, and totally disabled on and after January 1, 2006. *Id.* at ¶106. Unum issued benefit payments to Plaintiff in the amount of $576,753.30 for this time period; Unum had previously paid $503,246.70 in residual disability payments for overlapping time periods to Plaintiff. *Id.* at ¶108. However, for the first time, Unum determined that Plaintiff's total disability was due to sickness, not injury. *Id.* at ¶109. The issue of whether injury or sickness caused Plaintiff's disability had not arisen during the nearly eight previous years. *Id.* This determination is significant because the Policy provides that "[t]he maximum benefit period for Total Disability due to sickness starting at Age 61 but before Age 62 is 48 months" and Plaintiff was 61 years-old in 2005. *Id.* at ¶110.

Plaintiff immediately appealed this decision. *Id.* at ¶115. Unum denied the appeal because "[n]either you nor [Plaintiff] have previously reported that [Plaintiff's] Total Disability began prior to age 60, or was due to an Injury." *Id.* at ¶116. However, Plaintiff also never reported that his total disability resulted from a sickness and Unum never inquired whether the disability was caused by an injury. *Id.* On December 4, 2017, Plaintiff provided to Unum the specifics of the injury that led

8

to his total disability, and he "has both an injury over time caused by the weight of lead gowns as well as a specific sudden injury caused by the weight of the lead gowns which thereafter caused spinal deterioration." *Id.* at ¶¶117, 120. Unum reiterated its position on February 8, 2018. *Id.* at ¶121. The instant lawsuit followed.

### E.  The Alleged Scheme

Plaintiff alleges that Unum denied otherwise valid claims to make a profit, thereby engaging in fraudulent claims handling practices (the "Alleged Scheme"). *Id.* at ¶123. The Alleged Scheme targets high reserve "own occupation" disability claims for termination or denial that were part of a "Closed Block" of "own occupation" policies that are no longer sold by Unum and its predecessors. *Id.* at ¶124.

Provident initiated the scheme in 1994, which continued following successive mergers with The Unum Group. Unum increased its Closed Block reserves in 2011 by $183.5 million as a result of the Closed Block policies no longer being sold and declining premium income due to longer life expectancy. *Id.* at ¶127. Unum linked performance reviews and incentive compensation to profitability of the Closed Block, recognizing that only an increase in denial of claims could cause an increase in revenue. *Id.* at ¶134. Unum implemented increased profitability in the Closed Block by utilizing "historically profitable claim denial rates as a baseline and measure to implement current claim denial rates, instead of evaluating each claim on a case-by-case basis." *Id.* at ¶135. The senior management of Unum directed, monitored, and unethically intervened in both the claims review process and the decision-making process. *Id.* at ¶142. The failure of claims handlers to deny a certain proportion of disability claims resulted in negative employment consequences and poor performance results, whereas claims handlers were promoted and rewarded for termination of claims and denials. *Id.* at ¶¶148–150.

As a result of the Alleged Scheme, Plaintiff's claim was targeted and denied for fraudulent and meritless reasons. *Id.* at ¶156. Denying Plaintiff's claim served as part of Unum's deliberate, continuing pattern of "erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics." *Id.* at ¶157. From the date of Plaintiff's purchase of the Policy in 1988, neither Provident nor The Unum Group disclosed to Plaintiff that Unum adopted an illegal or unethical claims handling practice designed to terminate and deny medical specialists' claims or that, if Plaintiff made a disability benefits claim, Unum would make every attempt to terminate or deny such claim in accordance with its claim procedures. *Id.* at ¶¶158–159. Consequently, "Plaintiff had less or no disability income insurance coverage" as a result of Defendants' conduct. *Id.* at ¶162.

Finally, the Non-Unum Companies contracted with Unum through agreements under which Unum received financial renumeration from the Non-Unum Companies for "aggressively administering" the disability claims under policies underwritten by each of the Non-Unum Companies. *Id.* at ¶163. The Non-Unum Companies sought out, and benefitted from, this aggressive administration because it minimized their liability on legitimate claims. *Id.* at ¶164. The Non-Unum Companies knew that Unum's conduct in terminating legitimate disability claims would reduce the liabilities of the Non-Unum Companies. *Id.* at ¶166. By ignoring Unum's fraudulent conduct, the Non-Unum Companies greatly increased the scope of the Alleged Scheme and enterprise. *Id.* at ¶169.

## II.    PROCEDURAL HISTORY

Plaintiff lodges ten claims against Provident and Unum: (1) breach of contract under Florida law; (2) bad faith in violation of Florida Statutes § 624.155; (3) breach of contract "as to injury vs. sickness" under Florida law; (4) breach of fiduciary duty; (5) violation of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a); (6) violation of RICO, 18 U.S.C. § 1962(b); (7) violation of RICO, 18 U.S.C. § 1962(c); (8) fraud "as to statements and omissions regarding [the] nature and quality of [the] Policy" under Florida law; (9) fraud "as to occupation determination, CPT code analysis, and claim determinations" under Florida law; and (10) intentional infliction of emotional distress under Florida law. *Id.* at ¶¶172–329. Defendants now move to dismiss the Complaint. (Doc. 21). Plaintiff has responded in opposition, (Doc. 33), and Defendants have filed a reply, (Doc. 38). The Court previously held oral argument on the Motion. *See* (Docs. 39, 40). As such, the Motion is ripe for the Court's review.

### III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id.* A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The Court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id.*

### IV.   ANALYSIS

#### A.  Policy Provisions

Under the Policy, Provident agreed to "pay benefits for covered loss resulting from Injuries or Sickness," subject to the Policy's definitions, exclusions, and other provisions. (Doc. 1-1 at 3). The Policy defines "Injuries" as "accidental bodily injuries occurring while your policy is in force" and defines "Sickness" as "sickness or disease which is first manifested while your policy is in force." *Id.* at 12. Significantly, the Policy provides the following "Maximum Benefit Periods" for total disability resulting from injuries or sickness:

> Injuries:
> Total Disability starting before age 65………………………for Life
> Total Disability starting at age 65 but before age 75……...24 months
> Total Disability starting at or after age 75………………..12 months
> Sickness:
> Total Disability starting before age 60………………………for Life
> Total Disability starting at age 60 but before age 61……….to age 65
> Total Disability starting at age 61 but before age 62……...48 months
> Total Disability starting at age 62 but before age 63……...42 months
> Total Disability starting at age 63 but before age 64……...36 months
> Total Disability starting at age 64 but before age 65……...30 months
> Total Disability starting at age 65 but before age 75……...24 months
> Total Disability starting at or after age 75………………12 months

*Id.* at 9.

The Policy defines "Total Disability" or "Totally Disabled" as "mean[ing] that due to Injuries or Sickness: 1. you are not able to perform the substantial and material duties of your occupation; and 2. you are receiving care by a Physician which is appropriate for the condition causing the disability." *Id.* at 12. The Policy measures benefits from the time of the total disability, following the Elimination Period, with benefits continuing during the time of total disability, but not beyond the Maximum Benefit Period.[3] As for residual disability:

> Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness: 1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much

_____

[3] The Policy defines the "Elimination Period" as "the number of days of disability that must elapse in a period of disability before benefits become payable." (Doc. 1-3 at 4).

time as it would normally take you to do them; 2. you have a Loss of Monthly Income in your occupation of at least 20%; and 3. you are receiving care by a Physician which is appropriate for the condition causing disability.

*Id.* at 16.

### B. Timeliness

The statute of limitations bar constitutes an affirmative defense, and a plaintiff is not required to negate affirmative defenses in his or her complaint. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004). However, "[a] dismissal for failure to state a claim on statute of limitations grounds is appropriate" where "'it is apparent from the face of the complaint that the claim is time-barred.'" *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018), *aff'd sub nom. Cochise Consultancy, Inc v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019). Thus, because a dismissal for failure to state a claim on statute of limitations grounds is appropriate only if the untimeliness of the claim is apparent from the Complaint's face, the Court must examine a claim, as pleaded, to determine whether the claim's purported untimeliness is apparent from the face of the Complaint.

### i. Breach of Contract Claims

Defendants assert that Plaintiff's two breach of contract claims—Counts I and III—are untimely. (Doc. 21 at 7–12). Florida law provides that "a legal or equitable action on a contract, obligation, or liability founded on a written instrument" must be commenced within five years. Fla. Stat. § 95.11(2)(b). Except as otherwise provided, "the time within which an action shall be begun under any statute of limitations runs from the time when the cause of action accrues." *Id.* § 95.031. "A cause of action accrues when the last element constituting the cause of action occurs." *Id.* § 95.031(1). "Florida case law consistently holds that a cause of action for breach of contract accrues and the limitations period commences at the time of the breach." *Clark v. Estate of Elrod*,

61 So. 3d 416, 418 (Fla. 2d DCA 2011) (internal quotation marks omitted). As such, "a breach of contract action on an insurance contract accrues on the date the contract is breached." *Dinerstein v. Paul Revere Life Ins. Co.*, 173 F.3d 826, 828 (11th Cir. 1999) (quoting *State Farm Mut. Auto. Ins. Co. v. Lee*, 678 So. 2d 818, 821 (Fla. 1996)); *see Saenz v. State Farm Fire & Cas. Co.*, 861 So. 2d 64 (Fla. 3d DCA 2003) (citing *Lee* for the proposition that the statute of limitations period in breach of insurance contract actions begins running from the date of the alleged breach). To that end, "a specific refusal to pay a claim is the breach which triggers the cause of action and begins the statute of limitations running" in actions predicated upon insurance contracts.[4] *Donovan v. State Farm Fire & Cas. Co.*, 574 So. 2d 285, 286 (Fla. 2d DCA 1991) (citations omitted). For example, an insurer's notification to insureds that their claim was denied constituted a specific refusal that triggers the running of the statute of limitations. *Roth v. State Farm Mut. Auto. Ins. Co.*, 581 So. 2d 981, 983 (Fla. 2d DCA 1991). With these principles in mind, the Court must examine whether the alleged untimeliness of the breach of contract claims is apparent from the face of the Complaint.

Preliminarily, Defendants attach the purported denial letter to the Motion in support of their timeliness arguments. (Doc. 21-3). "[W]hen the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). "[A] court may consider a document attached to a motion to dismiss without

---

[4] Although *Donovan* involved an action to recover personal injury protection benefits, this rule has been applied in the context of disability insurance policies. *Dinerstein*, 173 F.3d at 828.

converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). "A document is central to a complaint when it is a 'necessary part of [the plaintiff's] effort to make out a claim.'" *Madura v. Bank of Am., N.A.*, 767 F. App'x 868, 870 (11th Cir. 2019) (alteration in original) (quoting *Day*, 400 F.3d at 1276). In this context, "undisputed" means that the document's authenticity is not challenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

Defendants have not requested the Court to take judicial notice of the letter, and they asserted only in passing during oral argument that the letter is central to the Complaint. Despite arguing in its response that the Court need not examine the letter, Plaintiff invited the Court to examine the letter during oral argument to argue that a substantive determination is needed, an argument which is discussed below. No argument has been made that the letter is a *necessary* part of Plaintiff's effort to make these claims or any other claim. The parties do not dispute the letter's authenticity. Defendants conceded that the Court need not examine the letter to determine, from the face of the Complaint, the untimeliness of the claims. And the Court need not examine the contents of the letter to determine, from the face of the Complaint, that these claims are untimely.

The Complaint's factual allegations are replete with references to Unum's decision in 2010 as a denial of Plaintiff's claim. Plaintiff alleges that Defendants denied him benefits on April 29, 2010. (Doc. 1 ¶¶177–78). Plaintiff alleges that Unum "denied" Plaintiff's claim in 2010 after Plaintiff failed to produce the requested CPT codes. *Id.* at ¶57. Plaintiff further alleges that, "at the time of these initial repeated *denials* of total disability," he was unaware that Unum's use of CPT codes was improper. *Id.* at ¶58 (emphasis added). Plaintiff again describes the 2010 decision as a denial several paragraphs later, stating that Unum knew "in 2009 and 2010 when it *originally denied* [Plaintiff's] claim for total disability that it should not have done so using CPT codes . . .

." *Id.* at ¶69 (emphasis added). According to the Complaint, after Defendants denied his claim for total disability in 2010 for failure to produce the CPT codes, Plaintiff waited until 2014, at which point he asked to "*re-analyze* his claim for disability without the use of CPT codes." *Id.* at ¶59 (emphasis added). It was only after Plaintiff's request for re-analysis of his denied total disability claim did Unum: (i) find Plaintiff to be totally disabled under the Overhead Policy; (ii) find Plaintiff to be residually disabled from April 1, 2005 to January 1, 2006, and totally disabled on and after January 1, 2006; and (iii) determine that Plaintiff's total disability was due to sickness, not injury. The Court will examine each claim.

### 1.   Count I

Count I focuses on Defendants' denial of benefits to Plaintiff for the over-seven-year period from April 29, 2010, when "Defendants denied Plaintiff's claim for total disability," until October 20, 2017, "when Defendants finally conceded that Plaintiff was entitled to disability benefits and was totally disabled." (Doc. 1 ¶177). Plaintiff alleges that, even though Defendants had sufficient information to determine his total disability as of April 29, 2010, they failed to pay him timely under the Policy. *Id.* at ¶176. Plaintiff claims that the failure to timely pay his benefits constituted a breach of the Policy. *Id.* at ¶180. According to Plaintiff, Defendants' actions through the loss of the use of benefits amounts for the eight years of claim administration injured Plaintiff. *Id.* at ¶181. As such, Plaintiff seeks "recovery of all sums expended in his attempts to require Defendants to pay him the total disability benefits he was entitled to under the Policy," including interest of the benefits that accrued after Defendants paid the benefits and "attorney's fees and costs incurred in connection with his claims and his appeal of his claim denials." *Id.* at 30.

Defendants argue that the claim is untimely because the statute of limitations period began on April 29, 2010, when Plaintiff's claim was denied. (Doc. 21 at 8). During oral argument,

Defendants pointed to several paragraphs of the Complaint, listed above, in which Plaintiff referred to Defendants' 2010 decision as a denial. In the Motion, Defendants also argue that Plaintiff's request for Defendants to "re-analyze" his claim for total disability in 2014 did not reset the five-year statute of limitations, highlighting that Plaintiff's request in 2014 for Defendants to "re-analyze" this claim without CPT codes, as alleged, highlights that the claim is the same claim. *Id.* at 8–12. Under Florida law, an insured may not extend the limitations period by resubmitting the same claim. *Roth*, 581 So. 2d at 983.

In response, Plaintiff argues that this cause of action did not accrue until Defendants actually *paid* Plaintiff in October of 2017, which allegedly failed to compensate Plaintiff "for interest accrued on benefits not timely paid and attorney's fees he was forced to incur in order to obtain his benefits." (Doc. 33 at 7). As pleaded, Plaintiff seeks "interest on the benefits which accrued on the Policy benefits" had such benefits been timely paid, reasonable attorney's fees and costs, and punitive damages. (Doc. 1 at 30). Significantly, Plaintiff claims that Unum's late total disability determination failed to compensate him "for interest accrued on benefits not timely paid" and attorneys' fees incurred to obtain such benefits. (Doc. 33 at 7). To that end, Plaintiff argues that "this claim for the interest accrued on the total disability benefits he was entitled to."[5] *Id.*

---

[5] Plaintiff specifically references case law regarding recovery of prejudgment interest and attorney's fees, including Section 627.428 of the Florida Statutes. (Doc. 33 at 7–8). Of course, the purpose of a prejudgment interest award is to make the plaintiff whole from the date of the loss once the factfinder determines the defendant's liability for damages, as well as the amount of such damages. *Capital Envtl. Servs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 597 (Fla. 5th DCA 2009) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985)). Further, "[u]pon the rendition of a judgment or decree by any of the courts [of Florida] against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer," the trial court or appellate court "shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had." Fla. Stat. § 627.428(1).

As pleaded, the untimeliness of Count I is apparent from the face of the Complaint. The allegations show that this claim for "recovery of all sums expended" in the claims handling process, together with attorney's fees and other damages, is tied to Defendants' "denial" of Plaintiff's claim for total disability on April 29, 2010. Indeed, Plaintiff alleges that Defendants had sufficient information to determine Plaintiff's total disability in 2010 and Defendants denied the claim on April 29, 2010. The Complaint is replete with references to Unum's decision in 2010 as a denial of Plaintiff's claim for total disability as a result of his failure to produce the requested CPT codes, which led to his subsequent request for re-analysis without the CPT codes. Therefore, even when accepting Plaintiff's allegations as true, it is apparent from the face of the Complaint that Defendants' denial of Plaintiff's claim on April 29, 2010, constituted a specific refusal to pay the claim, which triggered the cause of action and began the running of the statute of limitations.

Plaintiff points to an alleged breach that occurred only thereafter, in October of 2017, when Defendants failed to pay purportedly entitled benefits. Indeed, according to Plaintiff, this cause of action "for the interest accrued on the total disability benefits" to which Plaintiff was entitled. (Doc. 33 at 7). But Plaintiff's focus on the accrual of these alleged damages is misplaced. In evaluating whether the statute of limitations has run on a breach of contract claim in an insurance action, such as Count I, the focus is on the alleged breach of the contract, which occurs when there is a specific refusal to pay a claim. Plaintiff's attempt to subvert this rule by equivocating the accrual of damages with an alleged breach is unpersuasive. The untimeliness of this claim is apparent from the face of the Complaint, and the claim is due to be dismissed, with prejudice.

### 2.  Count III

In Count III, Plaintiff alleges that he is entitled to lifetime benefits under the Policy because his total disability resulted from injuries, not sickness. *Id.* at ¶196. Plaintiff claims that Unum

breached the Policy by denying his claim and unreasonably withholding payment of benefits. *Id.* at ¶198. Plaintiff further alleges that "[c]ommencing on October 20, 2017, Unum was obligated to pay Plaintiff a monthly benefit for total disability for life due to injury," yet refused to pay the sought benefits. *Id.* at ¶¶202, 205. Plaintiff seeks, *inter alia*, benefits under the Policy in the amount of $22,500 per month plus interest for all unpaid months through the present. *Id.* at 34.

Defendants attack this claim as time-barred, making the same arguments that they made for the untimeliness of Count I. (Doc. 21 at 7). As discussed, Plaintiff clearly alleges that Defendants denied his total disability claim in 2010 as a result of his failure to provide the requested information. Plaintiff alleges that, as a result of the denial, he did not receive the purportedly owed benefits. As such, the April 29, 2010 denial constitutes a specific refusal to pay the claim, thereby triggering the cause of action, and the statute of limitations began to run.

Plaintiff's submission of the same claim for re-analysis four years later did not extend or otherwise alter the limitations period. Indeed, Plaintiff alleges that Defendants made the "sickness" determination, which serves as the focal point of this claim, only after previously denying Plaintiff's claim and following Plaintiff's request for Defendants to re-analyze the claim without use of the CPT codes. The Policy measures benefits from the time of the total disability, following the Elimination Period, and benefits continue during the course of total disability, but not beyond the Maximum Benefit Period. As alleged, Plaintiff sought to recover in 2014 and thereafter for the same loss on which his original claim was based: the total disability arising from his injured back. Resubmitting the same claim does not extend the limitations period, *Roth*, 581 So. 2d at 983, nor does the submission of new information, such as additional records or CPT codes, transform a claim into a new claim when the claim is for the same loss as the prior claim. *See Cmty. Bank of Fla. v. Progressive Cas. Ins. Co.*, No. 12-cv-20430-UU, 2013 WL 12093842, at *5 (S.D. Fla. Feb.

25, 2013) (finding that the subsequent claims submitted by plaintiff, which provided new information, sought to recover for the same losses that the plaintiff sustained). Even when accepting Plaintiff's allegations as true, the allegations show that Plaintiff requested Defendant to analyze the same claim. The request for re-analysis did not restart the statute of limitations, nor does Plaintiff make this argument. Thus, as pleaded, Plaintiff submitted the same claim that was previously denied in 2010 for re-analysis in 2014.

Plaintiff argues that Defendants' breach of the Policy—the last element constituting Count III—occurred on October 20, 2017, when Defendants first determined that Plaintiff's disability resulted from "sickness." (Doc. 33 at 8). Plaintiff emphasizes that he does not claim that his request for Unum to re-analyze the claim restarted the limitations period, but that Count III accrued when Defendants "actually made a decision on the claim." *Id.* at 9 (original emphasis removed). In other words, Plaintiff argues that a substantive decision must exist in order for the statute of limitations to run, rather than a denial for failure to provide requested information. However, Plaintiff does not provide in his response to the Motion, nor has the Court located, any case law or legal authority to support this argument. Despite not offering any case law or legal authority in his response, Plaintiff relied on *Witt v. Metropolitan Life Insurance Company*, 772 F.3d 1269 (11th Cir. 2014), during oral argument to argue that a "clear and continuing repudiation" must exist to trigger the statute of limitations.[6] However, in *Witt*, the Eleventh Circuit examined ERISA cases from other circuits, recognizing that at least three circuits apply a clear-repudiation rule to determine when an ERISA cause of action accrues. *Id.* at 1276–77. The Eleventh Circuit's holding that the insurer's conduct "demonstrated a clear and continuing repudiation" of plaintiff's rights stemmed from

---

[6] In the Motion, Defendants rely on *Witt* to argue that Plaintiff's request for Defendants to re-analyze the claim did not reset the statute of limitations. (Doc. 21 at 8–9). As noted above, other cases echo this principle. *See*, *e.g.*, *Roth*, 581 So. 2d at 983.

ERISA case law from other circuits that the court evaluated in ruling on the plaintiff's ERISA complaint. *Id.* at 1278. Plaintiff has failed to provide any argument for why this Court should extend this principle, grounded in ERISA cases, to a non-ERISA case. Furthermore, *Witt* is also distinguishable from the instant action, as Plaintiff does not claim that he did not receive notice of the denial, but instead that the claim accrued when Defendants made a substantive decision on the claim.[7] Accordingly, Plaintiff's argument that a "clear and continuing repudiation" must exist to trigger the statute of limitations is unpersuasive.

Finally, Plaintiff's equitable estoppel argument fails. Plaintiff argues that Defendants are estopped from arguing that Plaintiff's claim is time-barred because they never questioned whether the disability was due to sickness or injury. (Doc. 33 at 9). Under Florida law, "[t]he elements of equitable estoppel are: (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *State v. Harris*, 881 So. 2d 1079, 1084 (Fla. 2004). Plaintiff does not offer any analysis regarding which representations were made, nor does he offer analysis for any other element. Instead, he relies merely on a case analyzing equitable estoppel under California law. (Doc. 33 at 9). As such, this argument is unavailing.

Therefore, based on the foregoing analysis, the untimeliness of Count III is apparent from the face of the Complaint, and this claim will be dismissed, with prejudice.

### ii. Remaining Claims

---

[7] To the extent that Plaintiff argues that he did not have reason to know of Defendants' eventual "sickness" determination, the Court previously highlighted that a specific refusal to pay the claim constitutes the breach that triggers the cause of action for breach of an insurance contract and the starts the running of the statute of limitations.

Defendant argues, tersely, that Plaintiff's remaining claims are also time-barred. (Doc. 21 at 12). Following this citation of authority, Defendant simply concludes that the statutes of limitations for Plaintiff's other claims have expired "[f]or the same reasons that the statute of limitations for Plaintiff's breach of contract claim expired." *Id.* Defendants do not present any argument for when each claim accrues for purposes of analyzing the statute of limitations. Significantly, Defendants also fail to argue for how the untimeliness of these claims is apparent from the face of the Complaint, which is the governing analysis in examining a claim's alleged untimeliness upon a motion to dismiss. Consequently, this argument fails. To the extent that any of these claims survive, Defendants may raise this argument again on a motion for summary judgment, as appropriate.

### C. Bad Faith Claim

Defendants move to dismiss Plaintiff's bad faith claim, arguing that it is premature. (Doc. 21 at 13–14). Defendants highlight that a bad faith claim does not accrue under Florida law until a determination of liability and damages exists in the underlying contract action. *Id.* at 13. Defendants argue that the Court should exercise its discretion to dismiss, rather than abate, the claim. *Id.* at 13–14.

Under Florida Statutes § 624.155, "[a]ny person may bring a civil action against an insurer when such person is damaged" by a violation of Florida Statutes § 626.9541(1)(i) or when the insurer does not attempt "in good faith to settle claims when, under all of the circumstances, it could and should have done so, had it acted fairly and honestly towards its insured and with due regard for his or her interests." Fla. Stat. § 624.155(1)(a)–(b). As a condition precedent to bringing an action under § 624.155, the Department of Financial Services and the insurer must receive 60 days' written notice of the violation. *Id.* § 624.155(3)(a). Further, "[a] long line of cases" from the

Florida Supreme Court "hold[s] that a determination of liability and the full extent of damages is a prerequisite to a bad faith cause of action." *Fridman v. Safeco Ins. Co. of Ill.*, 185 So. 3d 1214, 1215 (Fla. 2016). "Both the existence of liability and the extent of damages are elements of a statutory cause of action for bad faith under [Florida Statutes] §§ 624.155 and 626.9541." *Porcelli v. OneBeacon Ins. Co., Inc.*, 635 F. Supp. 2d 1312, 1316 n.2 (M.D. Fla. 2008) (Steele, J.) (citing, *inter alia*, *Progressive Select Ins. Co. v. Shockley*, 951 So. 2d 20, 20–21 (Fla. 4th DCA 2007); *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991)). The insured may obtain this determination of liability and the full extent of his or her damages through means other than a trial, such as settlement, stipulation, arbitration, or payment of policy limits, before bringing a bad faith cause of action. *Fridman*, 185 So. 3d at 1224; *Demase v. State Farm Fla. Ins. Co.*, 239 So. 3d 218, 223 (Fla. 5th DCA 2018).

For liability, a plaintiff adequately alleges a determination of liability where he or she alleges that defendant admitted liability in issuing partial payments. *Sammy Sterling Holdings, LLC v. U.S. Aircraft Ins. Grp.*, No. 16-CIV-21230-ALTONAGA/O'Sullivan, 2016 WL 8679130, at *4 (S.D. Fla. June 23, 2016). As for damages, "it is the establishment of the fact that such damages were incurred and not their precise amount which forms the basis for a subsequent first party cause of action for bad faith." *Id.* (internal quotation marks omitted).

"[A]n underlying action on an insurance contract is not required for there to be a determination of the insurer's liability and the extent of the damages as a prerequisite to filing a statutory bad faith action." *Demase*, 239 So. 3d 218, 220 (Fla. 5th DCA 2018). However, "litigation of the underlying contractual issue is required as a prerequisite when the plaintiff brings a breach-of-contract claim under the insurance contract simultaneously with its bad faith claim." *Sammy Sterling Holdings*, 2016 WL 8679130, at *4; *see Vanguard Fire & Cas. Co. v. Golmon*,

955 So. 2d 591, 594 (Fla. 1st DCA 2006). Such premature claims should be dismissed without prejudice or abated. *Landmark Am. Ins. Co. v. Studio Imports, Ltd., Inc.*, 76 So. 3d 963, 964 (Fla. 4th DCA 2011).

Plaintiff alleges that Unum[8] violated Florida Statutes §§ 624.155 and 626.954(1)(i) "[b]ased upon the above facts." (Doc. 1 ¶188). Plaintiff claims that Unum violated Florida Statutes § 624.155(1)(b)(1) for not attempting to settle Plaintiff's claim in good faith when, under the circumstances, it could have and should have done so, had it acted fairly and honestly towards Plaintiff. *Id.* at ¶186. Plaintiff's bad faith claim is also predicated upon Unum's alleged violation of Florida Statute § 626.9541(1)(i)(3)(a), (b), and (d) for several purported actions, including failing to adopt and implement standards for proper claims investigation and use of CPT codes, its finding that Plaintiff was totally disabled as a result of sickness instead of injury, its use of CPT codes to classify Plaintiff out of his occupation to deny his claim, and its failure to conduct any investigation into Plaintiff's 1998 injury. *Id.* at ¶¶ 189–92.

While Plaintiff brings breach of contract claims with his bad faith claims, the breach of contract claims are time-barred. Thus, breach of contract claims do not pend simultaneously with the bad faith claim, and dismissal without prejudice or abatement is not warranted on such grounds. Because Plaintiff alleges a violation of Florida Statutes§ 624.155, however, he must allege the satisfaction of the prerequisites for this bad faith claim: determination of liability, determination of damages, and that Defendants and the Department of Financial Services received written notice of the violations. Plaintiff does not explicitly allege that he has met these prerequisites, but he alleges that Unum denied his claim in 2010 and subsequently made payments to Plaintiff under the Policy for residual disability and total disability benefits.

---

[8] Plaintiff refers to "Unum" throughout the bad faith claim.

24

Even if the Court construes these allegations as alleging a determination of liability and the extent of damages, Plaintiff has not plausibly alleged that Unum or the Department of Financial Services received 60 days' notice of the alleged violations. Plaintiff filed a CRN in 2014, days after asking Unum to re-analyze the claim. The CRN, which is attached to the Complaint, lists violations of Florida Statutes §§ 624.155(1)(b)(1), 626.9541(1)(i)(3)(a), (b), (d), (e), and (f). (Doc. 1-3 at 1). In describing the facts and circumstances giving rise to the violations, the CRN states that "Unum misrepresented that the policies cover Dr. Myers if he became disabled from interventional procedures and used improper claims practices to classify Dr. Myers' occupation as other than an interventional cardiologist." (Doc. 1-2 at 2). The CRN thus does not state that the use of CPT codes, the "sickness" finding, or an alleged failure to conduct any investigation into Plaintiff's 1998 injury, all of which Plaintiff relies on to bring the bad faith claim, served as bases for the CRN. Plaintiff does not allege that the violations listed in the CRN serve as the same bases for the present bad faith claim, either. Instead, Plaintiff generally alleges that he filed the CRN in 2014, which "gave Unum 60 days to remedy its improper acts and approve the claim for total disability," which Unum did not do within the specified time period. (Doc. 1 ¶61).

Relatedly, the claims handling process allegedly spanned from 2009 to 2018. Although Plaintiff filed the CRN in 2014, approximately four years after the April 29, 2010 denial, the claims handling process continued after Plaintiff's request for re-analysis and after the CRN's filing. During this subsequent period, Unum made payments to Plaintiff for residual disability and total disability. Unum also concluded that Plaintiff's injury resulted from "sickness." Whether Plaintiff intends to rely on Unum's pre-CRN conduct, post-CRN conduct, or both to bring this claim is unclear from the Complaint. Plaintiff broadly alleges that Unum's violations are "[b]ased upon the above facts" and, with one exception for conduct that occurred after the CRN's filing, the alleged

25

violations may have occurred either before or after the CRN's filing.[9] If Plaintiff seeks to rely on post-CRN conduct, he does not allege that he provided Defendants or the Department of Financial Services with the requisite statutory notice of such post-CRN conduct. For the foregoing reasons, this claim is due to be dismissed, without prejudice. The Court will permit Plaintiff leave to amend this claim. In amending the claim, Plaintiff must plausibly allege that the prerequisites for the bad faith claim have been satisfied.

### D. RICO Claims

Plaintiff brings three RICO claims against Defendants. (Doc. 1 ¶¶220–293). Defendants seek to dismiss these claims because: (i) the RICO claims are subject to reverse preemption under the McCarran-Ferguson Act; (ii) the RICO claims do not satisfy the distinctiveness requirement; and (iii) Plaintiff's RICO claims fail to satisfy pleading requirements. (Doc. 21 at 15–27).

### i. Reverse Preemption under the McCarran-Ferguson Act

Defendants argue that Plaintiff's RICO claims are subject to reverse preemption under the McCarran-Ferguson Act (the "MFA"). (Doc. 21 at 18–21). As presented, this argument falls short.

The MFA declares, in relevant part, that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. 15 U.S.C. § 1012(b). Thus, the MFA "precludes application of a federal statute in face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." *Humana Inc. v. Forsyth*,

---

[9] Plaintiff alleges that Unum violated Florida Statutes § 626.9541(1)(i)(3)(b) when it found Plaintiff to be totally disabled as a result of "sickness." (Doc. 1 ¶191). However, this finding allegedly occurred in 2017, three years after the CRN's filing.

525 U.S. 299, 307 (1999) (alterations in original) (quoting 15 U.S.C. § 1012(b)). The Supreme Court has defined "invalidate" as ordinarily meaning "to render ineffective, generally without providing a replacement rule or law." *Id.* Similarly, "supersede" ordinarily means "to displace (and thus render ineffective) while providing a substitute rule." *Id.* Therefore, "state insurance law is neither invalidated nor superseded unless it is rendered ineffective by the application of a federal statute." *Kondell v. Blue Cross & Blue Shield of Fla., Inc.*, 187 F. Supp. 3d 1348, 1358 (S.D. Fla. 2016).

However, "the definition of 'impair' and its proper application in this context are a bit more elusive." *Id.* The Supreme Court has recognized that "to 'impair' a law is to hinder its operation or 'frustrate [a] goal' of that law." *Humana*, 525 U.S. at 311. Indeed, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the [MFA] does not preclude its application." *Id.* at 310. Significantly, this interpretation of "impair" is "fact-intensive" and requires an analysis of "the precise federal claims asserted." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 927 F. Supp. 2d 870, 878 (C.D. Cal. 2013) (internal quotation marks omitted) (analyzing pertinent provisions of Florida insurance law to determine whether the plaintiff's RICO claims were subject to reverse preemption under the MFA). To be sure, "a broadly-drafted federal statute, such as RICO, may impair state insurance laws in some circumstances but not others, depending on the theory of liability asserted and the relief sought by the plaintiffs." *Id.* (internal quotation marks and alterations omitted). Simply finding that all RICO claims are reverse-preempted by the insurance laws of particular state is "not enough." *Id.* at 877–78.

The parties do not dispute that RICO is not a law that "specifically relates to the business of insurance." (Docs. 21 at 18–19; 33 at 14). Thus, the focus is on whether Plaintiff's RICO claims

"invalidate, impair, or supersede" Florida law. In seeking to dismiss Plaintiff's RICO claims on this ground, Defendants make little effort to analyze the claims themselves. Defendants begin by broadly asserting that the RICO claims "necessarily involve the regulation and business of insurance and would impair applicable state insurance laws." (Doc. 21 at 18). Thus, Defendants argue that the RICO claims impair Florida's insurance laws, not that the claims invalidate or supersede such laws. Two sentences are offered as analysis of Plaintiff's claims. First, Defendants simply contend that the RICO claims are "based on [Plaintiff's] contention that his claim was handled in bad faith" and "[a]llowing the RICO claims to proceed prior to any adjudication on benefits eligibility would frustrate the policy of refraining from litigating premature bad faith claims." *Id.* at 19. In support of this broad argument, Defendants cite, merely as an example, the entirety of Florida's Unfair Insurance Trade Practices Act, Fla. Stat. § 626.951 *et seq.*, for the proposition that the "insurance codes include statues which proscribe *various* claim settlement activities." *Id.* (emphasis added). No further explanation is offered. Similarly, Defendants claim that "the statutes require that detailed notice of the claim be provided to the insurer and the regulators" as a prerequisite to any such private right of action.[10] *Id.*

Next, to establish such purported impairment, Defendants attempt to distinguish Florida's insurance regime from Nevada's insurance regime, as analyzed by the Supreme Court in *Humana* over two decades ago. *Id.* In doing so, Defendants make several claims about Florida insurance law that are unaccompanied by citation, such as contending that Florida "provides only statutory remedies." *Id.* This failure to provide any citation significantly frustrates the reverse preemption analysis considering that Florida's Insurance Code spans Chapters 624–632, 634, 636, 641, 642,

---

[10] Defendants presumably intended to cite Florida Statutes § 624.155(3)(a)–(b) for this proposition, yet they cited Florida Statutes § 624.155(2)(a)–(b), which does not exist. (Doc. 21 at 19).

and 651 of the Florida Statutes. Fla. Stat. § 624.01. In attempting to distinguish Florida's insurance regime from Nevada's insurance regime in *Humana*, Defendants reiterate that notice of a bad faith claim serves as a condition precedent for bringing such a claim, pursuant to Florida Statutes § 624.155(3), and Florida law limits the availability of punitive damages in first-party actions, pursuant to Florida Statutes § 624.155(5). (Doc. 21 at 19–20). Given Defendants' earlier citation to Chapter 626, whether they challenge the RICO claims under only Chapter 624 or any other chapters of the insurance code, such as Chapter 626, is unclear. Defendants conclude their analysis by highlighting cases where district courts found that certain RICO claims were preempted, explaining that "[o]ther district courts in Florida have determined that RICO claims in insurances cases are preempted." *Id.* at 20 (footnote omitted).

But this argument misses the mark. As previously emphasized, the interpretation of "impair" under the MFA is "fact-intensive" and requires an analysis of the federal RICO claims specifically asserted by Plaintiff. *Negrete*, 927 F. Supp. 2d at 878. It is for this reason that some district courts have found certain RICO claims preempted, while other district courts have found other RICO claims not preempted. *See*, *e.g.*, *Kondell*, 187 F. Supp. 3d at 1361 (holding that its conclusion that applying RICO would impair Florida's insurance law rested "largely on the fact that no other state statutory or common law claim available would permit Plaintiff to seek relief on behalf of a putative class for Defendant's alleged misrepresentations"); *Negrete*, 927 F. Supp. 2d 879 (examining, among other authority, regulations regarding the advertisement of life insurance and annuity contracts to determine whether the RICO claims were subject to reverse preemption). Over the course of thirty-one paragraphs in the Complaint, Plaintiff details the purported scheme. (Doc. 1 ¶¶123–153). Plaintiff alleges, for example, that the scheme involved denying otherwise legitimate disability claims without regard to merit and included several

"hallmarks." *Id.* at ¶135. Plaintiff alleges, over the course of nine paragraphs, how Unum allegedly utilized the scheme to deny Plaintiff's benefits and, over the course of another nine paragraphs, the alleged involvement of the Non-Unum Companies in the scheme. *Id.* at ¶¶154–171. Plaintiff brings three separate RICO claims against Defendants on this basis. *Id.* at ¶¶220–293. However, Defendants merely claim in conclusory fashion that Plaintiff's RICO claims are grounded in bad faith. Defendants do not provide the requisite analysis of Plaintiff's allegations under this "fact-intensive" inquiry to determine, with reference to specific provisions of Florida law, whether the RICO claims impair Florida law.[11] Without this analysis, the Court declines to find that the RICO claims impair Florida law. Defendants may raise this argument again, as appropriate, on a motion for summary judgment. Therefore, the Motion is denied on this ground.

### ii. Distinctiveness Requirement

Defendants assert that Plaintiff's RICO claims must be dismissed because Unum and its subsidiary, Provident, are not distinct; thus, actions attributed to the two entities acting in concert may not serve as a basis for RICO claims. (Doc. 21 at 15). Defendants claim that Plaintiff has not pleaded facts showing that The Unum Group and its subsidiary, Provident, are distinct. *Id.* at 16. This argument is unavailing.

An "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. 1961(4). In discussing liability under 18 U.S.C. § 1962(c), the Supreme Court has recognized, in accord with the statutory language, that "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply

---

[11] During oral argument, Defendants reiterated the cases cited in the Motion and discussed Florida's "detailed insurance regime" generally, but did not focus on specific allegations regarding Plaintiff's three RICO claims.

the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Further, in examining the sufficiency of a claim under 18 U.S.C. § 1962(c), the Eleventh Circuit has stated:

> In an association-in-fact enterprise, a defendant corporation cannot be distinct for RICO purposes from its own officers, agents, and employees when those individuals are operating in their official capacities for the corporation. Significantly, to state a civil RICO claim, a plaintiff must establish a distinction between the defendant 'person' and the 'enterprise' itself.

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1355 (11th Cir. 2016).

This requirement arises from the statutory language of § 1962(c), which "make[s] it 'unlawful for any person employed by or associated with any enterprise' to engage in racketeering activities through that enterprise." *Id.* (quoting 18 U.S.C. § 1962(c)). "It does not make sense for a person to employ or associate with himself." *Id.* "[A] defendant can clearly be a person under the statute and also be *part* of the enterprise. The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (emphasis in original).

Plaintiff alleges that The Unum Group operates "as a holding and parent company of Provident," with responsibility for the claims handling for all subsidiaries, including Provident. (Doc. 1 ¶15). Plaintiff alleges that the RICO enterprise consists of:

> Unum and its subsidiaries, including Paul Revere and Provident, and its common claims handling unit, as well as other independent insurers such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company who use Unum's common claims handling unit and methods, as well as the firm of NawrockiSmith and Ernest Smith . . . .

*E.g.*, *id.* at ¶ 283.

31

Thus, the alleged enterprise consists of entities beyond The Unum Group and Provident, such as the Non-Unum Companies, NawrockiSmith, and Ernest Smith. Defendants admit that the Eleventh Circuit has not directly addressed this situation before. (Doc. 21 at 16). Indeed, in *Goldin Industries*, the Eleventh Circuit explicitly declined to address the extent of distinction, if any, where "wholly-owned subsidiaries conduct[] a pattern of racketeering activity through an enterprise comprised only of themselves as the parent corporation." 219 F.3d at 1276 n.7. As such, Defendants urge the Court to follow the decisions of federal appellate courts outside the Eleventh Circuit, which have "held that a parent company and its subsidiaries cannot form a RICO 'enterprise.'" (Doc. 21 at 16). But the Court is not bound to follow these decisions. Defendants also claim that the Eleventh Circuit's holding in *Ray* demonstrates that the distinctness requirement here is not satisfied. *Id.* at 17. In *Ray*, the enterprise consisted of the defendant-airline company, two of its corporate officers, and outside consultants and vendors. 836 F.3d at 1345–46. The Eleventh Circuit held that the plaintiffs had not sufficiently pleaded the existence of a RICO enterprise because they failed to adequately establish that a common purpose was shared by the defendant and the other members of the alleged enterprise. *Id.* at 1352. The court also held that, even if the corporate officers had shared a common purpose, the pleading still failed because the defendant was not distinct from its corporate officers, agents, and employees. *Id.* at 1355.

However, as Defendants recognize, a situation involving a parent company, which is described as a holding company, and its subsidiary as part of a purported enterprise differs from an enterprise involving a corporation and its officers. Further, the Non-Unum Companies, NawrockiSmith, and Ernest Smith are independent from The Unum Group and Provident. To the extent that Defendants seek to assert that Plaintiff has failed to adequate establish a *common purpose* by The Unum Group, Provident, and the other members of the enterprise, they have not

cogently made such an argument. Further, Defendants submit a two-paragraph block-quote from an order in *Allen v. First Unum Life Insurance Company*, in which the Court found, in a case involving similar facts, that there was no distinction between the corporate person and the alleged enterprise because (1) the allegations regarding the Non-Unum Companies' general involvement in the enterprise were insufficient to provide notice of the claims to the defendants; and (2) the allegations regarding the non-employee medical consultants were conclusory and did not specify with particularity the role the medical consultants played, the conduct attributable to the injury, or their awareness of the scheme. No. 2:18-cv-69-FtM-99MRM, 2019 WL 1359480, at *5 (M.D. Fla. Mar. 26, 2019) (Steele, J.). However, the Motion is devoid of any analysis regarding how the allegations in this action demand the same result as *Allen*. While Defendants generally discussed *Allen* during oral argument, including briefly mentioning that certain allegations regarding the Non-Unum Companies were "lifted" from the operative complaint in *Allen*, Defendants did not persuasively analyze the allegations of the Complaint, which state a different scheme and enterprise than *Allen*, to show a lack of distinction. As such, the Motion is denied on this ground, at this stage of the litigation.

### iii.  Pleading Requirements

Defendants argue Plaintiff's RICO claims fail to satisfy applicable pleading requirements because (1) he fails to plead the required investment injury under the § 1962(a) claim and the required acquisition injury under his § 1962(b) claim; and (2) he fails to plead the pattern of racketeering activity, which involves alleged acts of fraud, with particularity. (Doc. 21 at 21–28).

### 1.  Injuries under §§ 1962(a) and 1962(b)

Courts must scrutinize RICO claim causation during the pleading stage. *Ray*, 836 F.3d at 1349. "Any person injured in his business or property by reason of a violation of section 1962 of

this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit . . . ." 18 U.S.C. § 1964(c). Thus, "a party is only entitled to recover under RICO 'to the extent that he has been injured in his business or property by the conduct constituting the violation.'" *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). The violation must be both the but-for and proximate cause of the plaintiff's injuries. *Ray*, 836 F.3d at 1349.

The Court begins with the § 1962(a) claim. Under § 1962(a):

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce.

18 U.S.C. § 1962(a).

Unlike the injury requirement under § 1962(c), "which may be satisfied by harm alleged to be the result of racketeering activity, the majority of courts that have addressed the issue have determined that a claimant under § 1962(a) must plead an injury which stems 'not from the racketeering predicate acts themselves,' but from the use or investment of . . . racketeering income." *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1369 (M.D. Fla. 2005) (Antoon, J.). Other district courts within the Eleventh Circuit have adopted this approach. *See*, *e.g.*, *Fuller v. Home Depot Servs., LLC*, 512 F. Supp. 2d 1289, 1294 (N.D. Ga. 2007); *Bradley v. Franklin Collection Serv., Inc.*, No. 5:10-cv-1537-AKK, 2011 WL 13134961, at *6 (N.D. Ala. Mar. 24, 2011). Indeed, "[b]ecause it is the use or investment of racketeering income that violates § 1962(a), rather than the racketeering acts themselves, it makes sense that qualifying injuries under § 1962(a) should flow from the prohibited acts." *Cont'l 322 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1143 (M.D. Fla. 2018) (Chappell, J.).

34

In his § 1962(a) claim, Plaintiff alleges that part of the income that Provident and The Unum Group obtained from Plaintiff through mail and wire fraud "was used" to acquire an interest in an enterprise, in which they serve as principals, that affects interstate commerce because they receive interstate disbursements and fraudulently handle claims nationally. (Doc. 1 ¶¶222, 224, 229–230, 237–238. Plaintiff broadly alleges that The Unum Group and its subsidiaries, including Provident and non-party Paul Revere, "used this racketeering income to become the dominant disability insurer in the country and perpetuate the fraud." *Id.* at ¶229. In an attempt to establish causation, Plaintiff alleges that he suffered a "racketeering injury" from Provident and The Unum Group's investment of racketeering income. *Id.* at ¶239. Indeed, he claims that his benefits would not have been denied if Provident and Unum had not "perpetuated their company-wide strategy to wrongfully deny long term disability claims through the operation of the enterprise supported by investment of racketeering income." *Id.* at ¶240. Plaintiff also alleges that he suffered an investment injury that flowed from the use of Provident and The Unum Group's investment of racketeering income in that such income was used to "undercut competing disability insurers." *Id.* at ¶241. Plaintiff claims that this conduct prevented Plaintiff from doing business with a wider variety of disability insurers who "would have provided [him] with quality service and honored their contractual obligations." *Id.* at ¶242.

Most of these allegations are merely conclusory statements. To determine whether Plaintiff has sufficiently pleaded causation under § 1962(a), the Court must be able to discern whether the use of racketeering income caused the injury. To do this, of course, the Court must be able to identify the alleged use of racketeering income. This task proves unavailing. First, given Plaintiff's use of the passive voice, whether Provident or The Unum Group constituted the entity who used the income from the racketeering activity to acquire an interest in the enterprise is unclear. Further,

a review of the Complaint does not reveal any allegations that identify the purported investment that allegedly caused the injury. In his response, Plaintiff identifies the investment of funds as Unum's use of acquired funds from racketeering activity to "provide its claim handlers with increased compensation for denying claims instead of basing their determinations on the validity of the claims." (Doc. 33 at 21). However, Plaintiff does not make such an allegation in the Complaint, and his cited paragraphs in the response do not stand for this proposition. Finally, Plaintiff's collective references to both Provident and The Unum Group are troubling, as the references indicate a lack of specificity. *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity.") As such, Count V is due to be dismissed, without prejudice.

Turning to Plaintiff's § 1962(b) claim, "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce." 18 U.S.C. § 1962(b). Thus, "[w]hile § 1962(a) prohibits using funds acquired through a pattern of racketeering activity to invest in or acquire an enterprise, § 1962(b) prohibits the acquisition or maintenance of an enterprise through a pattern of racketeering activity." *Cont'l 322 Fund*, 317 F. Supp.3d at 1144.

In order to determine whether Plaintiff has sufficiently pleaded causation for this claim, the Court necessarily must examine the allegations upon which the claim is predicated. Like his § 1962(a) claim, Plaintiff alleges that part of the income or proceeds that Provident and The Unum Group obtained from Plaintiff through mail and wire fraud "was used" to acquire or maintain an interest in an enterprise, in which they served as principals, that affects interstate commerce

because they receive interstate disbursements and fraudulently handle claims nationally. (Doc. 1 ¶¶253, 255, 260, 262, 263–265). Plaintiff alleges that "Unum and its subsidiaries, including Provident and The Unum Group, used this racketeering income to become the dominant disability insurer in the country and perpetuate the fraud." *Id.* at ¶261. Plaintiff's causation allegations are the same as those for his § 1962(a) claim. *Id.* at ¶¶266–69. Unlike his § 1962(a) claim, Plaintiff alleges here that Unum, through its pattern of fraudulent activity, acquired or maintained, directly or indirectly, an interest in or control of, the enterprise. *Id.* at ¶264. However, this alleged acquisition or maintenance of an interest in the enterprise lacks factual support in the Complaint. Indeed, a review of the Complaint does not reveal the action or actions that Plaintiff intends to serve as the alleged acquisition or maintenance of the interest in the enterprise. Further, Plaintiff's continued references to Provident and The Unum Group, collectively, raise specificity concerns. For example, in alleging that *Unum* acquired or maintained an interest in the enterprise, whether Plaintiff intends to refer to both The Unum Group and Provident or just The Unum Group is unclear, given his references to Provident and The Unum Group in other allegations. Because the Court cannot determine the basis for the alleged acquisition or maintenance of an interest in the enterprise, the Court will not address causation. Count VI is due to be dismissed, without prejudice.

### 2. Racketeering Activity

In each of his three RICO claims, Plaintiff alleges that the "racketeering activity conducted by Provident and The Unum Group" is mail fraud and wire fraud. (Doc. 1 ¶¶222, 247, 274). "Racketeering activity," as used in the RICO statute, is defined to include mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n v. Cigna*

*Corp.*, 605 F.3d 1283, 1290–91 (11th Cir. 2010) (internal quotation marks omitted). To show that "a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." *Id.* A "pattern of racketeering activity" demands "at least two acts of racketeering activity, one of which occurred after the effective date of [18 U.S.C. § 1961] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Predicates are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [are] interrelated by distinguishing characteristics," rather than isolated events. *United States v. Browne*, 505 F.3d 1229, 1258 (11th Cir. 2007) (internal quotation marks omitted).

Further, because Plaintiff's RICO claims are premised upon an alleged pattern of racketeering activity consisting of mail and wire fraud, his RICO allegations must comply not only with the plausibility standards under *Twombly* and *Iqbal*, but also the heightened pleading standard under Rule 9(b), which requires that a party, in alleging fraud or mistake, "state with particularity the circumstances constituting fraud or mistake." *Am. Dental*, 605 F.3d at 1291  (quoting Fed. R. Civ. P. 9(b)) (internal quotation marks omitted); *see Ambrosia Coal*, 482 F.3d at 1316 (stating RICO claims must be pleaded with specificity). For Plaintiff to satisfy the Rule 9(b) standard, he must allege: ""(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case or omissions, not making) same, and (3) the contents of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud," *Brooks*, 116 F.3d at 1371 (internal quotation marks omitted). Significantly, "when a complaint asserts claims against multiple defendants, it cannot

merely 'lump [] together all of the defendants in their allegations of fraud.'" *Cutler v. Voya Fin., Inc.*, No. 18-20723-cv-WILLIAMS/TORRES, 2018 WL 4410202, at 8 (S.D. Fla. Aug. 23, 2018) (alteration in original) (quoting *Ambrosia Coal*, 482 F.3d at 1317), *report and recommendation adopted*, No. 18-cv-20723-WILLIAMS, 2018 WL 7627867, at *1 (S.D. Fla. Oct. 26, 2018). Plaintiff must allege facts with respect to each defendant's alleged participation in the fraud. *Am. Dental*, 605 F.3d at 1291. As "the most basic consideration" rooted in Rule 9(b) is fair notice, a plaintiff who pleads fraud is required to provide reasonable notice to the defendants regarding their alleged role in the scheme. *Brooks*, 116 F.3d at 1381.

Defendants make a series of limited arguments for why Plaintiff has apparently failed to allege the predicate racketeering activity. Ultimately, each of the RICO claims falls short for Plaintiff's failure to allege the predicate racketeering activity with the requisite specificity under Rule 9(b). Because Plaintiff alleges predicate acts of mail fraud and wire fraud, his allegations must show both (1) an intentional participation in a scheme to defraud another of property or money; and (2) use of mail or wires in furtherance of that scheme. Plaintiff identifies the scheme as Unum's engagement in fraudulent claims handling practices with the goal of denying otherwise valid claims to make money. (Doc. 1 ¶123). Plaintiff claims that this scheme began with Provident in 1994 and "continued through each successive merger to the present with Defendant, The Unum Group." *Id.* at ¶125. Plaintiff claims that, in 2012, after Plaintiff's denial for failure to provide the requested CPT codes, Unum's executive vice president implemented a scheme to increase profitability for the "Closed Block" policies "by using historically profitable claim denial rates as a baseline and measure to implement current claim denial rates, instead of measuring each claim on a case-by-case basis." *Id.* at ¶¶132, 135. Plaintiff also identifies several "hallmarks" of "Unum's scheme," none of which include using CPT codes to make occupational determinations. *Id.*

Plaintiff alleges that Unum continued its practices in the 1990s and "revitalized" the scheme in 2011, "us[ing] many of the same tactics to deny legitimate claims," including Plaintiff's claim. *Id.* at ¶¶141–42. Plaintiff asserts that his claim "was the subject of this increased denial of claims" and Unum "improperly used CPT codes to classify him out of his occupation to support denial of his claim." *Id.* at ¶146. Plaintiff claims that "each of the aforementioned hallmarks of Unum's Scheme was effectuated by use of the U.S. Mail and via telephone discussions." *Id.* at ¶155

Plaintiff also describes the scheme as "us[ing] CPT codes to classify medical specialists out of their medical specialty to support denials of disability claims." *Id.* at ¶71. Plaintiff consistently alleges that "Unum" improperly used CPT codes to make an occupation determination. *See*, *e.g.*, *id.* at ¶¶45, 47, 50, 58–59, 63, 69, 71. Indeed, "Unum . . . intentionally and fraudulently requested and used CPT codes to deny [Plaintiff's] claim by asserting that his CPT codes established that he was not an Interventional Cardiologist while admitting that he was disabled from Interventional Cardiology." *Id.* at ¶77.

Plaintiff alleges that Defendants used the mail or wires in furtherance of the scheme. In each RICO claim, Plaintiff states, in relevant part:

> Provident and The Unum Group used the interstate mail and telephone to communicate with those who ma[d]e claims for disability to perpetuate this fraud [denying legitimate claims] and have used the mail and wires dozens of times in Plaintiff's case, in yearly notices of premiums due as well as letters to Plaintiff and his counsel dated 5/5/09, 10/6/09, 4/29/10, 10/21/14, 9/10/15, 5/6/2016, 4/7/17, 7/10/17, 10/20/17, 11/9/17, and 2/8/18.

*E.g.*, *id.* at ¶224.

Of course, Plaintiff must identify the precise statements, documents, or misrepresentations made. In his response, Plaintiff points to four paragraphs of the Complaint to argue that he sufficiently pleads racketeering activity. (Doc. 33 at 24). A review of these cited allegations, as well as other allegations in the Complaint, reveals that Plaintiff does not state the entity responsible

for the alleged mail fraud.[12] For example, to highlight an instance of alleged mail fraud, Plaintiff

alleges that "Unum" requested CPT codes from Plaintiff in the May 5, 2009 letter, stating, "[T]o

independently verify the duties of your occupation you were performing prior to your disability,

we are requesting that you provide us with your CPT codes for the year 2007." (Doc. 1 ¶46).

Plaintiff claims that he provided the requested CPT codes and that "Unum" knew that requesting

such codes was improper to determine occupation at this time. *Id.* at ¶¶47–48. However, claiming

that Provident is a subsidiary of The Unum Group and the entities operate under the alter-ego

"Unum," Plaintiff utilizes "Unum" throughout the Complaint to refer to both Provident *and* The

Unum Group. Consequently, the collective reference to both entities lacks particularity in alleging

the purported mail fraud.

Plaintiff's references to the entities individually in other allegations supporting the RICO

claims underscores the lack of particularity. For example, Plaintiff alleges that The Unum Group

*and* Provident conducted the racketeering activity. *Id.* at ¶¶222, 247, 274. Plaintiff also claims that

The Unum Group *and* Provident have conducted the pattern of racketeering activity since 2000.

*Id.* at ¶¶228, 259, 281. Plaintiff has improperly lumped together Defendants in their allegations of

fraud.[13] Further particularity is required. The Court will provide Plaintiff with an opportunity to

---

[12] Plaintiff's allegations and response also make clear that the acts are limited to mail fraud, rather than mail fraud and wire fraud.

[13] In his response, Plaintiff asserts that "*Defendants'* non-disclosure is actionable RICO fraud because [Plaintiff] has alleged that . . . *Defendants* stood in a special relationship of trust and confidence to Plaintiff amounting to a fiduciary relationship." (Doc. 33 at 25) (emphasis added). "Nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002). A plaintiff who intends to assert a RICO claim for fraudulent concealment or nondisclosure must plead that the defendants had a duty to disclose. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007). In its breach of fiduciary duty claim, Plaintiff alleges that the fiduciary duties owed to Plaintiff by Defendants "included a duty of ethical claims handling, including the duty to disclose to the

amend. Because this failure implicates each of Plaintiff's RICO claims, each RICO claim will be dismissed, without prejudice, with leave to amend.

### E. Fraud Claims

Defendants move to dismiss Plaintiff's two fraud claims. "To state a claim of fraud, a plaintiff must show (1) a false statement or an omission of material fact, (2) knowledge of the statement's falsity, (3) intent to induce reliance, and (4) injury resulting from the plaintiff's relying on the statement." *Drilling Consultants, Inc. v. First Montauk Sec. Corp.*, 806 F. Supp. 2d 1228, 1236 (M.D. Fla. 2011) (Merryday, J.) (citing *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001)). Plaintiff must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), which requires alleging "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case or omissions, not making) same, and (3) the contents of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud," *Brooks*, 116 F.3d at 1371 (internal quotation marks omitted).

### i. Count VIII

After reincorporating prior paragraphs of the Complaint, Count VIII begins with two vague allegations. Plaintiff first alleges: "In reliance, Plaintiff dutifully paid thousands of dollars in premiums every year." (Doc. 1 ¶295). Immediately thereafter, Plaintiff alleges that "[t]his

---

insured all facts under which benefits could be available and all facts known to Defendants that would support a finding of benefits coverage on Plaintiff's behalf." (Doc. 1 ¶216). Even assuming the allegation sufficiently alleges a duty to disclose, whether the alleged mail fraud rests entirely on fraudulent concealment or nondisclosure is unclear. For example, as discussed in further detail herein, Plaintiff identified all four of the paragraphs which purportedly state racketeering activity via mail fraud as both misrepresentations and omissions regarding coverage in his first fraud claim. *Id.* at ¶296.

statement, as well as the statements referenced above and specifically in paragraphs 19 and 20, *supra*, were misrepresentations and omissions regarding the nature and quality of the coverage Unum provided." *Id.* at ¶296. Defendants presume that this fraud claim is grounded in a statement made by Provident's agent to Plaintiff, but this presumption is mistaken; the recited allegations demonstrate that Plaintiff refers to more than one statement. Plaintiff cites multiple statements that constitute misrepresentations and omissions regarding the nature and quality of the coverage.[14] Significantly, the Complaint does not identify "this statement" or "the statements referenced above." Paragraph 19 of the Complaint merely states that the Policy is a long-term, individual "own occupation" disability policy, and paragraph 20 alleges that Plaintiff purchased the Policy because he had focused his practice on interventional cardiology. *Id.* at ¶19–20. This case thus differs from *Allen*, where the plaintiff explicitly identified two false statements, one of which was an assurance from Provident's agent to the plaintiff regarding benefits under the policy. 2018 WL 6428132, at *10.

During oral argument, the Court asked Plaintiff to identify the statements to which the Complaint refers. Plaintiff identified sixteen paragraphs of the Complaint, as well as "all the allegations regarding NawrockiSmith because that firm is specifically hired to do this analysis of the CPT codes," as the misrepresentations *and* omissions regarding the nature and quality of the coverage provided cited in paragraph 296.[15] Plaintiff has failed to offer any analysis of each of the referenced paragraphs under the elements for fraud. For example, the Complaint is devoid of allegations stating how each of these purported misrepresentations or omissions constitutes a false

---

[14] As such, and based on the analysis herein, Defendants' statute of repose argument is presently unavailing.

[15] Plaintiff identified the following paragraphs of the Complaint: ¶¶ 46, 48, 49, 62, 70, 71, 73, 78, 80, 81, 86, 89, 90, 92, 96, and 104.

statement or an omission of material fact in the context of the nature and quality of the Policy. In addition to alleging a false statement or omission of material fact, Plaintiff, to state a fraud claim, must also allege knowledge of the statement's falsity, an intent to induce reliance, and an injury resulting from Plaintiff's reliance on the statement. Plaintiff cites the May 5, 2009 letter from The Unum Group to Plaintiff, which requested CPT codes, as a material misrepresentation and omission regarding the nature and quality of the coverage provided. Although Plaintiff alleges that Unum knew that requesting CPT codes to determine the occupation was improper, that he provided these CPT codes, and that he was forced to continue working, Plaintiff does not allege that the letter constitutes a false statement or an omission or material fact, or that Provident or The Unum Group intended to induce reliance, in the context of the nature and quality of the Policy. The other referenced allegations do not fare any better.

Many of the referenced paragraphs raise Rule 9(b) concerns, as well. For example, in paragraph 78, Plaintiff alleges that, "at Unum's request, [Plaintiff] provided Unum" with medical records, business tax returns, and additional CPT codes. (Doc. 1 ¶78). However, this allegation, like many others, refers to The Unum Group and Provident collectively. The Complaint does not identify the person responsible for making the statement, or omitting information to the extent that this allegation is intended to serve as an omission, nor does the Complaint specify the content of the request.

The lack of clarity apparent in Count VIII is further compounded by two allegations therein. Plaintiff alleges that: (1) since 1988, and in each following year when Plaintiff renewed the Policy, Defendants did not disclose that "they had adopted unethical or illegal claims handling practices and an intensive joint claims/legal special review process intended to facilitate termination and denial of medical specialists' claims using fraudulent occupational

determinations," or that, if Plaintiff made a claim for disability coverage, Defendants would make every attempt possible to deny the claim; and (2) Defendants never informed Plaintiff that they had been named as a defendant in thousands of lawsuits across the country regarding their purported unlawful denial of income disability insurance claims. (Doc. 1 ¶¶298–99). Whether Plaintiff intends to allege that the referenced paragraphs, to the extent they allege statements, were misleading as a result of these omissions is unclear, in light of Plaintiff's identification of the statements referenced in paragraph 296 as misrepresentations *and* omissions. Regardless, the Complaint does not offer allegations analyzing these omissions under the elements for fraud. Once again, Defendants are referenced collectively.

Additionally, many of the paragraphs referenced by Plaintiff during oral argument pertain to the requests for, and provision of, CPT codes. For example, paragraph 48 discusses Plaintiff's provision of CPT codes and the October 6, 2009 letter to Plaintiff, which stated that the review of CPT codes did not indicate an impact on Plaintiff's ability to perform his occupation. (Doc. 1 ¶48). By way of another example, paragraph 62 discusses Walsh's request for Plaintiff to provide more CPT codes. *Id.* at ¶62. Notably, Count VIII alleges fraud as to statements and omissions regarding the nature and quality of the Policy, whereas Count IX is fraud as to CPT codes analysis, occupational determination, and claim determinations. It is unclear how each of the referenced paragraphs pertains to the nature and quality of the Policy, particularly when Plaintiff brings a separate count for fraud for the use of CPT codes, as Plaintiff merely recited the paragraphs during oral argument and does not address them directly in Count VIII.

Based on the foregoing, Count VIII is due to be dismissed, without prejudice. The Court will provide Plaintiff with an opportunity to amend the Complaint to articulate the statements or

omissions serving as the basis for the alleged fraud. Plaintiff shall ensure that, upon amendment, he pleads the elements of his fraud claim in accordance with applicable pleading standards.

### ii.   Count IX

The Complaint describes Count IX as "fraud as to occupational determination, CPT code analysis, and claim determinations." (Doc. 1 at 49). Count IX contains nearly identical allegations to Count VIII, except Plaintiff removes the paragraphs regarding Plaintiff's purchase of the Policy, the unidentified misrepresentations and omissions, and the October 6, 2009 letter regarding review of the CPT codes. Plaintiff adds one paragraph, alleging that Unum knowingly used CPT codes to determine Plaintiff's occupation improperly and did so with the intent of depriving Plaintiff of benefits. *Id.* at ¶316. Thus, Count IX's allegations are quite similar to those of Count VIII, despite Plaintiff's contention that the fraud alleged in Count IX differs from that alleged in Count VIII.

Plaintiff alleges the same omissions as Count VIII regarding Defendants' failure to disclose their adoption of unethical or illegal claims handling practices, the claims review process designed to facilitate claim determination, and being named in lawsuits across the country regarding alleged unlawful denial of income disability insurance claims. To the extent that Plaintiff intends to rely only on these omissions to establish the alleged fraud, they suffer from the same defects as Count VIII. Plaintiff does not identify in the Complaint any statements that were misleading as a result of these omissions.

In his response, Plaintiff cites four paragraphs from the factual section of the Complaint to assert he has "specifically described all of the communications to him in which Defendants undertook their fraudulent CPT code analysis, and the harm resulted because, as a result of Unum's

shift in its claims handling, he effectively had less or no coverage."[16] (Doc. 33 at 28). However, Plaintiff must do more than merely describe communications and the resulting harm to plead fraud: he must allege a false statement or omission of material fact; knowledge of the statement's falsity; an intent to induce his reliance; and an injury he sustained from his reliance.

Notwithstanding his failure to mention them in Count IX, Plaintiff again has failed to offer any analysis for each of the paragraphs referenced in his response under the elements for fraud. For example, as in Count VIII, Plaintiff again cites the May 5, 2009 letter from Unum to Plaintiff as one of the "communications." *Id.* But there is no allegation that this statement constituted a false statement or an omission of material fact, nor is there any allegation that Unum intended to induce reliance, in the context of occupational determination, CPT code analysis, or claim determinations. By way of another example, there is no allegation that the April 29, 2010 letter regarding CPT codes and financial information constituted a false statement or an omission of material fact, that Unum knew of the purported falsity of this statement, or that it intended to induce Plaintiff's reliance. Upon review, not all of the referenced paragraphs comply with the particularity requirement of Rule 9(b), either. For example, Plaintiff alleges in paragraph 62 that Walsh requested further CPT codes from Plaintiff in the October 21, 2014 letter and that she subsequently testified at a deposition that CPT codes should not be used as the sole basis to determine occupation. (Doc. 1 ¶62). This allegation does not identify the contents of the statements or the manner in which they misled Plaintiff. The Court also notes that Plaintiff refers to Provident and The Unum Group collectively as "Unum." To the extent that Plaintiff intends to allege that the referenced paragraphs were fraudulent because Defendants omitted their adoption of certain claim

---

[16] Plaintiff identifies the following paragraphs, the latter two of which are located in Count IX: ¶¶46, 49, 62, 80, 311, and 312. (Doc. 33 at 28).

handling practices, their review process, or the lawsuits across the country, the Complaint fails to allege this. In sum, Count IX fails to state a claim for fraud. The Court will dismiss Count IX, without prejudice, and provide Plaintiff with leave to amend.

### F.   Intentional Infliction of Emotional Distress Claim

Finally, Plaintiff brings a claim for intentional infliction of emotional distress. (Doc. 1 ¶¶317–329). The elements of a claim for intentional inflict of emotional distress are: "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007). "Outrageous conduct is that which goes 'beyond all bounds of decency' and is 'regarded as odious and utterly intolerable in a civilized community.'" *Mellette v. Trinity Mem'l Cemetery, Inc.*, 95 So. 3d 1043, 1048 (Fla. 2d DCA 2012) (quoting *Gallogly v. Rodriguez*, 970 So. 2d 470, 471 (Fla. 2d DCA 2007)). "Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact." *Steadman*, 968 So. 2d at 595. "The court must evaluate the conduct as objectively as is possible to determine whether it is atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted).

Plaintiff bases this claim on the injuries that he sustained as a result of being forced to work while Defendants intentionally or recklessly delayed its investigation of the claim for approximately eight years, during which time it knowingly requested improper information from him. (Doc. 1 ¶¶322–27). As explained during oral argument, the alleged conduct does not constitute "outrageous" conduct under Florida law. As such, this claim is due to be dismissed, with prejudice.

## V.     CONCLUSION

Accordingly, it is hereby **ORDERED**:

1.  Defendants' Motion to Dismiss Plaintiff's Complaint (Doc. 21) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

2.  Counts I and III of the Complaint (Doc. 1) are **DISMISSED WITH PREJUDICE**.

3.  Count II of the Complaint (Doc. 1) is **DISMISSED WITHOUT PREJUDICE**.

4.  Defendants' Motion to Dismiss is **DENIED** as to Count IV of the Complaint (Doc. 1).

5.  Counts V, VI, and VII of the Complaint (Doc. 1) are **DISMISSED WITHOUT PREJUDICE**.

6.  Counts VIII and IX of the Complaint (Doc. 1) are **DISMISSED WITHOUT PREJUDICE**.

7.  Count X of the Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.

8.  Plaintiff may file an amended complaint that cures the deficiencies noted herein within **FOURTEEN (14) DAYS** of the date of this Order.

**DONE AND ORDERED** in Tampa, Florida on July 13, 2020.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge


Copies to:
Counsel of Record and Unrepresented Parties, if any