**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GENE E. MYERS, M.D.,**

        **Plaintiff,**

**vs.**                              **CASE NO. 8:19-cv-724-T-36CPT**

**PROVIDENT LIFE AND**
**ACCIDENT INSURANCE COMPANY**
**and THE UNUM GROUP,**

        **Defendants.**
_____/

## FIRST AMENDED COMPLAINT

Plaintiff, GENE E. MYERS, M.D. ("Plaintiff" or "Dr. Myers"), by and through his undersigned counsel, hereby files this First Amended Complaint against Defendants, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY ("Provident") and THE UNUM GROUP ("Unum Group"), and alleges as follows:

### JURISDICTION

1.    This Court has jurisdiction over the parties because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest, costs and attorney's fees.

2.    At the time of the claim, appeal, and ultimate denial to the present, Plaintiff has been a permanent resident of Sarasota County, Florida.

3.    At all times material hereto, Provident and Unum Group are foreign corporations with their principal offices in Tennessee and Massachusetts, respectively, and are the insurer and claims administrator for the disability policy at issue.

4.     Jurisdiction is founded in part on 28 U.S.C. § 1331 because this action arises in part under 18 U.S.C. § 1962.

## VENUE

5.     The insurance policy which forms the basis of Plaintiff's claims was ultimately materially breached by Defendants in the state of Florida and venue is appropriate.

6.     Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## THE PARTIES

7.     Dr. Myers was an Interventional Cardiologist who practiced Interventional Cardiology in Sarasota, Florida for more than 30 years.

8.     Interventional Cardiology is a subspecialty of cardiology that deals specifically with the catheter based treatment of structural heart diseases.

9.     As of April of 2005, due to a spinal injury, Dr. Myers was no longer able to perform interventional coronary surgeries as frequently or for any substantial duration.

10.     Dr. Myers ceased practicing Interventional Cardiology completely in 2009 when he filed for total disability.

11.     Through a number of acquisitions and mergers throughout the 1990s, including Provident's 1996 acquisition of the Paul Revere Life Insurance Company and Unum Group's merger with Provident Companies, Inc., Unum Group became, and is currently, one of the dominant disability insurers and disability claim administrators in the United States.

12.     Unum Group was formed effective July 1, 1999 after a November 22, 1998 announcement by the merger of Unum Corporation, an insurer based in Portland, Maine, with

Provident Companies, Inc., a Delaware corporation and insurance holding company based in Chattanooga, Tennessee.

13.     The newly merged insurance holding company became known as UnumProvident Corporation and changed its name to "The Unum Group" on January 16, 2007.

14.     Since January 2007 to the present date, Defendant Unum Group operates as a holding and parent company of Provident, and is responsible for all claims handling for its subsidiaries including Provident.

15.     Unum Group is also responsible for disability claims handling for several other insurance companies, such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company (hereinafter "Non-Unum Companies").

16.     Upon information and belief, at all times since on or about July 1, 1999, all claims handling procedures and operations were prescribed in a unitary and coordinated fashion by Unum Group for all its subsidiaries and controlled companies, including Provident, as well as for any other companies for whom Unum Group administers disability claims, including the Non-Unum Companies.

**THE POLICY**

17.     On or about December 1, 1988, Plaintiff purchased a non-cancellable disability income insurance policy from Provident, # 6-335-879689 (hereinafter "Policy").  A true and correct copy of Policy is annexed hereto as **Exhibit "1".**

18.     The Policy is an individual, long term "own occupation" disability income insurance policy.

19.     Plaintiff purchased the Policy because he had focused his practice on the medical specialty of Interventional Cardiology.

20.     Provident's agent, Anthony Romero, informed Plaintiff that the Policy which Plaintiff purchased from Provident would provide him with disability insurance coverage in the event that he became unable to practice his medical specialty of Interventional Cardiology due to injury or sickness.

21.     Provident specifically marketed individual, long term "own occupation" disability income insurance policies like Plaintiff's Policy towards surgeons and also advertised these policies such that if a surgeon could no longer perform surgery he would be considered disabled even if he could make more money or work in any other occupation. An Interventional Cardiologist is a surgeon.

22.     Under the Policy, if Plaintiff becomes totally disabled as a result of an injury, Unum is obligated to pay Plaintiff a benefit of $22,500 per month plus annual increases for cost of living as defined in that Policy for his lifetime.

23.     The Policy defines "Total Disability" as follows:

*Total Disability or totally disabled means that due to Injuries or Sickness:*

    a.    *you are not able to perform the substantial and material duties of your occupation; and*
    b.    *you are receiving care by a Physician which is appropriate for the condition causing the disability.*

24.     The Policy defines "Injuries" as follows:

*Injuries means accidental bodily injuries occurring while your policy is in force.*

25.     The Policy defies "Sickness" as follows:

*Sickness means sickness or disease which is first manifested while your policy is in force.*

26.     The Policy's Maximum Benefit Periods for "Injuries" are as follows:

*Total Disability starting before age 65 . . . for Life*
*Total Disability starting at age 65 but before age 75 . . . 24 months*

*Total Disability starting at or after age 75 . . . 12 months*

27.     The Policy's Maximum Benefit Periods for "Sickness" are as follows:

*Total Disability starting before age 60 . . . for Life*
*Total Disability starting at age 60 but before age 61 . . . to age 65*
*Total Disability starting at age 61 but before age 62 . . . 48 months*
*Total Disability starting at age 62 but before age 63 . . . 42 months*
*Total Disability starting at age 63 but before age 64 . . . 36 months*
*Total Disability starting at age 64 but before age 65 . . . 30 months*
*Total Disability starting at age 65 but before age 75 . . . 24 months*
*Total Disability starting at or after age 75 . . . 12 months*

## THE DISABILITY CLAIM

### *Dr. Myers' Injury Causing Total Disability*

28.     Dr. Myers specialized and focused his cardiology practice into the subspecialty of Interventional Cardiology; in fact, Plaintiff was a pioneer of Interventional Cardiology and performed the first coronary angioplasty on the west coast of Florida in 1987.

29.     Interventional Cardiology requires the physician to stand for many hours at a time and also to wear a heavy leaded gown in order to protect the physician from radiation while performing various interventional procedures.

30.     These heavy leaded gowns along with the long hours required to perform life-saving procedures caused an irreparable injury to Dr. Myers' back and spine.

31.     Specifically, in or around 1998, Dr. Myers was performing an interventional coronary procedure at Sarasota Memorial Hospital wearing a heavy leaded gown as required for radiation protection and bending over, when he suddenly felt pain in his lower back and had sciatic-type pain in the buttock and leg.

32.     Dr. Myers immediately sought treatment for his injury from a chiropractor, Dr. William McComb.  Dr. McComb confirmed the injury as acute herniated nucleus pulposus secondary to the heavy lead gown and Dr. Myers' position at the time of the injury.

33. Dr. McComb advised that Plaintiff should not perform procedures until the symptoms disappeared and provided therapeutic traction to help alleviate the condition.

34. Dr. McComb also recommended a novel solution to the heavy lead gowns that were, at the time, only supported by the shoulders.  Dr. McComb advised Plaintiff to order a custom-made "split leaded gown".  This "split leaded gown" consisted of a separate leaded blouse and leaded skirt that would each independently support its own weight, rather than having the entire load suspended from the shoulders.

35. Plaintiff followed Dr. McComb's recommendation and employed the split leaded gown.  However, the effects of Dr. Myers' injury resulted in continued and accelerated deterioration of the discs in his spinal cord.

### *Dr. Myers' Claims Process*

36. After his injury, Dr. Myers' back became worse.  In 2005, he was forced to drastically cut back on coronary interventional procedures and in 2009 he ceased performing all coronary interventional procedures and ceased practicing Interventional Cardiology.

37. Plaintiff filed for total disability on February 23, 2009.

38. In making his initial claim for disability, Plaintiff completed a "Claimant's Statement," which is a form provided by Unum Group.

39. This "Claimant's Statement" is comprised of both a form section and narrative section.  In section 4 of the form it states, "Is this disability due to" and then has a series of very small boxes to check which includes "Motor Vehicle Accident", "Other Accident", "Sickness", "Work-related Injury/Sickness", and "Pregnancy".

40. Plaintiff did not check any of the boxes or write anything in the form section but instead submitted a separate narrative statement due to the limited space on the form.  At the

time, Plaintiff was not aware there was any significance to whether his disability was caused by an injury or a sickness and did not indicate whether the disability was due to sickness or injury.

41.     Importantly, as part of its handling of Plaintiff's claim for Provident, Unum Group **never** inquired about whether Dr. Myers' disability was caused by an injury or a sickness at any time during the entire claim process and never asked Plaintiff to complete any additional sections on the claim forms.

42.     The issue of whether Dr. Myers' disability was caused by injury or sickness did not resurface until Unum Group's final determination of Total Disability on October 20, 2017.

43.     Because the Policy is an own occupation policy, as part of the claim analysis, Unum Group is required to determine Plaintiff's occupation and whether Plaintiff is able to perform the substantial and material duties of that occupation.  If Plaintiff is unable to perform the substantial and material duties of his occupation, he is considered totally disabled even if he can work in any other occupation.

44.     Initially, to determine Dr. Myers' occupation,  Unum Group requested his Current Procedural Terminology or CPT codes, which are procedure specific codes maintained by the American Medical Association used for billing medical services and surgical procedures to third-party payers.

45.     In a May 5, 2009 letter to Plaintiff, Unum Group, through Lead Disability Benefit Specialist Susan Richmond, requested CPT codes from Plaintiff and stated:  "In an effort to independently verify the duties of your occupation you were performing prior to your disability, we are requesting that you provide us with your CPT codes for the year 2007."

46.     At the time Unum Group requested CPT codes to determine Dr. Myers'
occupation, Unum Group and Provident knew that it was improper to use CPT codes to
determine a claimant's occupation.

47.     In the May 5, 2009 letter, Ms. Richmond did not inform Dr. Myers that it was
improper to use CPT codes to determine his occupation and to determine whether Plaintiff was
able to perform the substantial and material duties of that occupation.

48.     Dr. Myers provided his CPT codes to Unum Group to review.  In an October 6,
2009 letter to Dr. Myers, Unum Group, through Ms. Richmond, stated, "Based on our review of
the CPT codes, it does not appear that these restrictions and limitations have had an impact on
his ability to perform the duties of his occupation."

49.     Again, in the October 6 letter, Ms. Richmond materially omitted the fact that it
was improper for Unum Group to use CPT codes to determine a claimant's occupation.

50.     In an April 29, 2010 letter to Dr. Myers, Ms. Richmond again noted that Unum's
occupational determination was based on CPT codes:

> As noted in our letter of October 6, 2009 (copy enclosed), we find no
> difference in the types of CPT billing procedures performed by Dr. Myers
> for the period 2007-2009.  In order to evaluate Dr. Myers' claim for
> disability prior to 2007 we need CPT codes from January 2004 to
> December 2006 to determine whether Dr. Myers had a reduction in
> occupational duties as well as the financial information outlined in that
> same letter for that particular time frame.

51.     In its April 29, 2010 letter, Unum Group materially omitted, once again, that it
was improper to use CPT codes to make this type of determination.

52.     Financials are only relevant to analysis of residual disability as opposed to total
disability as they are used to calculate income from year to year, so the only occupational
information Unum Group sought and used in its analysis were CPT codes.

53.     In the April 29, 2010 letter, Unum Group summarized its review of Dr. Myers' medical records going back to 2005, and concluded that he was disabled from Interventional Cardiology procedures.  The letter stated:

> As advised in our letter of December 18, 2009, our clinician completed a review of Dr. Myers' medical records going back to 2005.  This review concludes that Dr. Myers would have had restrictions and limitations related to his back and lower extremities dating back to April 2005.  This would include prolonged standing, walking, repetitive bending as well as performing procedures extending longer than 30 minutes in which a lead vest is required.

54.     The above noted "restrictions and limitations" would restrict Dr. Myers from performing all coronary interventional procedures as they all involve prolonged standing and repetitive bending and most last more than 30 minutes and could be as long as 4 hours. Accordingly, since at least December 18, 2009, Unum Group recognized that Plaintiff was disabled from performing Interventional Cardiology.

55.     At that point in 2009, Unum Group should have simply asked one of its vocational experts or on staff interventional cardiologists what are the duties of an interventional cardiologist and did Dr. Myers' practice conform to such occupation.

56.     When Dr. Myers purchased the Policy in 1988, he listed his occupation on the application as a full time Heart Catheterization Specialist whose duties were Catheterization and Angioplasty (interventional procedures).

57.     When Dr. Myers filed his claim for disability in 2009, he listed his occupation and specialty as Interventional Cardiologist on the claim form.

58.     Unum Group was aware that Dr. Myers was a pioneer in Interventional Cardiology and had performed more procedures than the average Interventional Cardiologist.

Unum Group thus had enough information to determine that Dr. Myers was totally disabled from his occupation as an Interventional Cardiologist.

59.     However, Unum Group advised Dr. Myers that it needed to review *additional* CPT codes from prior to 2007 to determine whether he was disabled.  Dr. Myers in 2010 did not timely provide Unum Group with additional requested CPT codes from prior to 2007, and Unum Group closed his claim at that time for failure to produce the CPT codes.

60.     Dr. Myers did not know at the time that Unum Group closed his total disability claim that Unum Group's request for and consideration of CPT codes was improper and was forced to continue working as best he could, exacerbating his injuries.

61.     In the communications described above, Unum Group fraudulently requested and subsequently used CPT codes in order to classify Dr. Myers out of his occupation.  The communications described above contained material omissions relating to the use of CPT codes in a claim analysis as at all times Unum Group internally knew that CPT codes should not be used to determine occupation.

62.     In 2014, Dr. Myers obtained new counsel familiar with Unum Group and its affiliated entities' improper use of CPT codes, and through new counsel asked Unum Group to analyze his claim for disability without the use of CPT codes in a letter dated August 25, 2014. Dr. Myers' attorney specifically told Unum Group it was improper to use CPT codes to determine Dr. Myers' occupation in this letter.

63.     Based on the improper use of CPT codes to classify Plaintiff out of his occupation as an Interventional Cardiologist, Unum Group's admission that Dr. Myers had restrictions and limitations as early as 2005 and Defendants' complete failure to investigate Dr. Myers' claims and its failure to pay Dr. Myers on his policy, on August 27, 2014, Dr. Myers filed a Civil

Remedy Notice of Insurer Violations with the Florida Department of Financial Services against both Provident and Unum Group, copies of which are attached as **Composite Exhibit "2".**

64.     The Civil Remedy Notices of Insurer Violation ("CRN") gave Provident and Unum Group 60 days' notice to remedy their improper acts and approve the claim for total disability.  Provident and Unum Group did not remedy their improper acts within 60 days of receiving the Civil Remedy Notice, and denied liability in their response to the Civil Remedy Notices, a copy of which is attached as **Exhibit "3"**.

65.     Defendants, Unum Group and Provident had clear notice from the CRN that their use of CPT codes was improper because they justified the use of CPT codes in the response to the CRN. On October 21, 2014, Unum Group's letter in response to Dr. Myers' CRN repeatedly references CPT codes for page after page and attempts to justify their use to classify Dr. Myers out of his occupation. *See* Response to CRN Notice, "**Exhibit 3**."

66.     In another separate October 21, 2014 letter, Unum Group through Appeal Specialist Melissa Walsh again asked Dr. Myers for more CPT codes that were previously requested in 2010.  Highlighting the impropriety of the request, Ms. Walsh testified at a deposition in another case just a few months later on January 15, 2015 that CPT codes should not be used as the sole basis to determine occupation yet materially omitted this fact in the letter to Dr. Myers.

67.     Ms. Walsh also testified on January 15, 2015 that despite the fact Unum Group should not be using CPT codes to determine an insured's occupation, Unum Group uses CPT codes for analysis of occupation in all claims by medical specialists.

68.     In addition, Ms. Walsh testified that the important and substantial duties of a surgeon are performing surgery.

69.     Since Unum Group was aware that Dr. Myers was a surgeon who could no longer perform surgery, it had all of the information it needed to find he was totally disabled.

70.     Further, Defendant Provident specifically marketed the Policy in question to surgeons like Dr. Myers with a promise that if they cannot perform surgery they would be considered totally disabled.  The marketing material states:

> ● **You're considered totally disabled if you cannot perform the duties of your occupation.** You don't have to take a job paying you less to support your standard of living. If you're a surgeon and can no longer operate, Provident will consider you disabled—regardless of how much you can make teaching or in another profession. That definition of disability can be yours up to age 65 . . . even longer in some cases.

71.     Unum Group's in-house Cardiologist Dr. John Clarke testified in another case on July 8, 2009 that his definition of an interventional cardiologist is "somebody who does cardiac coronary interventions, cardiac interventions."

72.     Unum Group's senior vocational consultant Mary Cloutier testified in another case on May 14, 2009 that "my understanding of the important duties of an interventional cardiologist is that the cardiologist performs angioplasties and invasive procedures of both diagnostic and treatment nature."

73.     Unum Group was thus aware in 2009 and 2010 when it originally reviewed Dr. Myers' claim for disability that it should not have ever sought CPT codes and it had enough information to find that he was totally disabled from his occupation of Interventional Cardiologist.

74.     In the response letter to Dr. Myers' Civil Remedy Notice of October 21, 2014 wherein Unum Group maintained its fraudulent scheme despite having been explicitly told not to use CPT codes, Unum Group also stated that Dr. Myers' claim in 2009 reported his occupation as a mere Cardiologist. *See* Response to CRN Notice, "**Exhibit 3**." Unum Group's statement was false as Dr. Myers had listed his occupation as an Interventional Cardiologist on the 2009 claim form.

75.     Unum Group's false statement concerning Dr. Myers' occupation was intended to further its and its associated entities' fraudulent scheme to use CPT codes to classify medical specialists out of their medical specialty to support denials of disability claims.

76.     Unum Group's letter of October 21, 2014 notes that Dr. Myers met with Unum Group's claims investigator in person on February 22, 2010 at which time Dr. Myers "offered to produce copies of patient logs/appointment books, and pay records from 2004 forward." The letter also notes that Dr. Myers advised Unum Group in 2010 he previously performed more than 250 stent operations per year and Unum Group was aware that this number far exceeded the national average number of procedures performed by an Interventional Cardiologist. Unum Group ignored this information and did not obtain the offered records.

77.     Instead, as noted in the letter dated October 21, 2014, Unum Group maintained its position and use of CPT codes and stated:

> It was not until February 2010 that [Dr. Myers] informed our field representative he believed he stopped performing up to full capacity during 2005. At that time, we only had his billing codes for 2007, 2008, and 2 months in 2009. Those codes documented Dr. Myers was working as an Interventional and Invasive Cardiologist. Interventional Procedures represented a small percentage of his billings for this period of time.

78.     At all times that Unum Group requested CPT codes from Dr. Myers and used them to determine his occupation so as to deny his claim, Unum Group knew that it should not

be using CPT codes in such a manner.  In fact, Unum Group and its affiliated entities, including Defendant Provident were previously censured and fined by the California Department of Insurance in 2004 for improperly using CPT codes to determine occupation and classify medical specialists out of their occupation.

79.    In response to such censure, Unum Group and its affiliated entities promised in writing to implement additional training on this topic and cease such practice but clearly never did. Unum Group continued to improperly use CPT codes to determine occupation and did so in Dr. Myers' claim.

80.    Unum Group internally has recognized that the reason CPT codes should not be used to classify a medical specialist's occupation is because CPT codes cannot correlate pre- and post-operative office visits with their related surgical procedures and CPT codes cannot tell specific amounts of time that are spent on a particular duty.

81.    Although Unum Group has recognized that CPT codes should not be used as the sole or primary basis to determine a medical specialists' occupation, Unum Group nonetheless intentionally and fraudulently requested and used CPT codes to deny Dr. Myers' claim by asserting that his CPT codes established that he was not an Interventional Cardiologist while admitting that he was disabled from Interventional Cardiology.

82.    In a letter dated December 18, 2009, Unum Group falsely stated it was unable to evaluate Dr. Myers' claim without additional CPT code information and requested such information from Dr. Myers. On August 25, 2014, Dr. Myers provided this CPT code information to Unum.

83.    In a letter dated October 21, 2014, Unum Group, through lead appeals specialist Melissa Walsh, attached the December 18, 2009 letter a second time and sent it again to Dr.

Myers, falsely reiterating that Unum Group needs CPT codes to determine Dr. Myers' occupation.

84.     On November 20, 2014, at Unum Group's request, Dr. Myers provided Unum Group with business tax returns, the requested additional CPT codes, medical records, personal tax returns, and profit and loss statements even though Dr. Myers believed none of the requested information was relevant to determining whether he was disabled from Interventional Cardiology.

85.     Unum Group took from November of 2014 to March 10, 2015 to analyze the additional CPT codes Dr. Myers provided. To put the extensive amount of time in perspective, Unum Group's internal claims manual states that pursuant to Florida law, Unum Group must accept or deny a claim within 30 days after receipt of proof of a loss.

86.     On March 10, 2015, Unum Group representative Dawn Doud wrote to Dr. Myers and advised him that Unum Group had completed its preliminary review but needed even more CPT codes from 2009 to 2014 to complete its "analysis."  Dr. Myers provided these additional CPT codes to Unum on April 24, 2015.

87.     In a letter dated June 5, 2015, Unum Group presented Dr. Myers with its latest CPT code analysis which included 2009 to 2014, and admitted that for all of the procedures that Dr. Myers performed he would have been restricted from due to his disability: "It is our understanding that all of the procedures included in these charts involve standing and require the wearing of a lead vest."

88.     However, instead of making a decision on Dr. Myers' total disability claim, Unum Group continued to request additional information that was unrelated to a determination of total disability but which was related to residual disability and income.

89.     The Policy requires Dr. Myers to be "actively and gainfully working full time." Specifically, the Policy provides that if Dr. Myers was to "stop working, (except by reason of Total Disability), this policy will terminate[.]"

90.     Through counsel, Dr. Myers wrote Unum Group on June 30, 2015, and advised that Unum Group's continued use of CPT codes was improper and its failure to pay benefits under the Policy's total disability provisions greatly exacerbated Dr. Myers' injury by forcing him to work for all those years while his claim was reviewed and subsequently denied.

91.     Unum Group then continued reviewing the Policy for *another* three months and attempted to pacify Dr. Myers by providing him with limited benefits under the residual disability provisions of the Policy.

92.     In a letter dated September 10, 2015, Unum advised Dr. Myers that it found him to be totally disabled under a separate overhead policy issued by Provident (the "Overhead Policy") and paid him in full on such policy.  A true and correct copy of the Overhead Policy is attached hereto as **Exhibit "4".**

93.     The Overhead Policy's definitions of "Total Disability," "Injuries" and "Sickness" are identical to the definitions in the Policy.  *See* paragraphs 24-26, *supra*.

94.     In his application for the Overhead Policy, Dr. Myers listed his occupation as "Heart Catheterization Specialist."

95.     However, on the much larger individual own occupation Policy, Unum Group continued to use its fraudulent CPT code analysis to deny total disability and inexplicably find Dr. Myers was merely residually disabled for the time periods April 1, 2005 to January 1, 2006, and January 1, 2009 to September 1, 2011.  Unum Group paid Dr. Myers residual disability benefits under the Policy for these time periods in the amount of $575,683.54.

96.     To reach this conclusion, Unum Group stated in the letter of September 10, 2015: "The Practice Analysis/CPT information for the year 2004 provides us with a baseline of the substantial and material occupational duties that Dr. Myers performed prior to the onset of his restrictions and limitations."  From that baseline, Unum Group then analyzed the CPT codes for each year to classify Dr. Myers in and out of his occupation in order to reach its fraudulent conclusion.

97.     Unum Group's continued fraudulent use of CPT codes to deny Dr. Myers' total disability benefits in 2015 was particularly egregious in light of the multiple letters Dr. Myers' counsel sent to Unum Group advising that this practice was improper and the fact that Unum Group had already found Dr. Myers to be disabled from all Interventional Cardiology procedures.

98.     Further, to support its continued fraudulent position, Unum Group falsely advised Dr. Myers in the letter of September 10, 2015 that it had found no change in his medical condition over the years.  The letter stated, "In December 2014 we reviewed the additional medical information you provided to us: we concluded there had been no change in Dr. Myers' medical condition and the associated restrictions and limitations."

99.     Dr. Myers' counsel wrote to Unum Group on December 16, 2015 and advised that its statement that there had been "no change in his medical condition" was completely false and provided an analysis of his medical records evidencing a continued deterioration.  Dr. Myers also again pointed out the multiple issues with Unum Group's CPT code analysis and denial of total disability.

100.    In this letter dated December 16, 2015, since Unum Group was determined to use its CPT code analysis, Dr. Myers again pointed out the flaws in any CPT code analysis and requested Unum Group perform a Relative Value Unit analysis ("RVU") of Dr. Myers' practice.

101.    An RVU analysis takes the CPT codes and assigns a relative value to each in relation to the entire practice.  While still an improper way to determine occupation, it would highlight the relative value certain CPT codes have to the practice in relation to others.

102.    On February 12, 2016, Unum Group wrote to Dr. Myers and conceded that its prior statement that there had been no change in Plaintiff's medical condition was false: "We have completed our review of the medical information you submitted regarding Dr. Myers.  Our physician stated Dr. Myers' condition did gradually worsen over time, as would be expected, and this is supported by the progressive changes seen in his lumbar MRI scans."

103.    Unum Group then asserted it would retain an outside expert to conduct the RVU analysis.

104.    In response to this continued delay, Dr. Myers' counsel in a letter dated March 14, 2016 protested that, "Unum has taken far too long in its evaluation on this case and I request you ask the independent consultant who is conducting the RVU analysis to complete it as quickly as possible."

105.    Unum Group retained an accounting firm, NawrockiSmith, to conduct the RVU analysis.  However, notwithstanding the copious amounts of information Dr. Myers had already provided to Unum Group, in a May 6, 2016 letter NawrockiSmith requested additional extremely burdensome and inappropriate information including patient files and information which Dr. Myers could not legally provide.

106.   NawrockiSmith also has been retained as Unum Group's expert in numerous litigation cases to provide expert reports on behalf of Unum Group.

107.   From May of 2000 to the present, Unum Group has engaged NawrockiSmith as an expert to opine in legal cases as to a determination of occupation for medical specialists using CPT codes. NawrockiSmith has over the past two decades consistently assisted Unum Group in its fraudulent scheme by using CPT codes to classify medical specialists out of their occupation.

108.   Unum Group's representative from NawrockiSmith, Ernest Smith, conducted an in-person interview with Plaintiff on March 30, 2017 and was provided a foot high stack of documents he had requested which could be provided. Mr. Smith improperly requested to see patient records and obtain access to Plaintiff's computer system but Plaintiff refused as that would violate HIPAA. Then in letters dated April 7, 2017 and July 10, 2017, Mr. Smith requested still more information unrelated to a determination of total disability including payroll summary reports, W-2s and tax returns, as well as productivity reports for *other* doctors employed by Dr. Myers' practice.  Dr. Myers complied with the copious and continual requests for information by Unum Group and incurred great expense in doing so.

109.   In an August 10, 2017 letter, Dr. Myers' counsel again expressed dismay at the completely inappropriate amount of time Unum Group's claims process was taking.  The letter stated, "The years of constant evaluation by Unum of documents and information which are immaterial to the actual claim determination and the resultant delay in a determination of benefits has caused Dr. Myers considerable physical stress and strain."

110.   Unum Group finally received a report from NawrockiSmith in September of 2017, yet in October of 2017 Unum Group asserted it needed even more time to consider the report.

111.    On October 16, 2017, before Unum Group made a decision on the claim, Dr. Myers was contacted by a Unum Group representative who inquired whether he was interested in a lump sum settlement.  Dr. Myers indicated he was.

112.    Unum Group's offer to settle in a lump sum was a recognition that Dr. Myers was not going to ever recover from his total disability and benefits would continue for the remainder of his life.

113.    Inexplicably, Unum Group did not pursue settlement further and instead issued a letter on October 20, 2017 stating that it had found Dr. Myers to be residually disabled from April 1, 2005 to January 1, 2006, and totally disabled on and after January 1, 2006.  Finally, after an eight-year investigation of his claim, Unum Group determined Plaintiff to be totally disabled.

114.    Unum Group issued benefit payments to Dr. Myers in the amount of $576,753.30 for this time period as it had already previously paid $503,246.70 in residual disability payments for overlapping time periods.

115.    However, in its October 20, 2017 letter and for the very first time, Unum Group unilaterally determined that Dr. Myers' total disability was due to *sickness* as opposed to *injury*. At no point in the nearly eight years Unum Group spent investigating Dr. Myers' claim for total disability did the issue of whether his disability was caused by injury or sickness arise.

116.    Unum Group's about-face as to the reason for the disability is significant because under the Policy, "[t]he maximum benefit period for Total Disability due to Sickness starting at Age 61 but before Age 62 is 48 months."  Dr. Myers was age 61 in 2005.  Thus, Unum Group's fraudulent determination that his disability was as a result of sickness limits benefit payments to only 48 months instead lifetime benefits.

117.    Had Unum Group truly believed that Dr. Myers' disability was caused by sickness, and benefits were for a set period, there would have been no reason for Unum Group to contact Dr. Myers only four days earlier to inquire whether he would be interested in a lump sum settlement. A lump sum settlement is appropriate when benefits are likely to continue for the foreseeable future.

118.    According to Unum Group's internal claims manual, a lump sum settlement is calculated by a member of Unum's Financial Services Unit by estimating the net present value of future benefits through the use of a present value calculation tool developed by the firm's actuarial department.  This tool takes into account variables such as mortality ratings.

119.    Had Unum Group attempted to negotiate a lump sum settlement on behalf of Provident on benefits payable for a set period that ended in the past with no future expected payments, such practice would have violated Florida Statute, Section 624.155 and constitute a bad faith practice.

120.    Accordingly, Unum Group either violated Florida statutes or internally recognized four days before it denied lifetime benefits that Plaintiff was entitled to lifetime benefits.

121.    Dr. Myers immediately requested an appeal review of the decision on October 20, 2017, which was conducted by Melissa Walsh.

122.    Unum Group through Ms. Walsh responded on November 9, 2017, denying the appeal on the basis that, "Neither you nor Dr. Myers have previously reported that Dr. Myers' Total Disability began prior to age 60, or was due to an Injury."  Dr. Myers never previously reported that his total disability was due to a sickness either and Unum Group never inquired whether the disability was caused by an injury.

123.    On December 4, 2017, Dr. Myers provided Unum Group with the specifics of the injury that occurred leading to his total disability, stating:

> Dr. Myers was injured while performing an interventional coronary procedure in 1998-1999.  He was wearing a heavy leaded gown and bending over during a prolonged procedure when he suddenly felt pain in the lower back and had sciatic pain in the buttock and leg.  Dr. Myers immediately went to see Dr. William McComb regarding this injury.  Dr. McComb confirmed that the injury Dr. Myers had suffered was an acute herniated nucleus polyposis secondary to the heavy leaded gown.

124.    Dr. McComb, the chiropractor who treated Dr. Myers' injury in 1998, wrote a letter which was provided to Unum Group explaining his excellent and specific recollection of Plaintiff's original injury but that no written records were kept that far back.  Unum Group's claim file specifically referenced this chiropractor and incident yet Unum Group failed to inquire or seek any information from Dr. McComb in the claim process.

125.    In addition, the nature of Dr. Myers' condition is such that the weight of the heavy leaded gowns caused his injury; the injury did not spontaneously occur as a result of a sickness.

126.    Dr. Myers thus has both an injury over time caused by the weight of lead gowns as well as a specific sudden injury caused by the weight of the lead gowns which thereafter caused spinal deterioration.

127.    On February 8, 2018, Unum Group maintained its position and denied Dr. Myers' claim for lifetime benefits: "We have concluded his claim was appropriately managed as a Sickness and he has reached the Maximum Benefit Period under his claim."

128.    Unum Group never contacted Dr. McComb to inquire about the 1998 injury.  Unum Group has also historically treated spinal injuries caused by the weight of lead vests to be considered an injury as opposed to a sickness.

## THE SCHEME

129.     Unum Group and its affiliated entities, including Defendant Provident, have engaged in fraudulent claims handling practices with the goal of denying otherwise valid claims to make money (the "Scheme").

130.     The Scheme improperly targeted high reserve "own occupation" disability benefits claims for denial or termination that were part of a "Closed Block" of "own occupation" policies no longer sold by Provident or Unum Group's other predecessors, subjecting Plaintiff and other similarly situated insureds to abusive and sham claims practices and procedures.

131.     The Scheme began in 1994 with Defendant Provident and was continued through each successive merger to the present with Defendant, Unum Group.

132.     Provident used the income from denying claims to acquire Paul Revere Life Insurance Company in 1996.

133.     In 1999, when Provident Companies merged with Unum Group to become UnumProvident, the fraudulent scheme to deny claims was implemented at UnumProvident, which ultimately became Unum Group.  Unum Group uses the scheme to deny own occupation disability claims for dozens of separate companies who have entered into general services agreements with Unum Group for it to handle their claims.

134.     Unum Group's employees from the claim handler to the senior executives are compensated at a higher rate for denying claims and penalized if they do not deny a sufficient amount of claims.

135.     Unum Group's 2011 Annual Report shows its Closed Block was performing poorly because the policies were no longer sold and premium income was in a constant state of

decline while claim risks were increasing due to longer life expectancy which creates longer payouts.

136.    As a result, in 2011, Unum Group had to increase its Closed Block reserves by $183.5 million.

137.    Unum Group's 2013 Proxy Statement notes struggles with profitability in the Closed Block through 2012 and executive compensation was reduced because of underperformance in the Closed Block.

138.    The 2013 Proxy Statement notes for COO Kevin McCarthy, "His annual incentive is slightly lower than last year because of underperformance in the Closed Block."  CEO Tom Watjen and CFO Richard McKenney also had reduced incentive compensation because of the Closed Block underperformance.

139.    At Unum Group, as much as 88% of executives' compensation is contingent upon performance and is thus "at risk."

140.    As a result of the Closed Block underperformance and failure to deny sufficient claims to maintain profitability, Unum Group CEO Tom Watjen appointed Jack McGarry to the position of Executive Vice President, Individual Disability and Long-Term Care Closed Block Operations in September 2012.

141.    Mr. McGarry took charge of the Closed Block on September 23, 2012 and his biography on Unum Group's website states that he "...re-engineered the financial management strategy for the block...."

142.    Mr. McGarry linked incentive compensation and performance reviews to profitability of the Closed Block, knowing that since the Closed Block no longer sold policies, the only increase in revenue could come from an increase in denial of claims.

143.    Pursuant to the Scheme to deny legitimate disability claims without regard to merit, Mr. McGarry in 2012 devised, implemented and/or revised a plan to increase profitability in the Closed Block by using historically profitable claim denial rates as a baseline and measure to implement current claim denial rates, instead of evaluating each claim on a case-by-case basis.

144.    Other hallmarks of Unum Group's Scheme include:

    a.    targeting long-term disability claims with high reserves, exactly like Dr. Myers' claim, where the insured was a disabled "own occupation" policyholder who had been or would otherwise rightfully be receiving benefits for years or lifetime;

    b.    conducting "roundtables," meetings where Unum Group employees brainstormed and formulated ways to deny legitimate claims;

    c.    Using CPT code analysis to classify specialist physicians and surgeons out of their occupations;

    d.    employing various incentives and awards to reward claims handlers with high termination rates, and penalizing claims handlers if they did not deny a sufficient number of claims;

    e.    relying on the opinions of in-house and outside medical personnel and accountants who never examined the insured over opinions of treating physicians or IME physicians; and

    f.    cherry-picking or actively misrepresenting findings in records to find grounds for denying claims regardless of merit.

145.    Unum Group knew that many of these tactics listed above, especially using historically profitable claim denial rates as a baseline, would increase revenue for the Closed

Block because its predecessors, including Defendant Provident, had previously instituted many of these same tactics starting in 1994 to address the high levels of payable claims which were coming from Provident's Closed Block at that time.

146. A Provident memorandum dated September 29, 1994 states that "[i]n hindsight, it is generally viewed that the [own occupation disability] policies sold during this period [the 1980s] were poorly underwritten and underpriced."

147. As a result of the deleterious financial impact of claims on the portfolio of in-force, long-term, individual "own occupation" policies, in 1994, Provident adopted a practice, pattern and policy of wrongfully and intentionally denying and terminating legitimate disability claims filed by long-term, individual own occupation policyholders.

148. On May 22, 1995, Provident's Senior Vice President in charge of Customer Care Ralph Mohney sent a memorandum to then CEO J. Harold Chandler, addressing the Scheme's goal of denying and terminating legitimate claims which would, in turn, provide a corresponding increase in "annual savings" to the company, and describes the initiatives adopted to "move Provident from a claims payment to a claims management approach."

149. Chandler responded to the memorandum stating, "Begin implementation. Move w/sense of urgency w/o risk of being out of control."

150. After adopting these unscrupulous and fraudulent tactics to deny legitimate disability claims, Provident turned a profit in 1995 and continued to do so in the following years as these practices were continued.

151. In 2011, when the Closed Block began performing poorly again, Unum Group revitalized the Scheme as described above and used many of the same tactics to deny legitimate claims, including Plaintiff's. Pursuant to the Scheme, Unum Group's senior management closely

monitored, directed and unethically intervened in the claims review and decision-making process.

152.    Unum Group's Management Incentive Compensation Plan states at §1.2, "The purpose of the Plan is to motivate the Participants to perform in a way that will enable Unum Group to reach or exceed its Goals."

153.    Premiums received by insurers like Provident are a source for producer compensation and bonuses, reserves, claims, expenses, and other normal business activities for both Defendants.

154.    Dr. Myers' claim was the subject of this increased denial of claims. Unum Group performed roundtables on Plaintiff's claim and improperly requested and used CPT codes on multiple occasions to classify him out of his occupation to support denial of his claim.

155.    Defendants pay out approximately $65 million per year in annual incentives which are derived in part from premiums.

156.    Failure of claims handlers, including physician reviewers, to follow the directives of senior management and deny a certain proportion of disability claims, even when the claims recommendation was inappropriate given the supportive claims data, resulted in negative employment consequences, including termination.

157.    Conversely, claims handlers were rewarded and promoted based upon achievement of claims termination and denial goals.

158.    Claim handlers who deny claims below what has historically made Unum Group profitable are given poor performance reviews and are considered "Below Plan" on internal reviews called Scorecards.  "Below Plan" performance results in decreased total compensation to the employees of Unum Group.

159.    Claim handlers who deny claims above the historically profitable rates are determined to be "Above Plan" on the Scorecard and were provided with increased total compensation.

160.    On this Scorecard at the bottom, Defendant Unum Group has an Appeal Uphold Rate with the "expectation" that such rate will exceed 75%.

161.    Unum Group also maintains a "Weekly Tracking" document that notes the liability acceptance rate, and there are columns for "actual" and columns for "Plan." Thus, if the Closed Block accepts too much liability and does not deny enough claims, it is "Below Plan," and incentive compensation is reduced.

### Unum Group Used the Scheme to Deny Dr. Myers Proper Benefits

162.    Each of the aforementioned hallmarks of Unum Group's Scheme was utilized in the administration of Dr. Myers' claim to deny his legitimate claim to monthly total disability benefits.

163.    Each of the aforementioned hallmarks of Unum Group's Scheme was effectuated by use of the U.S. Mail and via telephonic discussions between representatives of Unum Group, acting as claims administrator for Provident, and Dr. Myers.

164.    Dr. Myers' claim was targeted and denied for fraudulent and meritless reasons as a result of this Scheme.

165.    Dr. Myers' benefit claims denials were part of Unum Group's deliberate and continuing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics.

166.    From 1988 to date, and each year that Plaintiff paid Provident premiums to maintain his coverages in force, neither Provident nor Unum Group disclosed to Plaintiff that

they had adopted unethical or illegal claims handling practices intended to facilitate termination and denial of medical specialists' claims.

167.   From 1988 to date, neither Provident nor Unum Group informed Plaintiff that if he made a claim for disability benefits in the future, they would make every attempt possible to deny or terminate the claim through fraudulent internal claim process and procedures, for any attainable reason.

168.   After Plaintiff's purchase of the Policy, Provident did not charge Plaintiff a lower premium, despite Provident's change in its claims handling procedures through Unum Group and marked alteration of the lack of intent to honor the Policy, and the relative worthlessness of the Policy due to such changes.

169.   At the time Provident continued to charge Plaintiff the same premiums that he had paid since the inception of the Policy, Provident knew that Plaintiff would have less of a chance of recovering on a claim made for disability benefits after 2009 than he would have had he made a claim for disability coverage prior to 2009.

170.   Because of Defendants' conduct as aforementioned, Plaintiff had less or no disability income insurance coverage.

*Use of the Scheme by Non-Unum Companies*

171.   The Non-Unum Companies contracted with Unum Group through Administrative Services Agreements wherein Unum Group would receive financial remuneration from the Non-Unum Companies for aggressively administering the disability claims brought by insureds under policies underwritten by each of New York Life Insurance Company, John Hancock Life Insurance Company and Metropolitan Life Insurance Company.

172.   The Non-Unum Companies specifically sought out and benefitted from Unum Group's aggressive administration of claims because this conduct served to minimize their liability on legitimate claims.

173.   Each of the Non-Unum Companies knew and was fully aware of the reputation held by Unum Group as a leader in aggressive disability claims administration.

174.   Each of the entities comprising the Non-Unum Companies knew and was fully aware that through the direct conduct perpetrated by Unum Group in connection with administration and ultimate termination of legitimate disability claims, the Non-Unum Companies' liabilities would be reduced.

175.   Each of the entities comprising the Non-Unum Companies contracted Unum Group to administer their disability claims handling with knowledge of Unum Group's claims denial strategy and with the specific intent that Unum Group deny the vast majority of outstanding disability claims in order to minimize their liability on legitimate claims.

176.   Each of the entities comprising the Non-Unum Companies turned a blind eye to the fraudulent conduct exhibited by Unum Group toward insureds/contracting parties under disability insurance contracts with each of the Non-Unum Companies.

177.   In so doing, the Non-Unum Companies greatly increased the scope of Unum Group's Scheme and the overall enterprise.

178.   Failure to act to forestall, suspend and/or stop Unum Group from continuing the conduct comprising Unum Group's Scheme while all the while benefitting from the Scheme amounts to a facilitation of such Scheme.

179.    The continuation of Administrative Services Agreements by and between each of the Non-Unum Companies for such aggressive and unlawful claim administration under their respective policies amounts to a facilitation of such Scheme.

**COUNT 1– VIOLATION OF CHAPTER 624 OF
THE FLORIDA STATUTES (BAD FAITH)
(against Defendant Provident)**

180.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 170 above as though fully set forth herein.

181.    Florida Statute, Section 624.155 provides a civil remedy for certain enumerated insurance bad faith practices.

182.    Florida Statute, Section 624.155(1)(b)(1) states that it is unlawful for an insurer to "[n]ot attempt[] in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests."

183.    Between 2009 when Plaintiff filed his initial disability claim and 2014 when Plaintiff filed his Civil Remedy Notice, Provident did not attempt in good faith to settle Plaintiff's claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward the insured and with due regard for his interests, in violation of its duties under Chapter 624 of the Florida Statutes.

184.    Further, Florida Statute, Section 624.155 provides that any violation of Section 626.9541(1)(i) also is unlawful.  Under Section 626.9541(1)(i), Provident  is prohibited from the following practices:

1.    Attempting to settle claims on the basis of an application, when serving as a binder or intended to become a part of the policy, or any other material

document which was altered without notice to, or knowledge or consent of, the insured;

2. A material misrepresentation made to an insured or any other person having an interest in the proceeds payable under such contract or policy, for the purpose and with the intent of effecting settlement of such claims, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy; or

3. Committing or performing with such frequency as to indicate a general business practice any of the following:

   a. Failing to adopt and implement standards for the proper investigation of claims;

   b. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

   c. Failing to acknowledge and act promptly upon communications with respect to claims;

   d. Denying claims without conducting reasonable investigations based upon available information;

   e. Failing to affirm or deny full or partial coverage of claims, and, as to partial coverage, the dollar amount or extent of coverage, or failing to provide a written statement that the claim is being investigated, upon the written request of the insured within 30 days after proof-of-loss statements have been completed;

   f. Failing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement.

185. Based upon the above facts, Provident has violated Florida Statute, Sections 626.9541(1)(i) and 624.155.

186. Between 2009 and 2014, Provident violated Florida Statute Section 626.9541(1)(i)(3)(a) when its claims handler Unum Group failed to adopt and implement standards for the proper investigation of claims and use of CPT codes.

187.    Provident repeatedly violated Florida Statute Section 626.9541(1)(i)(3)(b) between 2009 and 2014 when its agent and claims handler Unum Group used a CPT code analysis to classify Plaintiff out of his occupation in order to deny his claim.

188.    When Unum Group on behalf of Provident paid Dr. Myers and determined total disability, liability was established, as well as a determination of the damages amount which was paid to Dr. Myers.

189.    Provident violated Florida Statute Section 626.9541(1)(i)(3)(d) when it failed to conduct any investigation into Plaintiff's 1998 injury.

190.    Plaintiff was forced to retain and pay an attorney to recover his benefits.

191.    As a result of Provident's actions, Plaintiff has been damaged.   Provident has caused emotional distress and exacerbation of Plaintiff's injuries when he was forced to continue to work.

WHEREFORE, Plaintiff seeks:

(a)    Reasonable attorneys' fees;

(b)    Interest and Compensatory damages;

(c)    Such other benefits as this Court may deem appropriate and just.

### COUNT 2 – BREACH OF FIDICUARY DUTY
### (against Defendant Unum Group)

192.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 170 above as though fully set forth herein.

193.    By virtue of Unum Group's representations to the public and to Plaintiff, and by virtue of its position as administrator of claims, and by virtue of Unum Group, through Provident, having accepted Plaintiff's premium payments for disability insurance coverage, and

in light of its responsibility to administer claims for benefits fairly, Unum Group stood in a special relationship of trust and confidence to Plaintiff amounting to a fiduciary relationship.

194.    Some if not all of the duties owed by Unum Group arose from dealings that are separate and apart from Provident's contractual relationship with Plaintiff.

195.    Said fiduciary capacity required Unum Group to place Plaintiff's interests above its own in the handling of his claim for benefits.

196.    The fiduciary duties owed to Plaintiff included a duty of ethical claims handling, including the duty to disclose to the insured all facts under which benefits could be available and all facts known to Unum Group that would support a finding of benefits coverage on Plaintiff's behalf.

197.    Upon information and belief, at the various times Unum Group received Plaintiff's disability claims, Unum Group continued to receive numerous claims from other disability insurance policyholders in which these policyholders claimed that Unum Group improperly handled their claim and denied insurance benefits for the insurers in bad faith.

198.    This in turn threatened Unum Group with adverse financial impact should it pay all legitimate "own occupation" claims under this line of insurance without delay.

199.    As a direct and proximate result of Unum Group's conduct, alleged above, Unum Group breached its fiduciary duties and as such, caused Plaintiff to suffer severe, extreme, and continuing financial, physical, emotional and mental injury and damage.

WHEREFORE, Plaintiff seeks judgment against Defendant Unum Group, including:

(a)    Punitive and exemplary damages in an amount to be determined at trial according to proof.

(b)    Such other benefits as this Court may deem appropriate and just.

## COUNT 3 - RICO - 18 U.S.C. §1962(a)
### (against Defendants Provident and Unum Group)

200.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 179 above as though fully set forth herein.

201.    Provident and Unum Group derived income, either directly or indirectly, from a pattern of racketeering activity.

202.    The racketeering activity conducted by Provident and Unum Group is mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343.

203.    Provident and Unum Group engaged in a fraudulent scheme to deny legitimate disability claims, including Plaintiff's claim, to increase profitability.

204.    Provident and Unum Group use the interstate mail and telephone to communicate with those who make claims for disability and to perpetuate this fraud, and have used the mail and wires dozens of times in Plaintiff's case, in yearly notices of premiums due, as well as letters to Plaintiff and his counsel dated 5/5/09, 10/6/09, 4/29/10, 10/21/14, 9/10/15, 5/6/2016, 4/7/17, 7/10/17, 10/20/17, 11/9/17, and 2/8/18.

205.    The collective actions of Provident and Unum Group are related to one another and establish a pattern of racketeering activity as they have a similar purpose, similar methods and similar victims.

206.    Provident and Unum Group participated as principals in the pattern of racketeering activity.

207.    As principals, Provident and Unum Group willfully and intentionally committed the pattern of racketeering alleged.

208.    The pattern of racketeering activity conducted by Provident and Unum Group has continued since 2000 and is likely to be repeated in the future.

209.    Part of the income or proceeds that Provident and Unum Group obtained from Plaintiff through racketeering activity was used to acquire or maintain an interest in, or to operate, an enterprise as defined by 18 U.S.C. § 1961(4). Unum Group and its subsidiaries, including Provident and Paul Revere, used this racketeering income to become the dominant disability insurer in the country and perpetuate the fraud described herein.

210.    Unum Group and its subsidiaries, including Paul Revere and Provident, and its common claims handling unit, as well as other independent insurers such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company who use Unum Group's common claims handling unit and methods, as well as the firm of NawrockiSmith and Ernest Smith, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

211.    Defendants engaged in a fraudulent scheme to deny disability claims of medical specialists by solely and improperly using CPT codes to classify a medical specialist out of their occupation so that Defendants can claim such medical specialist is not disabled from his or her occupation.

212.    Defendants, in order to maximize profits, steer claimants away from total disability and towards residual disability. This occurred with Plaintiff when, after an extended review of his total disability claim, they found him residually disabled.

213.    Defendants inform claimants that they are not totally disabled before even making a determination of the claimant's occupation and when making a determination of occupation for medical specialists solely and improperly use CPT codes as the sole basis for such occupational determination.

214.    For example, Unum Group will review the CPT codes of an interventional cardiologist and fraudulently determine that since the actual surgical procedures performed only

constituted a minority of gross revenue (i.e., 20%), such interventional cardiologist was not in fact an interventional cardiologist but rather a cardiologist who performs some Interventional Cardiology or is both an interventional cardiologist and a cardiologist.

215.     The result is that most if not all medical specialists have their claims denied because Defendants fraudulently classify them out of their occupation.

216.     Defendants committed the same fraud against Plaintiff.

217.     As principals in the enterprise, Provident and Unum Group were also the direct beneficiaries of the proceeds from the pattern of racketeering activity.

218.     Provident and Unum Group engaged in, and their activities have substantially affected, interstate commerce in that they receive interstate disbursements of millions or billions of dollars in premiums, Provident marketed and sold its policies throughout the country, and they commit or cause to be committed fraud in handling claims filed by medical specialists, like Dr. Myers, from around the country.

219.     Plaintiff suffered a "racketeering injury" that flowed from the use of Provident and Unum Group's investment of racketeering income.

220.     Specifically, had Provident and Unum Group not perpetuated their company-wide strategy to wrongfully deny long term disability claims through the operation of the enterprise supported by investment of racketeering income, Plaintiff's benefits would not have been denied by Provident and Unum Group.

221.     Plaintiff suffered a cognizable "investment injury" that flowed from the use of Provident and Unum Group's investment of racketeering income in that Provident and Unum Group used such income to provide claims handlers with increased compensation as incentive to deny claims.

222.    Such conduct prevented Plaintiff from considering doing business with a wider variety of disability insurers with which to choose from, especially disability insurers that would have provided Plaintiff with quality service and honored their contractual obligations. Many other insurers thereafter engaged Unum Group to handle their disability claims.

223.    As a result of Provident and Unum Group's actions, Plaintiff was damaged.

224.    By implementing the Scheme as described herein, Provident and Unum Group violated 18 U.S.C. §1962(a).

WHEREFORE, Plaintiff seeks:

(a)    Three-fold the damages sustained by Plaintiff by reason of the violations under 18 U.S.C. §1964.

(b)    Reasonable attorneys' fees and costs for representation in this action under 18 U.S.C. §1964.

(c)    Such other benefits as this Court may deem appropriate and just.

## COUNT 4 - RICO - 18 U.S.C. §1962(b)
### (against Defendants Provident and Unum Group)

225.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 179 above as though fully set forth herein.

226.    Provident and Unum Group derived income, either directly or indirectly, from a pattern of racketeering activity.

227.    The racketeering activity conducted by Provident and Unum Group is mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343.

228.    Provident and Unum Group denied Plaintiff's disability claim to increase profitability in part by using CPT codes to classify Plaintiff out of his medical specialty and claim he was not disabled to support denial of his disability claim.

229.   Provident and Unum Group also denied Plaintiff's claim to increase profitability by fraudulently classifying Plaintiff's back injuries as a sickness.

230.   Upon information and belief, Defendants have committed the same fraud against all other medical specialists in the country who have made claims for disability.

231.   Defendants use the mail and telephone to communicate with those who make claims for disability and to perpetuate this fraud, and have used the mail and wires dozens of times in yearly premiums and letters regarding CPT codes.

232.   Defendants use the mail and wires to both request CPT codes from claimants and communicate the fraudulent occupational determination to claimants.

233.   The racketeering activity conducted by Provident and Unum Group is mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

234.   Unum Group engaged in a fraudulent scheme to deny legitimate disability claims, including Plaintiff's claim, to increase profitability.

235.   Provident and Unum Group use the interstate mail and telephone to communicate with those who make claims for disability and to perpetuate this fraud, and have used the mail and wires dozens of times in Plaintiff's case, in Provident's yearly notices of premiums due, as well as letters from Unum Group to Plaintiff and his counsel dated 5/5/09, 10/6/09, 4/29/10, 10/21/14, 9/10/15, 5/6/2016, 4/7/17, 7/10/17, 10/20/17, 11/9/17, and 2/8/18.

236.   The collective actions of Provident and Unum Group as well as the Non-Unum Companies are related to one another and establish a pattern of racketeering activity as they have a similar purpose, similar methods and similar victims.

237.   Provident and Unum Group participated as principals in the pattern of racketeering activity.

238.    As principals, Provident and Unum Group willfully and intentionally committed the pattern of racketeering alleged.

239.    The pattern of racketeering activity conducted by Provident and Unum Group has continued since 2000 and is likely to be repeated in the future.

240.    Part of the income or proceeds that Provident and Unum Group obtained from Plaintiff through racketeering activity was used to acquire or maintain an interest in, or to operate, an enterprise as defined by 18 U.S.C. §1961(4).

241.    Unum Group and its subsidiaries, including Provident, used this racketeering income to become the dominant disability insurer in the country and perpetuate the fraud described herein.

242.    Unum Group and its subsidiaries, including Paul Revere and Provident, and its common claims handling unit, as well as other independent insurers such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company who use Unum Group's common claims handling unit and methods, as well as the firm of NawrockiSmith and Ernest Smith, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

243.    As principals in the enterprise, Provident and Unum Group were also the direct beneficiaries of the proceeds from the pattern of racketeering activity.

244.    Through its pattern of fraudulent activity, Unum Group acquired or maintained, directly or indirectly, an interest in or control of the enterprise.

245.    Provident and Unum Group engaged in, and their activities have substantially affected, interstate commerce in that they receive interstate disbursements of millions or billions of dollars in premiums, Provident marketed and sold its policies throughout the country, and they

commit or cause to be committed fraud in handling claims filed by medical specialists, like Dr. Myers, from around the country.

246.    Plaintiff suffered a "racketeering injury" that flowed from the use of Provident and Unum Group's investment of racketeering income.

247.    Specifically, had Provident and Unum Group not perpetuated their company-wide strategy to wrongfully deny long term disability claims through the operation of the enterprise supported by investment of racketeering income, Plaintiff's benefits would not have been denied by Provident and Unum Group.

248.    Plaintiff suffered a cognizable "investment injury" that flowed from the use of Provident and Unum Group's investment of racketeering income in that Provident and Unum Group used such income to provide claims handlers with increased compensation as incentive to deny claims..

249.    Such conduct prevented Plaintiff from considering doing business with a wider variety of disability insurers with which to choose from, especially disability insurers that would have provided Plaintiff with quality service and honored their contractual obligations. Many other insurers thereafter engaged Unum Group to handle their disability claims handling.

250.    As a result of Provident and Unum Group's actions, Plaintiff was damaged.

251.    By implementing the Scheme as described herein, Provident and Unum Group violated 18 U.S.C. §1962(b).

WHEREFORE, Plaintiff seeks:

(a)    Three-fold the damages sustained by Plaintiff by reason of the violations under 18 U.S.C. §1964.

(b)     Reasonable attorneys' fees and costs for representation in this action under 18 U.S.C. §1964.

(c)     Such other benefits as this Court may deem appropriate and just.

### COUNT 5 - RICO - 18 U.S.C. §1962(c)
### (against Defendants Provident and Unum Group)

252.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 179 above as though fully set forth herein.

253.    Provident and Unum Group derived income, either directly or indirectly, from a pattern of racketeering activity.

254.    The racketeering activity conducted by Provident and Unum Group is mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343.

255.    Defendants engaged in a fraudulent scheme to deny disability claims to increase profitability.

256.    Provident and Unum Group committed the same fraud against Plaintiff.

257.    Provident and Unum Group use the interstate mail and telephone to communicate with those who make claims for disability and to perpetuate this fraud, and have used the mail and wires dozens of times in Plaintiff's case, in Provident's yearly notices of premiums due, as well as Unum Group's letters to Plaintiff and his counsel dated 5/5/09, 10/6/09, 4/29/10, 10/21/14, 9/10/15, 5/6/2016, 4/7/17, 7/10/17, 10/20/17, 11/9/17, and 2/8/18.

258.    The collective actions of Provident and Unum Group are related to one another and establish a pattern of racketeering activity as they have a similar purpose, similar methods and similar victims.

259.    Provident and Unum Group participated as principals in the pattern of racketeering activity.

260.    As principals, Provident and Unum Group willfully and intentionally committed the pattern of racketeering alleged.

261.    The pattern of racketeering activity conducted by Provident and The Unum Group has continued since 2000 and is likely to be repeated in the future.

262.    Part of the income or proceeds that Provident and Unum Group obtained from Plaintiff through racketeering activity was used to acquire or maintain an interest in, or to operate, an enterprise as defined by 18 U.S.C. §1961(4).   Unum Group and its subsidiaries, including Provident, used this racketeering income to become the dominant disability insurer in the country and perpetuate the fraud described herein.

263.    Unum Group and its subsidiaries, including Paul Revere and Provident, and its common claims handling unit, as well as other independent insurers such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company who use Unum Group's common claims handling unit and methods, as well as the firm of NawrockiSmith and Ernest Smith, constitute and "enterprise" as defined by 18 U.S.C. § 1961(4).

264.    As principals in the enterprise, Provident and Unum Group were also the direct beneficiaries of the proceeds from the pattern of racketeering activity.

265.    Through their pattern of fraudulent activity, Provident and Unum group participated, directly or indirectly, in the conduct of the affairs of the enterprise.

266.    Provident and Unum Group engaged in, and their activities have substantially affected, interstate commerce.

267.    Provident and Unum Group participated in the conduct of such enterprise's affairs through a pattern of racketeering activity in that they received interstate disbursements of millions or billions of dollars in premiums, Provident marketed and sold its policies throughout

the country, and Unum Group commits or causes to be committed fraud in handling claims filed by medical specialists, like Dr. Myers, from around the country.

268. Plaintiff suffered a "racketeering injury" that flowed from the use of Provident and Unum Group's investment of racketeering income.

269. Had Provident and Unum Group not perpetuated their company-wide strategy to wrongfully deny long term disability claims through the operation of the enterprise supported by investment of racketeering income, Plaintiff's disability claim would have been honored by Provident and Unum Group.

270. Furthermore, Plaintiff suffered a cognizable "investment injury" that flowed from the use of Provident and Unum Group's investment of racketeering income, in that Provident and Unum Group used such income to provide claims handlers with increased compensation as incentive to deny claims..

271. Such conduct prevented Plaintiff from considering doing business with a wider variety of disability insurers with which to choose from, especially disability insurers that would have provided Plaintiff with quality service and honored their contractual obligations. Many other insurers thereafter engaged Unum Group to handle their disability claims handling.

272. As a result of Provident and Unum Group's actions, Plaintiff was damaged.

273. By implementing the Scheme as described herein, Provident and Unum Group violated 18 U.S.C. §1962(c).

WHEREFORE, Plaintiff seeks:

(a) Three-fold the damages sustained by Plaintiff by reason of the violations under 18 U.S.C. §1964.

(b)      Reasonable attorneys' fees and costs for representation in this action under 18 U.S.C. §1964.

(c)      Such other benefits as this Court may deem appropriate and just.

## COUNT 6 – FRAUD AS TO STATEMENTS AND OMISSIONS REGARDING NATURE AND QUALITY OF POLICY (against Defendant Provident)

274.    Plaintiff hereby re-alleges and incorporates paragraphs 7 through 128 above as though fully set forth herein.

275.    In reliance upon Provident's agent's representations regarding the quality of and coverage which would be provided to him in his own occupation, Plaintiff purchased the Policy and dutifully paid thousands of dollars in premiums every year.

276.    This statement, as well as the statements referenced above and specifically in paragraphs 20 and 21, *supra*, were misrepresentations and omissions regarding the nature and quality of the coverage Provident provided.

277.    In an October 6, 2009 letter to Plaintiff, Unum Group, acting as Provident's claims handler, stated, "Based on our review of the CPT codes, it does not appear that these restrictions and limitations have had an impact on his ability to perform the duties of his occupation."

278.    From 1988 to date, and each year that Plaintiff was required to renew the policy and pay additional premiums, neither Unum Group nor Provident ever disclosed to Plaintiff that they had adopted unethical or illegal claims handling practices and an intensive joint claims/legal special review process intended to facilitate termination and denial of medical specialists' claims using fraudulent occupational determinations or that if Plaintiff, in the future, made a claim for disability coverage, Unum Group would make every attempt possible to deny the claim under

their fraudulent internal process and procedures, for any attainable reason.  Unum Group, acting as Provident's claims handler, did in fact delay Plaintiff's final claim determination for nearly 9 years.

279.    Neither Provident nor Unum Group also never informed Plaintiff that they had been named as a defendant in thousands of lawsuits nationwide during this period of time, arising out of intentional and unlawful denial of income disability insurance claims.

280.    Every year when Plaintiff's premium was due, Unum Group, through Provident, accepted Plaintiff's yearly premium and failed to inform Plaintiff that it intended to try to terminate or deny his claim should one arise.

281.    Further, Provident did not charge Plaintiff a lower premium for his Policy despite the change in internal policy and marked alteration of the intent under the Policy, and the relative worthlessness of the Policy due to such change.

282.    At the time Provident charged Plaintiff the same or greater premiums, Provident knew that Plaintiff would have less of a chance of recovering on a claim made for disability benefits after it started its Scheme than he would have had he made a claim for disability coverage prior to such Scheme, and therefore, that effectively Plaintiff had less or no coverage.

283.    Thus, Provident's previous statements to Plaintiff regarding his coverage were false or became false.

284.    As a result of Provident's material omissions as to the nature and quality of Plaintiff's Policy coverage and the expectation that the Policy would pay out should Plaintiff be unable to perform the important duties of his occupation as an Interventional Cardiologist, Plaintiff relied on the statements made by Provident because he forewent looking for other

insurance policies from other companies, purchased additional coverage, and renewed his policies year after year.

285.   Plaintiff was directly damaged by Unum Group's fraudulent omissions through loss of premiums which Provident collected every year and by loss of income from a payout on the Policy, as well as through the lost opportunity to obtain a disability policy from another company, with any ancillary benefits that would have been provided through that alternate policy.  Since Plaintiff has been declared disabled, he is not eligible for another disability policy.

286.   Plaintiff is entitled to recovery of all premiums plus interest and the benefit of the bargain in terms of payment on the contract.

WHEREFORE, Plaintiff seeks:

(a)   Contract benefits of $22,500 per month plus interest for all unpaid months through the present.

(b)   Reasonable attorneys' fees for representation in this action.

(c)   Punitive and Exemplary Damages in an amount to be determined at trial according to proof.

(d)   Such other benefits as this Court may deem appropriate and just.

## COUNT 7 – FRAUD AS TO OCCUPATIONAL DETERMINATION, CPT CODE ANALYSIS, AND CLAIM DETERMINATIONS
### (as to Defendants Provident and Unum Group)

287.   Plaintiff hereby re-alleges and incorporates paragraphs 7 through 170 above as though fully set forth herein.

288.   From 1988 to date, and each year that Plaintiff was required to renew the policy and pay additional premiums, Defendants never disclosed to Plaintiff that they had adopted unethical or illegal claims handling practices and an intensive joint claims/legal special review

process intended to facilitate termination and denial of medical specialists' claims using fraudulent occupational determinations or that if Plaintiff, in the future, made a claim for disability coverage, Defendants would make every attempt possible to deny the claim under their fraudulent internal process and procedures, for any attainable reason. Defendants did in fact delay Plaintiff's final claim determination for nearly 9 years.

289. Defendants also never informed Plaintiff that they had been named as defendants in thousands of lawsuits nationwide during this period of time, arising out of their intentional and unlawful denial of income disability insurance claims.

290. Every year when Plaintiff's premium was due, Unum through Provident accepted Plaintiff's yearly premium and failed to inform Plaintiff that it intended to try to terminate or deny his claim should one arise.

291. Further, Provident did not charge Plaintiff a lower premium for the Policies renewed after the Scheme, despite the change in internal policy and marked alteration of the intent under the Policy, and the relative worthlessness of the Policy due to such change.

292. At the time, Provident charged Plaintiff the same or greater premiums than he had paid prior to the Scheme, Provident knew that Plaintiff would have less of a chance of recovering on a claim made for disability benefits after the Scheme than he would have had he made a claim for disability coverage prior to the Scheme, and therefore, that effectively Plaintiff had less or no coverage.

293. Thus, Provident's previous statements to Plaintiff regarding his coverage were false or became false.

294. As a result of Provident and Unum's material omissions as to the nature and quality of Plaintiff's policy coverage and the expectation that the Policy would pay out should

Plaintiff be unable to perform the important duties of his occupation as an Interventional Cardiologist, Plaintiff relied on the statements made by Provident because he forewent looking for other insurance policies from other companies, purchased additional coverage, and renewed his Policy each year.

295.    Plaintiff was directly damaged by Unum Group's fraudulent omissions through loss of premiums which Provident collected every year and by loss of income from a payout on the Policy, as well as through the lost opportunity to obtain a disability policy from another company, with any ancillary benefits that would have been provided through that alternate policy.  Since Plaintiff has been declared disabled, he is not eligible for another disability policy.

296.    Defendants were also aware that CPT codes should not be used to determine occupation yet did so anyway without advising Plaintiff of the impropriety.  Defendants' acts were fraudulent and done with the intent of depriving Plaintiff his benefits under the Policy.

WHEREFORE, Plaintiff is entitled to recovery of all premiums plus interest and the benefit of the bargain in terms of payment on the contract, including:

(a)    Contract benefits of $22,500 per month plus interest compounded monthly for all unpaid months through the present.

(b)    Reasonable attorneys' fees for representation in this action.

(c)    Punitive and Exemplary Damages in an amount to be determined at trial according to proof.

(d)    Such other benefits as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff, GENE E. MYERS, M.D., demands trial by jury on all issues so triable.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 10, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will electronically serve a copy of this document to Eric S. Adams, Esq. and John E. Meagher, Esq., counsel for Defendants, Provident Life and Accident Insurance Company and The Unum Group, via email to EAdams@shutts.com and JMeagher@shutts.com.

Shumaker, Loop & Kendrick, LLP
240 South Pineapple Avenue
Post Office Box 49948
Sarasota, Florida  34230-6948
(941)  366-6660 / (941)  366-3999 (fax)
Attorneys for Plaintiff

By  */s/Jarrod J. Malone*
    Jarrod J. Malone
    Fla. Bar No. 0010595
    jmalone@shumaker.com
    Meghan O. Serrano
    Florida Bar No. 53124
    Michael S. Taaffe
    Fla. Bar No. 490318
    mtaaffe@shumaker.com