## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GENE E. MYERS, M.D.,

      Plaintiff,

v.                             Case No: 8:19-cv-724-CEH-CPT

PROVIDENT LIFE AND
ACCIDENT INSURANCE
COMPANY and THE UNUM
GROUP,

      Defendants.

_____/

## O R D E R

    This cause comes before the Court upon Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 56) and Plaintiff's Response in Opposition to Defendant's Motion to Dismiss First Amended Complaint (Doc. 65). The Court, having considered the parties' submissions, having heard oral argument, and being fully advised in the premises, will grant-in-part and deny-in-part the motion.

## I.    FACTUAL BACKGROUND[1]

### A. Introduction

    Former interventional cardiologist Gene Myers purchased a non-cancelable disability income insurance policy from Provident Life Accident and Insurance

---

[1] The facts are derived from the complaint, the allegations of which the Court must accept as true in ruling on the motion. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F. 2d 989, 994 (11th Cir. 1983).

Company in 1988. Doc. 47 ¶17. Myers purchased the Policy—an individual long-term "own occupation" disability income policy—because his practice focused on interventional cardiology. *Id.* at ¶¶18, 20. Provident marketed these types of policies towards interventional cardiologists and advertised them such that a surgeon who was unable to perform surgery would be considered "disabled," even if he or she could earn more money, or work, in another occupation. *Id.* at ¶21. A Provident agent advised Myers that the Policy would provide him with disability insurance coverage if injury or sickness prevented him from practicing interventional cardiology. *Id.* at ¶20.

Provident and Unum Group serve as the insurer and claims administrator for the Policy. *Id.* at ¶3. Currently one of the dominant disability insurers and disability claim administrators in the country, Unum Group has operated as a holding and parent company of Provident since 2007. *Id.* at ¶¶11, 14. Unum Group is responsible for all claims-handling for subsidiaries, including Provident, and for disability claims handling for several other insurance companies, including New York Life Insurance Company and John Hancock Mutual Life Insurance Company, known as the "Non-Unum Companies." *Id.* at ¶¶14–15. Since 1999, Unum Group has prescribed all claims-handling procedures and operations in a unitary and coordinated fashion for all subsidiaries and controlled companies, including Provident. *Id.* at ¶16.

### B. Injury and Claim

In the late-1990s, Myers suffered an irreparable injury from wearing a heavy leaded gown for the extended hours required to perform medical procedures. *Id.* at

¶31. A chiropractor identified this injury as "acute herniate nucleus pulposus secondary to the heavy lead gown" and "Myers's position at the time of the injury." *Id.* at ¶32. Myers's back injury worsened: in 2005, he cut back on coronary interventional procedures; in 2009, he ceased performing coronary interventional procedures and practicing interventional cardiology. *Id.* at ¶36.

Myers filed for total disability in February of 2009. *Id.* at ¶37. He completed Unum Group's "Claimant's Statement" and submitted a separate narrative statement due to the form's limited space, but he did not check off any of the form's boxes to indicate the reason for his disability. *Id.* at ¶¶38, 40. Myers was unaware of the significance of whether an injury or a sickness caused his disability. *Id.* at ¶40. In handling Myers's claim for Provident, Unum Group never inquired whether sickness or injury caused his disability nor asked Myers to complete additional sections on the claim forms. *Id.* at ¶41.

Because the Policy is an "own occupation" policy, Unum Group needed to determine Myers's occupation and whether he was able to perform the substantial and material duties of that occupation. *Id.* at ¶43. To determine Myers's occupation, Unum Group requested current procedural terminology codes, known as "CPT codes," which are codes used for billing medical services and surgical procedures to third-party payers. *Id.* at ¶44. In a May 5, 2009 letter to Myers, Unum Group, through Lead Disability Benefit Specialist Susan Richmond, requested CPT codes for 2007. *Id.* at ¶45. At this time, Unum Group and Provident knew that using CPT codes to determine a claimant's occupation was improper. *Id.* at ¶46. Richmond did not inform

3

Myers that using CPT codes to determine his occupation, or determine whether he was able to perform the substantial and material duties of that occupation, was improper. *Id.* at ¶47. Myers provided his CPT codes to Unum Group. *Id.* at ¶48. In an October 6, 2009 letter to Myers, Unum Group, through Richmond, stated that its review of the CPT codes did not show that the "restrictions and limitations" had an impact on Myers's ability to perform his occupation's duties. *Id.* Richmond again materially omitted that Unum Group's use of CPT codes to determine occupation was improper. *Id.* at ¶49.

Later, in an April 29, 2010 letter to Myers, Richmond reiterated that Unum Group found no difference in the types of Myers's CPT billing procedures for 2007 through 2009. *Id.* at ¶50. This letter also requested CPT codes from 2004 to 2006 to determine if Myers "had a reduction in occupational duties." *Id.* Unum Group again materially omitted that using CPT codes to make this type of determination was improper. *Id.* at ¶51. The letter also summarized Unum Group's conclusion following a review of Myers's medical records, as stated in a December 2009 letter, that Myers would have had restrictions and limitations related to his back and lower extremities dating back to April 2005. *Id.* at ¶53. Thus, since at least December of 2009, Unum Group recognized that Myers was disabled from performing interventional cardiology. *Id.* at ¶54. Unum Group possessed sufficient information to determine that Myers was totally disabled from his occupation as an interventional cardiologist, but Unum Group requested the CPT codes from 2004 to 2006 to determine whether he was totally disabled. *Id.* at ¶¶58–59. Because Myers failed to timely provide the requested

pre-2007 CPT codes, Unum Group closed his claim. *Id.* at ¶59. At that time, Myers did not know that Unum Group's request for, and consideration of, CPT codes was improper. *Id.* In these communications, Unum Group fraudulently requested, and subsequently used, CPT codes to classify Myers out of his occupation. *Id.* at ¶61. The communications contained material omissions relating to the use of CPT codes in a claim analysis because Unum Group knew that it should not use CPT codes to determine occupation. *Id.*

After retaining new counsel in 2014, Myers asked Unum Group to analyze his disability claim without using CPT codes. *Id.* at ¶62. Myers's attorney informed Unum Group that using CPT codes to determine Myers's occupation was improper. *Id.* Also, Myers filed a civil remedy notice of insurer violations ("CRN") against both Unum Group and Provident based upon the improper use of CPT codes to classify Myers out of his occupation as an interventional cardiologist, Unum Group's admission that Myers had restrictions as early as 2005, the failure of Unum Group and Provident to investigate Myers's claim, and their failure to pay Myers under the Policy. *Id.* at ¶63. Although the CRN gave 60 days' notice to Provident and Unum Group to remedy their improper acts and approve the claim for total disability, they failed to do so. *Id.* at ¶64. Unum Group and Provident justified using CPT codes in responding to the CRN. *Id.* at ¶65. Unum Group stated that Myers's claim reported his occupation as a mere cardiologist, which was false because Myers had listed his occupation as an interventional cardiologist on the 2009 claim form. *Id.* at ¶74. This false statement was intended to further the fraudulent scheme of Unum Group and its associated entities

to classify medical specialists out of their medical specialty to support denials of disability claims. *Id.* at ¶75.

Unum Group has recognized that using CPT codes to classify occupation is improper because the codes cannot correlate preoperative and postoperative office visits with related surgical procedures and the codes do not indicate specific amounts of time that are spent on a particular duty. *Id.* at ¶80. Unum Group intentionally and fraudulently requested and used CPT codes to deny Myers's claim by asserting that his CPT codes established that he was not an interventional cardiologist while admitting that he was disabled from interventional cardiology. *Id.* at ¶81.

In an October 2014 letter, Unum Group Appeal Specialist Melissa Walsh again asked Myers to provide the CPT codes that Unum Group had requested in 2010. *Id.* at ¶66. Myers provided the requested CPT codes, along with additional information, in November of 2014. *Id.* at ¶84. In March of 2015, Unum Group advised Myers of the completion of its preliminary review, yet Unum Group requested more CPT codes from 2009 through 2014 to complete the analysis. *Id.* at ¶86. Myers provided these codes in April of 2015. *Id.*

In June of 2015, Unum Group provided Myers with its CPT code analysis, including years 2009 to 2014, and admitted that, for all of the procedures that Myers had performed, "he would have been restricted from due to his disability," as "all of the procedures included in these charts involve standing and require the wearing of a lead vest." *Id.* at ¶87. Rather than determining total liability, Unum Group continued to request information related to residual disability and income, not total disability. *Id.*

6

at ¶88. Myers's counsel again advised that Unum Group's continued use of CPT codes was improper and that its failure to afford benefits under the Policy's total disability provisions significantly exacerbated Myers's injury by forcing him to work during the review, and subsequent denial, of his claim. *Id.* at ¶90.

Unum Group reviewed the Policy for another three months and provided Myers with limited benefits under the residual disability provisions of the Policy to pacify him. *Id.* at ¶91. In September of 2015, Unum Group found Myers totally disabled under a separate Provident overhead policy and paid him in full under that policy. *Id.* at ¶92. However, Unum Group continued using its fraudulent CPT code analysis to deny total disability and find that Myers was merely residually disabled under the Policy for the periods of April 1, 2005 to January 1, 2006, and January 1, 2009 to September 1, 2011. *Id.* at ¶95. As such, Unum Group paid residual disability benefits under the Policy to Myers in the amount of $575,683.54. *Id.* To reach this conclusion, Unum Group first utilized the "practice analysis/CPT information" for 2004 as a "baseline of the substantial and material occupational duties" that Myers performed before the onset of his restrictions and limitations and then analyzed the CPT codes for each year to classify Myers in and out of his occupation. *Id.* at ¶96. Unum Group also advised that it had found no change in Myers's medical condition over the years. *Id.* at ¶98.

Myers's counsel advised that Unum Group's statement concerning "no change" in Myers's medical condition was false. *Id.* at ¶99. Myers again highlighted the flaws in the CPT code analysis and asked Unum Group to perform a relative value unit—

known as "RVU"—analysis of his practice, which involves assigning a value to each CPT code in relation to the entire practice. *Id.* at ¶¶100–01. In addition to conceding that the statement concerning "no change" in Myers's medical condition was false, Unum Group agreed to retain an outside expert to conduct the RVU analysis. *Id.* at ¶¶102–03. Unum Group retained accounting firm NawrockiSmith to conduct the RVU analysis. *Id.* After Myers met with Ernest Smith of NawrockiSmith in early-2017, Smith requested more information unrelated to a total disability determination. *Id.* at ¶108. While Myers refused to supply patient records or provide access to his computer system, he otherwise complied with Unum Group's continual requests. *Id.* After receiving a NawrockiSmith report in September of 2017, Unum Group asserted that it needed more time to consider the report. *Id.* at ¶110.

### C. Finding and Appeal

In October of 2017, Unum Group concluded that Myers had been residually disabled from April 1, 2005 to January 1, 2006 and totally disabled on and after January 1, 2006. *Id.* at ¶113. Unum Group issued benefits payments to Myers in the amount of $576,753.30 for this time period; Unum Group had previously paid $503,246.70 in residual disability payments for overlapping time periods to Myers. *Id.* at ¶114. However, for the first time, Unum Group determined that Myers's total disability claim was due to sickness, not injury. *Id.* at ¶115. The issue of whether injury or sickness caused Myers's disability had not arisen during the nearly eight previous years. *Id.* This determination is significant because Myers was 61 years old in 2005 and

the Policy limits the maximum benefit period for total disability due to sickness beginning at age 61, but before age 62, to 48 months. *Id.* at ¶116.

Myers appealed. *Id.* at ¶121.Unum Group denied the appeal because "[n]either you nor [Myers] have previously reported that [Myers's] Total Disability began prior to age 60, or was due to an Injury." *Id.* at ¶122. But Myers also never reported that his total disability resulted from a sickness, and Unum Group had never inquired whether an injury caused his disability. *Id.* After Unum Group denied the appeal, Myers explained the specifics of his injury to Unum Group, including that he suffered the injury while performing an interventional coronary procedure in the late-1990s, when he wore a heavy leaded gown and was bending over during a prolonged procedure. *Id.* at ¶123. Unum Group maintained its position, explaining that Myers's claim "was appropriately managed as a Sickness" and that he had "reached the Maximum Benefit Period under his claim." *Id.* at ¶127.

### D. Alleged Scheme

Unum Group and its affiliated entities, including Provident, have engaged in fraudulent claims-handling practices with the goal of denying otherwise valid claims to make money. *Id.* at ¶129. This scheme improperly targeted high-reserve "own occupation" disability claims for termination or denial that were part of a "closed block" of "own occupation" policies no longer sold by Provident or Unum Group's other predecessors. *Id.* at ¶130.

Provident initiated the scheme in 1994, which has continued to the present with Unum Group following successive mergers. *Id.* at ¶131. Provident utilized the income from denying claims to acquire Paul Revere Life Insurance Company in 1996. *Id.* at ¶132. When Provident Companies merged with Unum Group to become UnumProvident in 1999, the scheme to deny claims was implemented at UnumProvident. *Id.* at ¶133. UnumProvident ultimately became Unum Group. *Id.* Unum Group denies own occupation disability claims for dozens of separate companies who have entered into general services agreements with Unum Group for Unum Group to handle their claims. *Id.* at ¶133.

When Unum Group's 2011 Annual Report showed poor performance for the Closed Block, Unum Group increased the Closed Block reserves by $183.5 million. *Id.* at ¶¶135–36. Unum Group linked performance reviews and incentive compensation to the Closed Block's profitability, recognizing that only an increase in denial of claims could increase revenue. *Id.* at ¶142. In 2012, Unum Group devised, implemented, or revised a plan to increase the Closed Block's profitability by using historically profitable claim denial rates as a baseline to implement current claim denial rates, rather than evaluating each claim on a case-by-case basis. *Id.* at ¶143. Hallmarks of the scheme include, among other things: (1) targeting long-term disability claims with high reserves, like Myers's claim, where a disabled "own occupation" insured had been, or otherwise rightfully would be, receiving benefits for years or lifetime; and (2) using CPT code analysis to classify surgeons and physicians out of their occupations. *Id.* at ¶144. Unum Group knew that the hallmarks would increase the Closed Block's

10

revenue because Unum Group's predecessors, including Provident, had previously instituted many of the same tactics beginning in 1994 to address high levels of payable claims from Provident's Closed Block. *Id.* at ¶145. Unum Group's senior management directed, monitored, and unethically intervened in the claims review and decision-making process. *Id.* at ¶151.

Myers's claim was the subject of this increased denial of claims. *Id.* at ¶154. Unum Group improperly requested, and used, CPT codes on multiple occasions to classify him out of his occupation to support denial of his claim. *Id.* As a result of Unum Group's scheme, Myers's claim was targeted and denied for fraudulent and meritless reasons. *Id.* at ¶164. Since Myers's purchase of the Policy in 1988, including each year that Myers paid premiums to Provident, neither Provident nor Unum Group: (1) disclosed to Myers that they had adopted illegal or unethical claims-handling practices intended to facilitate both termination and denial of medical specialists' claims; or (2) informed Myers that, if he made a claim for disability benefits, they would make every attempt to deny or terminate the claim through fraudulent internal claim processes and procedures. *Id.* at ¶167. Myers "had less or no disability income insurance coverage" as a result of the conduct of Unum Group and Provident. *Id.* at ¶170.

Finally, the Non-Unum Companies contracted with Unum Group through agreements under which Unum Group received financial remuneration from the Non-Unum Companies for "aggressively administering" insureds' disability claims under policies underwritten by each of the Non-Unum Companies. *Id.* at ¶171. The Non-

Unum Companies sought out, and benefitted from, this aggressive administration because it minimized their liability on legitimate claims. *Id.* at ¶172. The Non-Unum Companies knew that Unum Group's termination of legitimate claims would reduce the liabilities of the Non-Unum Companies. *Id.* at ¶174. By ignoring Unum Group's fraudulent conduct, the Non-Unum Companies increased the scope of Unum Group's scheme and the overall enterprise. *Id.* at ¶177.

## II.    PROCEDURAL HISTORY

The Court previously dismissed three of Myers's claims with prejudice and dismissed six of his claims without prejudice. Doc. 44 at 49. Myers now brings the following claims: (1) violation of Chapter 624, Florida Statutes, against Provident; (2) breach of fiduciary duty against Unum Group; (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), against Provident and Unum Group; (4) violation of RICO, 18 U.S.C. § 1962(b), against Provident and Unum Group; (5) violation of RICO, 18 U.S.C. § 1962(c), against Provident and Unum Group; (6) fraud "as to statements and omission regarding [the] nature and quality of [the] policy" against Provident; and (7) fraud "as to occupational determination, CPT code analysis, and claim determinations" as to Provident and Unum Group. *Id.*

12

Unum Group and Provident move the Court to dismiss all claims with prejudice under Rule 12(b)(6), except for the claim for breach of fiduciary duty.[2] Doc. 56 at 27. Myers responds in opposition. Doc. 65.

## III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id.* A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The Court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id.*

## IV.   ANALYSIS

---

[2] Having answered the breach of fiduciary duty claim, Doc. 70, Provident and Unum Group also move the Court to enter judgment on the pleadings on that claim, Doc. 71 at 10. The Court will address that motion in a separate order.

Like Provident and Unum Group, the Court will address the claims in the order in which Myers pleads them.

### A. Bad-Faith Claim

Myers brings a claim against Provident for "Violation of Chapter 624 of the Florida Statutes (Bad Faith)." Doc. 47 at 31. Provident moves to dismiss this claim, arguing that (1) the Court's earlier dismissal of the breach of contract claims requires the Court's dismissal of the bad-faith claim with prejudice; and (2) Myers fails to plausibly allege that he satisfied the prerequisites for a bad-faith claim. Doc. 56 at 2–12. The Court will dismiss this claim.

Under Florida Statutes § 624.155, "[a]ny person may bring a civil action against an insurer when such person is damaged" by a violation of § 626.9541(1)(i) or when the insurer does not attempt "in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured with due regard for her or his interests." Fla. Stat. § 624.155(1)(a)–(b). In turn, § 626.9541(1)(i) details certain "[u]nfair claim practices." *Id.* § 624.9541(1)(i).

Here, Myers alleges that between 2009, when he filed his initial disability claim, and 2014, when he filed the CRN, Provident did not attempt in good faith to settle Myers's claim when, under all circumstances, it could and should have done so if it had acted fairly and honestly toward Myers and with due regard for his interests. Doc. 47 ¶183. Myers also alleges that between 2009 and 2014, Provident violated § 626.9541(1)(i)(3)(a) when Unum Group, as Provident's claims handler, "failed to

adopt and implement standards for the proper investigation of claims and use of CPT codes." *Id.* at ¶186. Myers also contends that Provident "repeatedly violated" § 626.9541(1)(i)(3)(b) between 2009 and 2014 when Unum Group, as Provident's "agent and claims handler," utilized a CPT code analysis to classify Myers out of his occupation to deny his claim. *Id.* at ¶186. Finally, Myers alleges that Provident violated § 626.9541(1)(i)(3)(d) by failing to conduct any investigation into Myers's 1998 injury. *Id.* at ¶189.

As a condition precedent to bringing an action under § 624.155, the Department of Financial Services and the insurer must receive 60 days' written notice of the violation. Fla. Stat. § 624.155(3)(a). Also, "a long line of cases" from the Florida Supreme Court "hold[s] that a determination of liability and the full extent of damages is a prerequisite to a bad faith cause of action." *Fridman v. Safeco Ins. Co. of Ill.*, 185 So. 3d 1214, 1215 (Fla. 2016). Thus, a bad-faith claim under § 624.155 is ripe "when there has been (1) a determination of the insurer's liability for coverage; (2) a determination of the extent of the insured's damages; and (3) the required notice is filed pursuant to section 624.155(3)(a)." *Demase v. State Farm Fla. Ins. Co.*, 239 So. 3d 218, 221 (Fla. 5th DCA 2018). To state a claim for bad faith under § 624.155, a plaintiff "must allege that there has been a determination of the existence of liability on the part of the insurer and the extent of the plaintiff's damages." *Heritage Corp. of S. Fla. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 255 F. App'x 478, 481 (11th Cir. 2007) (citing *Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289, 1291 (Fla. 1991)); *see also Trafalgar at Greenacres, Ltd. v. Zurich Am. Ins. Co.*, 100 So. 3d 1155, 1157 (Fla. 4th DCA 2012) ("It is well

settled that a statutory first-party bad faith action is premature until two conditions have been satisfied: (1) the insurer raises no defense which would defeat coverage, or any such defense has been adjudicated adversely to the insurer; and (2) the actual extent of the insured's loss must have been determined."). Also, a plaintiff need not allege a specific amount of damages. *Heritage Corp. of S. Fla.*, 255 F. App'x at 481. Rather, the purpose of the allegation concerning a determination of damages is to demonstrate that the plaintiff has a valid claim. *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1273 (Fla. 2000) (quoting *Brookins v. Goodson*, 640 So. 2d 110, 112 (Fla. 4th DCA 1994), *disapproved on other grounds*, *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 62 (Fla. 1994), *receded from on other grounds*, 658 So. 2d at 63).

"[A]n underlying action on the insurance contract is not required for there to be a determination of the insurer's liability and the extent of the damages as a prerequisite to filing a statutory bad faith action." *Demase*, 239 So. 3d at 220. Indeed, "[a] determination of liability and extent of damages does not require that the insured bring and succeed in some form on a breach-of-contract claim against the insurer before the insured can state a claim against the insurer for first-party bad faith." *Id.* at 222 n.1; *see also Trafalgar at Greenacres*, 100 So. 3d at 1158 ("A judgment on a breach of contract action is not the only way of obtaining a favorable resolution").

Nor does Florida law obligate an insured to obtain the determination of liability and the full extent of his or her damages through a trial. *Fridman*, 185 So. 3d at 1224. Instead, the insured "may utilize other means of doing so, such as an agreed settlement, arbitration, or stipulation before initiating a bad faith cause of action." *Id.*

Payment of full policy limits after the 60-day cure period under § 624.155(3)(a) also satisfies the requirement of a final determination of liability and damages. *Demase*, 239 So. 3d at 224. And some district courts have held that an insured may proceed with a bad-faith claim where an insurer has issued only partial payments to the insured. *See, e.g.*, *Plante v. USF&G Specialty Ins. Co.*, No. 03-23157CIVGOLD, 2004 WL 741382, at *4 (S.D. Fla. Mar. 2, 2004) (concluding that the Florida Supreme Court would find that an award need not meet the policy limit to permit a plaintiff to proceed with a bad faith claim); *Sammy Sterling Holdings, LLC v. U.S. Aircraft Ins. Grp.*, No. 16-CIV-21230-ALTONAGA/O'Sullivan, 2016 WL 8679130, at *4 (S.D. Fla. June 23, 2016) (finding that the plaintiffs had adequately alleged a determination of liability and extent of damages where they alleged that the defendant admitted liability in issuing partial payments in response to the plaintiffs' claim). However, Florida's Second District Court of Appeal has held that "an allegation that an insurer has paid a portion, but not all, of the damages that it allegedly owes does not constitute a legally sufficient allegation that the amount of damages has been finally determined." *State Farm Mut. Auto. Ins. Co. v. O'Hearn*, 975 So. 2d 633, 635 (Fla. 2d DCA 2008)).

As summarized by one district court, "litigation of the underlying contractual issue is required as a prerequisite when the plaintiff brings a breach-of-contract claim under the insurance contract simultaneously with its bad faith claim." *Sammy Sterling Holdings*, 2016 WL 8679130, at *4. For example, in *Vanguard Fire and Casualty Company v. Golmon*, the plaintiffs-insureds sued the defendant-insurer for breach of contract and statutory bad faith failure-to-settle and unfair claims practices after the insurer refused

17

to pay the full amount of the policy to the plaintiffs. 955 So. 2d 591, 593 (Fla. 1st DCA 2006). The defendant argued that it was not liable for the full amount of the policy because wind damage, which the policy covered, and flood damage, which the policy did not cover, both caused the loss to the plaintiffs' property. *Id.* The defendant moved to dismiss the bad-faith claims because the extent of insurance coverage had not yet been resolved in the plaintiffs' favor on the underlying breach-of-contract claim, but the trial court denied the motion. *Id.*

Explaining that a statutory bad-faith failure-to-settle claim does not accrue until the underlying action for insurance benefits is resolved in favor of the insured, thereby establishing the insurer's liability, the First District Court of Appeal held that the trial court erred in finding that coverage was undisputed and failing to dismiss the statutory bad-faith claims. *Id.* The court emphasized that the plaintiffs had brought a breach-of-contract claim to determine coverage simultaneously with their bad-faith claims. *Id.* at 594. The court distinguished the case from the *Blanchard* line of cases on the grounds that the extent of coverage in *Vanguard Fire* served as "the very issue yet to be determined" as a result of the pending breach-of-contract claim. *Id.* Under these circumstances, the court stated, the defendant's partial payment of the policy limits did not settle the issue of coverage. *Id.* The court concluded that the trial court erred in allowing the bad-faith claims to proceed because the plaintiff had not yet secured a final determination that the defendant paid less than was due under the policy. *Id.*

Although not binding authority, various district courts in the Eleventh Circuit have followed this reasoning when faced with lawsuits that include claims for breach

of contract and bad faith following insurers' issuance of partial payments. *See*, *e.g.*, *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-21404-CIV, 2008 WL 540742, at *2 (S.D. Fla. Feb. 25, 2008) (holding that the plaintiff-insured's breach-of-contract claim was premature and that "[t]he existence of liability beyond the amount conceded, and the extent of damages beyond that same amount, needed to be determined before the plaintiff could proceed with its simultaneous bad faith claims where the plaintiff had sued for breach of contract and bad faith after the defendant-insured had tendered a "partial payment" and the 60-day notice period had run); *Grey Oaks Country Club, Inc. v. Zurich Am. Ins. Co.*, No. 2:18-cv-639-JES-UAM, 2019 WL 1359604, at *1, 3 (M.D. Fla. Mar. 26, 2019) (finding no determination as to the extent of the plaintiff-insurer's damages, which served as the "heart of [the plaintiff's] breach of contract claim," where the defendant-insurer paid the plaintiff less than the plaintiff's claimed damages and the plaintiff sued for breach of contract and bad faith).

Under Florida law, a court faced with an unripe bad-faith claim may dismiss or abate the claim. *Vanguard Fire*, 955 So. 2d at 595. "Where causes of action for both the underlying damages and bad faith are brought in the same action, the appropriate step is to abate the bad faith action until coverage and damages have been determined." *State Farm Mut. Auto. Ins. Co. v. Tranchese*, 49 So. 3d 809, 810 (Fla. 4th DCA 2010) (citing *Allstate Indemn. Co. v. Ruiz*, 899 So. 2d 1121 (Fla. 2005)). "If a determination regarding liability is not made, a cause of action for bad faith can never ripen." *Landmark Am. Ins. Co. v. Studio Imports, Ltd., Inc.*, 76 So. 3d 963, 964 (Fla. 4th DCA 2011) (citing *Blanchard*, 575 So. 2d at 1291). "[D]epending on the outcome of the

[breach-of-contract] claim, a plaintiff may never be entitled to relief on his or her bad faith claim." *Bele v. 21st Century Centennial Ins. Co.*, 126 F. Supp. 3d 1293, 1296 (M.D. Fla. 2015); *see also Molina v. Provident Life & Accident Ins. Co.*, No. 18-24413-CIV-MORENO, 2019 WL 3429889, at *3 (S.D. Fla. May 31, 2019), *report and recommendation adopted*, No. 18-24413-CIV-MORENO, 2019 WL 7937935, at *1 (S.D. Fla. June 27, 2019) (recommending dismissal of the plaintiff's breach-of-contract claim against one defendant for failure to state a claim and recommending dismissal of the plaintiff's bad-faith claim on the grounds that the bad-faith claim was not ripe and could possibly never become ripe if the plaintiff failed to obtain a determination that the insurer breached the policy or if such a determination was overturned on appeal).

Here, Myers alleges that "[w]hen Unum Group on behalf of Provident paid [Myers] and determined total disability, liability was established, as well as a determination of the damages amount" that was paid to Myers. Doc. 47 ¶188. Thus, Myers contends that Unum Group's total disability finding and resulting payments to him in October of 2017, in which Unum Group found that Myers's total disability resulted from sickness instead of injuries, serves as a determination of Provident's liability and extent of damages. However, Myers previously challenged this total disability determination through a breach-of-contract claim, claiming that he was entitled to lifetime benefits under the Policy because his total disability resulted from injuries, not sickness. Doc. 1 ¶196; Doc. 44 at 18–19.[3] In that breach-of-contract claim,

---

[3] "Public records are among the permissible facts that a district court may consider" without converting a motion to dismiss into a motion for summary judgment. *Univ. Express, Inc. v. U.S.*

which accompanied a bad-faith claim, Myers claimed that "Unum was obligated to pay [Myers] a monthly benefit for total disability for life due to injury, yet refused to pay the sought benefits." Doc. 1 ¶¶202, 205; Doc. 44 at 19 (internal quotation marks omitted). Among other relief, Myers sought benefits under the Policy in the amount of $22,500 per month plus interest for all unpaid months. Doc. 1 at 34; Doc. 44 at 19.

Thus, Myers brought a breach-of-contract claim and a bad-faith claim together, with the former challenging the sickness determination and resulting benefits payments. In alleging his entitlement to benefits under the Policy because his total disability resulted from injuries, and in claiming that Unum was obligated, yet refused, to pay him for total disability due to injury, Myers challenged the 2017 coverage determination. Myers did not allege that the sickness determination was correct and that he merely received insufficient payments. As a result, a determination of liability and extent of damages did not yet exist. The Court dismissed the breach-of-contract claim with prejudice as time-barred. *Id.* at 18–21. In addressing the bad faith claim, the Court noted that Unum Group and Provident sought the dismissal of the bad-faith claim on the grounds that it was premature until a determination of liability and damages existed in the underlying contract action. *Id.* at 22. Despite arguing that the breach-of-contract claim was time-barred in the prior motion to dismiss, Unum Group and Provident argued only that the bad-faith claim was premature, summarily

---

*S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006); *see also Allen v. Vintage Pharms. LLC*, No. 5:18-cv-329-TES, 2019 WL 542981, at *5 n.9 (M.D. Ga. Feb. 11, 2019) ("The Court may take judicial notice of its prior orders without converting a motion to dismiss into one for summary judgment.); Fed. R. Evid. 201(c)(1) (stating that a court may take judicial notice on its own).

concluding that Myers may never receive relief on his bad faith claim. Doc. 21 at 14. Because the Court had dismissed the breach-of-contract claim with prejudice, the Court rejected the argument that the bad faith claim was premature, explaining that the breach-of-contract claim did not pend simultaneously with the bad-faith claim. Doc. 44 at 24. However, the Court also explained that Myers failed to explicitly allege the existence of a determination of liability and the extent of damages. *Id.* And the nature of the bad-faith claim was unclear because he also failed to identify the underlying conduct for the claim. *Id.* at 25–26. As such, the Court dismissed the claim without prejudice and instructed Myers to plausibly allege the satisfaction of the prerequisites for a bad-faith claim. *Id.* at 26.

Now, Myers brings the bad-faith claim against Provident and has clarified, to some extent, the nature of the claim. The parties have also now extensively briefed, and addressed during oral argument, the issue of a determination of liability and the full extent of damages. Because Myers previously challenged the sickness determination and resulting benefits payments, a determination of liability and extent of damages did not exist. And because such determination does not exist now, the Court must dismiss the bad-faith claim. Finally, because the Court dismissed the breach-of-contract claim with prejudice, there will never be a determination regarding liability and damages. Thus, the Court will dismiss the bad-faith claim with prejudice.

### B. RICO Claims

Myers brings three RICO claims, each against Provident and Unum Group. Doc. 47 ¶¶200–73. Provident and Unum Group argue that the Court should dismiss

these claims because (i) Provident and Unum Group are not distinct; and (ii) Myers insufficiently pleads the claims. Doc. 56 at 12–23.

### i. Distinctiveness Requirement

Provident and Unum Group argue that the Court should dismiss Myers's RICO claims because Provident, as Unum Group's subsidiary, and Unum Group are not distinct and, therefore, actions attributed to the two entities acting in concert may not serve as a basis for RICO claims. Doc. 56 at 21. In a detailed analysis, the Court previously declined to dismiss the RICO claims as a result of a purported lack of distinction. Doc. 44 at 33. Provident and Unum Group now raise the distinctiveness issue again, but only to urge the Court to follow law from federal appellate courts on the "parent-subsidiary issue" in the absence of any guidance from the Eleventh Circuit. Doc. 56 at 21.

RICO defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. 1961(4). In discussing liability under 18 U.S.C. § 1962(c), the Supreme Court has recognized that "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Further, in examining the sufficiency of a claim under 18 U.S.C. § 1962(c), the Eleventh Circuit has stated:

> In an association-in-fact enterprise, a defendant corporation cannot be distinct for RICO purposes from its own officers, agents, and employees when those individuals are operating in

> their official capacities for the corporation. Significantly, to state a civil RICO claim, a plaintiff must establish a distinction between the defendant 'person' and the 'enterprise' itself.

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1355 (11th Cir. 2016).

This requirement arises from the language of § 1962(c), which "make[s] it 'unlawful for any person employed by or associated with any enterprise' to engage in racketeering activities through that enterprise." *Id.* (quoting 18 U.S.C. § 1962(c)). "[A] defendant can clearly be a person under the statute and also be *part* of the enterprise. The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (emphasis in original).

Here, Myers defines the enterprise as:

> Unum Group and its subsidiaries, including Paul Revere and Provident, and its common claims handling unit, as well as other independent insurers such as New York Life Insurance Company and John Hancock Mutual Life Insurance Company who use Unum Group's common claims handling unit and methods, as well as the firm of NawrockiSmith and Ernest Smith . . . .

Doc. 47 ¶263.

Again, Provident and Unum Group limit this distinctiveness argument to simply a purported lack of distinction between Unum Group and Provident. Relying upon caselaw from another district court and some federal appellate courts, they argue that the Court must dismiss all three RICO claims because Myers "does not allege that Unum Group's separate incorporation from its subsidiaries facilitated the alleged

24

fraudulent scheme, and thus does not sufficiently allege that these corporations are distinct in a manner relevant to RICO liability." Doc. 56 at 22.

In *Goldin Industries*, the Eleventh Circuit declined to address the extent of distinction, if any, where "wholly-owned subsidiaries[] conducting a pattern of racketeering activity through an enterprise comprised only of themselves as the parent corporation." 219 F.3d at 1276 n.7. Provident and Unum Group cite to *Berber v. Wells Fargo Bank, N.A.*, in which another district court within the Eleventh Circuit recognized, where the plaintiff alleged that a bank and a bank manager "generated proceeds" from a pattern of criminal activity which were used to further the operation of the bank's parent company, that "most circuits have held that a parent company and its subsidiaries cannot form an 'enterprise' for RICO purposes unless there is some suggestion that the vehicle of corporate separateness was deliberately used to facilitate unlawful activity." No. 16-24918-CIV-MARTINEZ-GOODMAN, 2018 WL 10436236, at *2, 4 (S.D. Fla. May 24, 2018) (internal quotation marks omitted). The Seventh Circuit has held that "[a] parent and its wholly owned subsidiary have no more sufficient distinctness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act, unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity . . . ." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003).

While some district courts within the Eleventh Circuit have followed cases from other circuits, *Berber*, 2018 WL 10436236, at *4, others have not, *Venerus v. Avis Budget Car Rental, LLC*, No. 6:13-cv-921-CEM-GJK, 2016 WL 11742053, at *11 (M.D. Fla.

Mar. 29, 2016) (recognizing no "express ruling from the Eleventh Circuit regarding whether a parent company and its wholly-owned subsidiary fail to satisfy the distinctness rule" and adopting the "fact-intensive inquiry from [the Eleventh Circuit's holding in] *Goldin*" to resolve the defendants' challenge to distinctness on summary judgment). As such, at this stage of the litigation, the Court declines to follow the cited cases from other circuits to dismiss the RICO claims.[4] This fact-intensive inquiry is best left for a summary judgment motion.

### ii.  Pleading Requirements

Next, Provident and Unum Group argue that Myers insufficiently pleads his RICO claims in that: (1) he insufficiently pleads the required investment injury under his § 1962(a) and the required acquisition under his § 1962(b) claim; and (2) he insufficiently alleges the predicate racketeering activity. Doc. 12–20.

### 1.  Injuries under §§ 1962(a) and 1962(b)

Beginning with Myers's § 1962(a) claim, § 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any

---

[4] Similarly, Provident and Unum Group contend in passing that Myers "must allege that Defendants, and NawrockiSmith / Ernest Smith share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." Doc. 56 at 22–23 (internal quotation marks omitted). But they neither argue that Myers fails to allege a common purpose nor offer any supporting analysis of the amended complaint in the motion. The Court previously noted, in addressing the prior motion to dismiss, that Provident and Unum Group had not cogently argued that Myers failed to allege a common purpose. Doc. 44 at 32–33. During oral argument, counsel for Provident and Unum Group briefly added that the amended complaint does not identify any common purpose for NawrockiSmith or Ernest Smith. At this stage of the litigation, given the incomplete briefing on the issue, the Court rejects this argument.

> interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce.

18 U.S.C. § 1962(a).

Provident and Unum Group first argue that Myers's "RICO allegations" are conclusory. Doc. 56 at 14. Not so. Myers alleges that Unum Group and its affiliated entities, including Provident, engage in fraudulent claims practice with the goal of denying valid claims to make money. Doc. 1 ¶129. The scheme began with Provident in 1994 and has continued to the present with Unum Group through successive mergers. *Id.* at ¶¶131, 133. Provident turned a profit after implementing fraudulent tactics to deny legitimate claims and continued to do so in the following years. *Id.* at ¶¶148–150. Unum Group's vice president linked incentive compensation and performance review to profitability of the Closed Block, recognizing that an increase in revenue could result from an increased denial of claims. *Id.* at ¶142. To that end, Unum Group devised, implemented, or revised a plan to increase profitability, using the many hallmarks. *Id.* at ¶¶143–44. Unum Group allegedly used the scheme to deny Myers's claim. Unum Group and Provident pay out approximately $65 million per year in annual incentives derived, in part, from premiums. *Id.* at ¶155. Provident and Unum Group purportedly denied legitimate claims, including Myers's claim, to increase profitability. *Id.* at ¶203.

To that end, in his § 1962(a) claim, Myers alleges that Provident and Unum Group derive income from mail fraud and wire fraud. *Id.* ¶¶201–202. He alleges that part of the income that Provident and Unum Group obtained from Myers through

mail fraud and wire fraud was used to acquire or maintain an interest in, or to operate, an enterprise, which he defines as consisting of Unum Group and its subsidiaries, including Provident, its claims-handling unit, other independent insurers, NawrockiSmith, and Ernest Smith. Doc. 47 ¶¶209–10. He now alleges that he suffered an investment injury that flowed from Provident and Unum Group's investment of racketeering income "in that Provident and Unum Group used such income to provide claims handlers with increased compensation as incentive to deny claims." *Id.* at ¶221. This conduct, he alleges, prevented him from considering doing business with a wider variety of disability insurers. *Id.* at ¶222. He also contends that Provident and Unum Group would not have denied his benefits if they had not "perpetuated their company-wide strategy to wrongfully deny long term disability claims through the operation of the enterprise supported by the investment of racketeering income." *Id.* at ¶220.

Next, Provident and Unum Group argue that Myers's "investment injury" flows directly from the racketeering predicate acts themselves, rather than from the use or investment of racketeering income. Doc. 56 at 14–15. Unlike the injury requirement under § 1962(c), "which may be satisfied by harm alleged to be the result of racketeering activity, the majority of courts that have addressed the issue have determined that a claimant under § 1962(a) must plead an injury which stems 'not from the racketeering predicate acts themselves,' but from the use or investment of . . . racketeering income." *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1369 (M.D. Fla. 2005). Other district courts within the Eleventh Circuit have adopted this approach. *See*, *e.g.*, *Fuller v. Home Depot Servs., LLC*, 512 F. Supp. 2d 1289, 1294 (N.D.

Ga. 2007); *Bradley v. Franklin Collection Serv., Inc.*, No. 5:10-cv-1537-AKK, 2011 WL 13134961, at *6 (N.D. Ala. Mar. 24, 2011). Indeed, "[b]ecause it is the use or investment of racketeering income that violates § 1962(a), rather than the racketeering acts themselves, it makes sense that qualifying injuries under § 1962(a) should flow from the prohibited acts." *Cont'l 322 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1143 (M.D. Fla. 2018).

The Court is not persuaded by the argument that Myers's investment injury flows directly from the racketeering predicate acts themselves. Myers contends that he was injured by Provident and Unum Group's investment of income to provide claims handlers with increased compensation as incentive to deny claims, which prevented him from doing business with a wider variety of disability insurers. Thus, as alleged, the injury stems from this provision of increased compensation to claims handlers, not the mail fraud or wire fraud serving as the predicate racketeering activity. As such, this argument is unavailing.

Provident and Unum Group argue that Myers fails to allege that the income was invested into a separate enterprise. Doc. 56 at 15. In *Lockheed Martin*, the court, in surveying cases from outside the Eleventh Circuit, explained that "[b]ecause § 1962(a) aims at punishing not the predicate offenses but the investment of the ill-gotten gains of the predicate offenses, racketeering proceeds [which] are merely reinvested back into the same RICO enterprise . . . derive proximately not from the investment but from the predicate acts themselves." 357 F. Supp. 2d at 1370–71 (alteration in original) (internal quotation marks omitted). Other courts have applied this principle. *See, e.g.,*

*Fuller*, 512 F. Supp. 2d at 1293 ("[M]erely alleging reinvestment of racketeering proceeds into the enterprise is insufficient to state a claim under § 1962(a)."); *see also Bradley v. Franklin Collection Serv., Inc.*, No. 5:10-cv-1537-AKK, 2011 WL 13134961, at *6 (N.D. Ala. Mar. 24, 2011) ("The court further agrees with the *Lockheed Martin* court that § 1962(a) does not 'contemplate a channeling of profits' derived from the racketeering acts 'back to [the] RICO violator.'"). On this basis, Provident and Unum Group contend that the Court must dismiss the § 1962(a) claim because Myers alleges that they "used the proceeds of [the] scheme to pay existing claims handlers more money" and Myers has "made no allegation of a separate enterprise." Doc. 56 at 15.

Even if the Court follows this line of cases, *Rosen v. Provident Life and Accident Insurance Company*, which Myers cites in his response, persuasively shows that Myers has sufficiently pleaded the requisite investment injury. There, the plaintiff alleged that Provident's savings from racketeering allowed it to undercut competing disability insurers and prevent the plaintiff from having access to a wider variety of insurer options, including insurers that would provide quality services and honor policy obligations. No. 2:14-cv-922-WMA, 2015 WL 260839, at *15 (N.D. Ala. Jan. 21, 2015). The court explained that the plaintiff's alleged injury was not simply an injury from reinvestment in Provident generally, but instead that Provident's specific investment of its savings cut out insurance competitors from the market and prevented them from offering benefits plans that would honor claims payouts. *Id.* The court also explained that the plaintiff alleged that he relied on Provident's representations and that his timely and consistent payments entitled him to long term disability coverage.

30

*Id.* The court held that the plaintiff had sufficiently pleaded the requisite investment injury for his claim under § 1962(a) because his injuries were arguably proximately caused by Provident's investment and market dominance, rather than directly caused by the racketeering scheme. *Id.*

Similarly, Myers alleges here that Provident and Unum Group used the income to provide claims handlers with increased compensation as an incentive to deny claims, which prevented Myers from considering doing business with a wider variety of disability insurers to choose from, especially disability insurers that would have provided him with quality service and honored their contractual obligations. Doc. 47 ¶¶221–22. He also alleges that he continued to pay premiums to Provident, even though he was never informed that he would have less of a chance of recovering on a claim made for disability benefits after 2009 than before 2009 or that he had "less or no disability income insurance coverage." *Id.* at ¶¶166, 169–70. For pleading purposes, these allegations, like those in *Rosen*, are sufficient to show that Myers's injury was not simply an injury from reinvestment. Thus, this argument is unavailing.

Turning to Myers's § 1962(b) claim, "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate . . . commerce." 18 U.S.C. § 1962(b). Thus, "[s]ection 1962(a) prohibits the investment of proceeds derived from a pattern of racketeering activity in any enterprise involving interstate commerce," while "[s]ection 1962(b) prohibits acquisition through a pattern of racketeering activity of any interest

in an enterprise involving interstate commerce." *Beck v. Prupis*, 162 F.3d 1090, 1095 n.8 (11th Cir. 1998); *see Cont'l 322 Fund*, 317 F. Supp.3d at 1144 ("While § 1962(a) prohibits using funds acquired through a pattern of racketeering activity to invest in or acquire an enterprise, § 1962(b) prohibits the acquisition or maintenance of an enterprise through a pattern of racketeering activity.")

Provident and Unum Group raise two limited arguments. First, they argue that the Court should dismiss this claim because the Amended Complaint does not reveal the action or actions that Myers intends to serve as the alleged acquisition or maintenance of the interest in the enterprise and Myers's relevant allegations lack factual support. Doc. 56 at 16. In his § 1962(b) claim, Myers alleges that, through its pattern of fraudulent activity, Unum Group acquired or maintained, directly or indirectly, an interest in, or control of, the enterprise. Doc. 47 ¶244. He also alleges that part of the income or proceeds that Provident and Unum Group obtained from him was used to acquire or maintain an interest in, or operate, an enterprise. *Id.* at ¶242. To that end, he alleges, like his § 1962(a) claim, that he suffered an "investment injury" that flowed from the use of racketeering income in that Provident and Unum Group used the income to provide claims handlers with increased compensation to deny claims, which prevented him from considering doing business with a wide variety of disability insurers, especially those that would have provided him with quality service and honored their contractual obligations. *Id.* at ¶¶248–49. Also, during oral argument, Myers's counsel pointed to his allegation that Provident used the income from denying claims to acquire Paul Revere Life Insurance Company in 1996 in

describing the acquisition injury. *Id.* at ¶132. Myers's counsel explained that after Provident acquired Paul Revere, Unum Group continued the scheme, becoming the dominant disability insurer, and they prohibited Myers from conducting business with any competitors who would have honored the claims it would have received from the racketeering activity.

Thus, although not the most artfully pleaded claim, the Court construes Myers's allegations as alleging that (1) Provident and Unum Group obtained, through the racketeering activity, income that Provident and Unum Group used to obtain an interest in the enterprise through their payment of the income to claims handlers, which prevented him from considering doing business with other disability insurers; and (2) Provident used the income from the scheme to acquire Paul Revere and the scheme then continued at Unum Group, leading Provident and Unum Group to prevent Myers from conducting business with competitors. As such, the Court rejects Provident and Unum Group's argument that the complaint does not reveal that actions serving as the alleged acquisition or maintenance of the interest in the enterprise and that the relevant allegations lack factual support.

Provident and Unum Group's only other argument for dismissal here is that Myers has failed to allege an independent acquisition injury beyond the injury allegedly incurred as a result of the predicate acts. Doc. 56 at 17. The Eleventh Circuit has not held that the acquisition or maintenance injury must be separate from the racketeering activity itself, but other courts have recognized this principle. *See, e.g.,* *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("[A] well-pled

complaint under section 1962(b), just as with section 1962(a), requires the assertion of any injury independent from that caused by the pattern of racketeering."); *Rosen*, 2015 WL 260839, at *15 ("Similar to the 'investment injury' required under § 1962(a), in order to recover damages under § 1962(b), a plaintiff must allege injury from acquisition or maintenance of the enterprise separate from the racketeering activity itself.").

Here, even if the Court follows this line of cases, *Rosen* is, again, persuasive. There, the court also examined a § 1962(b) claim. 2015 WL 260839, at *15–16. The court held that the plaintiff pleaded an acquisition injury under § 1962(b) that was separate and distinct from Provident's alleged scheme. *Id.* at *16. To reach this conclusion, the court recognized that, beyond the injury from Provident's alleged scheme to deny payouts to the plaintiff and numerous other policyholders, the plaintiff alleged that by maintaining the enterprise, Provident's scheme undercut competitors, thus depriving him of competing disability insurers who would honor their contractual obligations. *Id.* The court also recognized that the plaintiff had attached a document to his complaint indicating that Provident acquired Paul Revere in 1997 and had revised Paul Revere's claim procedures to comport with Provident's nefarious procedures before Provident merged with UNUM in 1999 and similarly revised UMUM's claim procedures to comport with Provident's procedures. *Id.*

As explained above, the Court construes Myers's allegations as alleging that (1) Provident and Unum Group obtained, through the racketeering activity, income that Provident and Unum Group used to obtain an interest in the enterprise through their

payment of income to claims handlers, which prevented him from doing business with other disability insurers; and (2) Provident used the income from the scheme to acquire Paul Revere and the scheme then continued at Unum Group, leading Provident and Unum Group to prevent Myers from conducting business with competitors. For pleading purposes, these allegations, like those in *Rosen*, are sufficient to show that Myers has alleged an independent acquisition injury beyond the injury alleged incurred as a result of the predicate racketeering activity. Thus, the Court rejects Provident and Unum Group's argument.

Therefore, the Court rejects Provident and Unum Group's arguments concerning Myers's pleading of the requisite injuries under § 1962(a) and § 1962(b).

### 2. *Racketeering Activity*

"Racketeering activity," as used in the RICO statute, is defined to include mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1). In each RICO claim, Myers alleges that the "racketeering activity conducted by Provident and Unum Group is mail fraud . . . and wire fraud . . . ." Doc. 47 ¶¶202, 227, 254. "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290–91 (11th Cir. 2010) (internal quotation marks omitted). *See also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information."). A "pattern

of racketeering activity" demands "at least two acts of racketeering activity, one of which occurred after the effective date of [18 U.S.C. § 1961] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "In addition to alleging the requisite *number* of individually chargeable predicate acts, a plaintiff must plausibly allege that the defendant is engaged in criminal conduct of a *continuing* nature." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1216 (11th Cir. 2016) (emphasis in original) (internal quotation marks omitted). "[I]ndependently chargeable instances of mail or wire fraud cannot constitute a 'pattern or racketeering activity' when they arise from a single transaction." *Id.*

Because Myers premises his RICO claims upon an alleged pattern of racketeering activity consisting of mail and wire fraud, his substantive RICO allegations must comply with the plausibility standards under *Twombly* and *Iqbal* and also the heightened pleading standard under Rule 9(b), which requires a party, in alleging fraud or mistake, to "state with particularity the circumstances constituting fraud or mistake." *Am. Dental*, 605 F.3d at 1291 (quoting Fed. R. Civ. P. 9(b)) (internal quotation marks omitted). Thus, Myers must allege: (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case or omissions, not making) same, and (3) the contents of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Brooks v. Blue Cross & Blue Shield*

36

*of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 2007) (internal quotation marks omitted). Myers also must allege facts with respect to each defendant's alleged participation in the fraud. *Am. Dental*, 605 F.3d at 1291; *Brooks*, 116 F.3d at 1381.

Provident and Unum Group argue that Myers fails to satisfy pleading standards, including Rule 9(b). Doc. 56 at 18. They claim that Myers fails to "identify a criminally fraudulent statement intentionally designed to mislead," but only alleges instead that a scheme was conducted to defraud policyholders like him and that Provident Life and Unum Group continue to perpetrate such a scheme. *Id.* Relatedly, they argue that Myers fails to explain the "the manner in which he was misled by communications from the insurer." *Id.* at 19.

As explained above, Myers's allegations detail the purported scheme. Myers identifies the scheme as the engagement of Unum Group and its affiliated entities, including Provident, in fraudulent claims-handling practices with the goal of denying otherwise valid claims to make money. Doc. 47 ¶129. The scheme allegedly began with Provident in 1994 and has continued through each successive merger to the present with Unum Group. *Id.* at ¶131. Myers identifies several "hallmarks" of "Unum Group's Scheme," including "[u]sing CPT code analysis to classify specialist physicians and surgeons out of their occupations." *Id.* at ¶144. He alleges that his claim was the subject of the increased denial of claims, as Unum Group performed roundtables on his claim and both requested and used CPT codes on several occasions to classify him out of his occupation to support denying the claim. *Id.* at ¶154. Further, he claims that each of the hallmarks of "Unum Group's Scheme" was utilized in the

administration of his claim to deny his claim for the desired total disability benefits. *Id.* at ¶162. According to Myers, his claim "was targeted and denied for fraudulent and meritless reasons" as a result of this scheme. *Id* at ¶164.

Myers alleges that each of the hallmarks of the scheme "was effectuated by use of the U.S. Mail and via telephonic discussions between representatives of Unum Group, acting as claims administrator for Provident," and him. *Id.* at ¶163. More specifically, within each RICO claim, Myers states:

> Provident and Unum Group use the interstate mail and telephone to communicate with those who make claims for disability and to perpetuate this fraud, and have used the mail and wires dozens of times in [Myers's] case, in yearly notices of premiums due, as well as letters to [Myers] and his counsel dated 5/5/09, 10/6/09, 4/29/10, 10/21/14, 9/10/15, 5/6/2016, 4/7/17, 7/10/17, 10/20/17, 11/9/17, and 2/8/18.

*Id.* at ¶¶204, 235, 257.

Similarly, in his response, he argues that he sufficiently pleads "the predicate racketeering activity based on the acts of mail fraud and wire fraud, because Defendants used the mails to repeatedly request CPT code information from Dr. Myers during its [sic] eight-year investigation in order to make a fraudulent determination and classify him out of his occupation." Doc. 65 at 17. In support, he cites allegations discussing the May 5, 2009 letter, the April 29, 2010 letter, the October 21, 2014 letters, and a December 18, 2009 letter. *Id.*

Thus, Myers identifies this conduct as the requisite mail fraud and wire fraud. Although Myers identifies wire fraud as racketeering activity based on telephonic

communications, he fails to provide sufficient factual allegations to support wire fraud serving as racketeering activity. He does not plead any telephonic communications with Provident or Unum Group in furtherance of the alleged scheme, let alone plead such communications in accordance with Rule 9(b). As such, the racketeering activity is limited to mail fraud. Further, although Myers cites to "yearly notices of premiums due," the amended complaint lacks factual support for yearly premium notices in furtherance of the purported scheme, nor do any of the allegations discussing yearly premium notices satisfy Rule 9(b).

Myers references the letters cited above throughout the amended complaint. For the May 5, 2009 letter, Myers alleges that Unum Group, through Richmond, sent a letter to him, dated May 5, 2009, which requested CPT codes from him to determine his occupation—a hallmark of the alleged scheme—at a time when Unum Group and Provident knew that using CPT codes to determine an occupation was improper. Doc. 47 ¶¶45–46. Myers quotes a portion of the letter and alleges that Richmond did not inform him that using CPT codes was improper. *Id.* at ¶¶45, 47. He allegedly provided the CPT codes to Unum Group to review. *Id.* at ¶48. He alleges that Unum Group then used CPT codes to improperly determine his occupation. *Id.* at ¶¶48, 50. And Myers offers these allegations in the context of the development of the scheme by Provident and Unum Group. Unum Group and Provident allegedly knew that using CPT codes to determine occupation was improper. *Id.* at ¶46. As such, the allegations pertaining to the May 5, 2009 letter meet the elements of mail fraud under Rule 9(b).

For the October 6, 2009 letter, Myers alleges that Richmond advised him that a review of the CPT codes did not indicate that the restrictions and limitations affected his ability to perform his occupation. *Id.* at ¶48. He further alleges that Richmond "materially omitted the fact that it was improper for Unum Group to use CPT codes to determine a claimant's occupation." *Id.* at ¶49. Myers contends that this letter contained a material omission as to the use of CPT codes in a claim analysis when Unum Group knew that CPT codes should not be used to determine occupation. *Id.* at ¶61. Indeed, Myers's allegations indicate that this letter misled him by not informing him that using CPT codes for a claim analysis was improper. And, based on Myers' allegations, Unum Group initially "closed" his claim for total disability when he did not provide the requested CPT codes, later used the CPT codes to find, among other things, only residual disability from April 2005 to January 2006 and January 2009 to September 2011. *Id.* at ¶¶60, 95. Unum Group and its affiliated entities, including Provident, allegedly engaged in the scheme to earn money, and Provident continued to receive Myers's premium payments. *Id.* at ¶¶129, 166. Unum Group allegedly knew that CPT codes should not be used to determine occupation. *Id.* at ¶61. As such, the allegations pertaining to the October 6, 2009 letter meet the elements of mail fraud under Rule 9(b).

Thus, Myers has alleged at least two predicate racketeering acts of mail fraud. Each of these acts occurred after the effective date of 18 U.S.C. § 1961 and the latter of which occurred within ten years after the commission of the first. Because Myers has alleged at least two racketeering acts, which is sufficient to allege a pattern of

racketeering activity, the Court need not examine the sufficiency of the remaining letters.

Additionally, Myers argues in his response that Provident and Unum Group's "non-disclosure is actionable RICO fraud" because Myers alleges that Unum Group, as claims administrator, and Provident, having accepted Myers's premium payments for disability insurance coverage for more than twenty years, "stood in a special relationship of trust and confidence to [Myers] amounting to a fiduciary relationship." Doc. 65 at 19. "Nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose, either by statute or otherwise." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002). "'Otherwise' may include, for example, where there is a relationship of trust and confidence, such as a fiduciary relationship, between the plaintiff and the defendant." *Almanza v. United Airlines, Inc.*, 162 F. Supp. 3d 1341, 1357 (S.D. Ga. 2016), *aff'd*, 851 F.3d 1060 (11th Cir. 2017). At least one district court within the Eleventh Circuit has held that allegations are sufficient to establish predicate acts where the plaintiffs alleged that the defendant owed a fiduciary duty to them and that a failure to disclose caused them harm. *Design Pallets, Inc. v. GrayRobinson, P.A.*, 515 F. Supp. 2d 1246, 1255–56 (M.D. Fla. 2007). Here, Myers alleges that Unum Group "stood in a special relationship of trust and confidence to [Myers] amounting to a fiduciary relationship" and that the fiduciary duties owed to Myers included "the duty to disclose to the insured all facts under which benefits could be available and all facts known to Unum Group that would support a finding of benefits coverage on [Myers's] behalf." Doc.

41

47 ¶¶193, 196. As explained above, Myers identifies certain nondisclosures and alleges, in the context of the scheme, that failures to disclose caused him harm.

Therefore, the Court rejects the arguments for dismissal as to the racketeering claims premised on mail fraud.  But Plaintiff fails to provide sufficient factual allegations to support wire fraud as the racketeering activity.[5] Thus, the alleged racketeering activity is limited to mail fraud.

### C. Fraud Claims

Turning to Myers's fraud claims, "[t]o state a claim of fraud, a plaintiff must show (1) a false statement or an omission of material fact, (2) knowledge of the statement's falsity, (3) intent to induce reliance, and (4) injury resulting from the plaintiff's relying on the statement." *Drilling Consultants, Inc. v. First Montauk Sec. Corp.*, 806 F. Supp. 2d 1228, 1236 (M.D. Fla. 2011) (citing *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001)). Also, Myers must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), which requires alleging "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case or omissions, not making) same, and (3) the contents of such statements and the manner in which they misled the plaintiff, and

---

[5] Provident and Unum Group also contend that Myers's allegations of a company-wide scheme to deny disability claims is inconsistent with Myers's alleged facts for his own claim, which indicate that he received benefits in excess of $1 million. Doc. 56 at 18–19. But Myers's allegations about receipt of benefits do not render his allegations concerning the scheme implausible or otherwise serve to defeat the RICO claims.

(4) what the defendants obtained as a consequence of the fraud," *Brooks*, 116 F.3d at 1371 (internal quotation marks omitted).

> i. *Count 6: "Fraud as to Statements and Omissions Regarding Nature and Quality of Policy"*

In dismissing the previous version of this claim without prejudice, the Court identified numerous deficiencies, including Rule 9(b) deficiencies, and provided Myers with leave to amend the claim to articulate the statements or omissions serving as the basis for the alleged fraud. Doc. 44 at 45–46. The Court also instructed Myers to ensure, upon amendment, that he pleaded the elements of his fraud claim in accordance with pleading standards. *Id.*

Now, in bringing this fraud claim—labeled as "fraud as to statement and omissions regarding nature and quality of policy"—against Provident only, Myers alleges that he purchased the Policy and paid premiums every year in reliance upon the "representations" of Provident's agent concerning the quality of coverage which the Policy would provide him in his own occupation. Doc. 47 ¶275. Myers identifies "this statement" as well as "the statements referenced above and specifically in paragraphs 20 and 21" as "misrepresentations and omissions regarding the nature and quality of the coverage Provident provided." *Id.* at ¶276. In paragraph 20, Myers alleges that Provident's agent informed him that the Policy would provide him with disability insurance coverage if he became unable to practice interventional cardiology as a result of sickness or injury. *Id.* at ¶20. In paragraph 21, Myers alleges that Provident marketed policies like the Policy to surgeons and advertised these policies

such that a surgeon who could no longer perform surgery would be considered disabled, even if he or she could earn more money or work in another occupation. *Id.* at ¶21. Myers does not expressly identify any of the other "statements referenced above." The Court identified the same deficiency in the prior complaint. Doc. 44 at 43.

Myers also includes some allegations concerning the scheme. He offers the same allegations, most of them word-for-word, for the fraud claim under Count 7. He alleges that since 1988, and each year that Myers renewed the Policy and paid premiums, neither Unum Group nor Provident disclosed to him their adoption of unethical or illegal claims-handling practices, the review process intended to facilitate termination and denial of medical specialists' claims using fraudulent occupational determination, or that if Myers made a claim for disability coverage in the future, Unum Group would attempt to deny the claim. *Id.* at ¶278. He alleges that neither Unum Group nor Provident disclosed to him that they had been named as defendants in thousands of lawsuits concerning alleged unlawful denials of income disability insurance claims. *Id.* at ¶279. Unum Group, through Provident, also allegedly failed to inform him that it would intend to try to terminate or deny his claim if one arose. *Id.* at ¶280. Provident allegedly knew that Myers would have less of a chance of recovering on a disability claim after the scheme's implementation than beforehand and that Myers effectively "had less or no coverage." *Id.* at ¶298. Thus, Provident's statements to Myers concerning his coverage were allegedly "false or became false." *Id.* And Myers claims that "[a]s a result of Provident's material omissions as to the nature and quality of

[Myers's] Policy coverage and the expectation that the Policy would pay out" if Myers became unable to perform his occupation, Myers relied on Provident's statements "because he forewent looking for insurance policies from other companies, purchased additional coverage, and renewed . . . each year." *Id.* at ¶284.

Provident first argues that this claim lacks plausibility because Myers concedes that he received disability benefits in excess of $1,000,000 "on a claim that was untimely." Doc. 56 at 24. Provident contends that the "obvious alternate explanation" is that Unum Group and Provident, after paying benefits to Myers, reviewed his claim and determined that he "no longer qualified for total disability benefits" under the Policy, not that he served as the target of a fraudulent scheme. *Id.* In evaluating Rule 12(b)(6) motions to dismiss, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental*, 605 F.3d at 1290 (alteration in original) (quoting *Iqbal*, 556 U.S. at 682). Presumably, Provident's mention of the claim's untimeliness of the claim refers to Myers's failure to provide the requested CPT codes to Unum Group in 2010. But Provident fails to articulate why Myers's receipt of payment renders the fraud claim implausible. Myers's allegations do not supply, as an obvious alternative explanation, an inference that Provident or Unum Group simply decided that Myers "no longer qualified for total disability benefits," either. As such, this argument is unavailing.

Provident also contends that Myers neither alleges fraud with specificity under Rule 9(b) nor satisfies pleading requirements. Doc. 56 at 24–25. Myers grounds this

claim in Provident's representations concerning the nature and quality of coverage, upon which he allegedly relied when he purchased the Policy. He identifies only two statements as "misrepresentations and omissions" concerning the nature and quality of coverage: Provident's agent's claim that the Policy would provide him coverage if he became unable to practice and Provident's marketing and advertisement of policies such that a surgeon who could no longer perform surgery would be considered disabled, regardless if he or she could earn more money or work in another occupation. He also focuses on Provident's alleged involvement in the scheme and alleged failure to disclose the scheme or its consequences, claiming that Provident's previous statements to Myers concerning coverage were thus "false or became false."

But the basis for the identified statements qualifying as false statements or containing omissions of material fact—the first element of a fraud claim under Florida law—is unclear. Myers does not explicitly allege the timing of his allegations concerning the Provident agent's statement and Provident's marketing of policies, thereby violating Rule 9(b), but these allegations arise in the context of Myers's allegations discussing his purchase of the Policy in 1988. Indeed, Myers references "Provident's agent's representations regarding the quality of . . . coverage that would be provided to him" as the representations upon which he relied in purchasing the Policy and paying premiums each year. As Provident highlights, although Myers purchased the Policy in 1988, he alleges that Provident did not initiate the scheme until 1994. Thus, under his own allegations, the purported scheme cannot serve as the basis for the identified statements qualifying as false statements or omissions of material fact

46

because the scheme did not yet exist.[6] Myers's assertion that the statements "became false" ignores the nature of a fraud claim; an individual who offers a statement that becomes false only years later—in other words, the statement, when offered, is true—does not offer a false statement or omission of material fact, have knowledge of the false statement, or intend to induce reliance on that statement.

And when divorced from his allegations concerning the purported scheme, Myers's allegations do not reveal why the identified statements are false statements or omissions of material fact, any knowledge of the statements' falsity, or any intent to induce his reliance. The statements also violate Rule 9(b) in that Myers does not allege when they were made or, with respect to the second identified statement, the precise statement or the person responsible for the statement.

Finally, as for the allegations pertaining to the alleged scheme, Myers identifies three omissions in this set of allegations: (1) Unum Group and Provident's failure to disclose their adoption of unethical or illegal claims-handling practices or a review process designed to facilitate termination and denial of claims using fraudulent

---

[6] Relatedly, Provident also contends that this claim "is barred because the commission of the underlying fraud regarding representations as to the nature and quality of the insurance policy occurred at the time that the policy was purchased in 1988, more than 12 years before [Myers] filed this lawsuit." Doc. 56 at 25. Under Florida's statute of response, an action for fraud "must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered." Fla. Stat. § 95.031(2)(a). The statute of response is an affirmative defense. *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 694–95 (Fla. 2015). "[A] complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *aff'd and reinstated on reh'g*, 764 F.2d 1400 (11th Cir. 1985) (en banc). But as explained above, Myers does not explicitly allege that these statements occurred when he purchased the Policy in 1988.

occupational determinations; (2) Unum Group and Provident's failure to disclose that they had been named in thousands of lawsuits concerning alleged unlawful denials of income disability claims; and (3) Unum Group's failure to inform Myers that it would terminate or deny his claim should one arise. Myers does not allege that these omissions were omissions of material facts. The complaint does not identify any statements that were misleading as a result of these omissions, nor does Myers allege knowledge of any statement's falsity with respect to these allegations, an intent to induce reliance with respect to these allegations, or an injury from reliance with respect to these allegations.[7] And although Myers brings this claim against Provident only, these allegations inexplicably refer to both Unum Group and Provident.

Because Myers fails to plead all of the essential elements of a fraud claim under Florida law, this claim is due to be dismissed. Myers also fails to plead the claim with particularity under Rule 9(b). As such, in contravention of the Court's instructions, Myers has failed to plead the elements of his fraud claim in accordance with pleading standards.[8]

> *ii. Count 7: Fraud as to Occupational Determination, CPT Code Analysis, and Claim Determinations*

---

[7] Unlike his argument for Count 7, Myers, in responding to the motion, does not point to his allegations regarding certain letters he received about his claim for Count 6.

[8] Provident also contends that Myers may not rely on the alleged statements concerning the nature and quality of the Policy to the extent that the Policy contradicts those alleged statements. Doc. 56 at 25. However, Provident fails to explain how the Policy contradicts any alleged statements.

The Court dismissed the previous version of this claim without prejudice. Doc. 44 at 48. The Court explained that: the complaint failed to identify any statements that were misleading as a result of alleged omissions; notwithstanding his failure to mention them in the complaint, Myers failed to offer any analysis for each of the paragraphs referenced in his response under the elements of fraud; not all of the referenced paragraphs complied with Rule 9(b); and, to the extent that Myers intended to allege that the referenced paragraphs contained fraud because Unum Group and Provident omitted their adoption of certain claims-handling practices, the complaint failed to allege that. *Id.* at 46–48. In sum, the Court concluded, Myers failed to state a claim for fraud. *Id.* at 48.

In this fraud claim against Provident and Unum Group, Myers's allegations are nearly identical to his allegations in the fraud claim in Count 6, except Myers removes some paragraphs, including the paragraph pertaining to his purchase of the Policy in reliance upon Provident's representations about the quality and nature of coverage and the paragraph identifying the alleged misrepresentations and omissions. Similar to Count 6, Myers alleges that Unum Group and Provident failed to disclose their adoption of unethical or illegal claims-handling practices or a review process designed to facilitate termination and denial of specialists' claims using fraudulent occupational determinations or that if Myers made a claim for disability coverage in the future, Unum Group and Provident would attempt to deny the claim. Doc. 47 ¶288. He alleges again that neither Unum Group nor Provident disclosed the thousands of lawsuits concerning alleged unlawful denials of income disability insurance claims. *Id.*

at ¶289. And Unum Group, through Provident, failed to inform Myers that it would try to terminate or deny his claim if one arose. *Id.* at ¶290. Unlike the other fraud claim, Myers alleges that Unum Group and Provident knew that CPT codes should not be used to determine occupation, but did so without advising Myers of the impropriety. Doc. 47 ¶296. Myers alleges that "Defendants' acts were fraudulent and done with the intent of depriving [Myers of] his benefits under the Policy." *Id.*

Unum Group and Provident argue that Count 7 fails to state a claim for fraud because the allegations indicate only an insurance coverage dispute.[9] Doc. 56 at 28. They contend that Myers fails to plead essential elements of this claim. *Id.* With most of his allegations here copied from the claim under Count 6, Myers identifies three omissions: (1) Unum Group and Provident's failure to disclose their adoption of unethical or illegal claims-handling practices or a review process designed to facilitate termination and denial of claims using fraudulent occupational determinations; (2) Unum Group and Provident's failure to disclose that they had been named in thousands of lawsuits concerning alleged unlawful denials of income disability claims; and (3) Unum Group's failure to inform Myers that it would terminate or deny his claim should one arise. Again, Myers does not allege that these omissions were omissions of material fact. And again, the complaint does not identify any statements

_____

[9] Relatedly, they also argue that Count 7 fails as a matter of law because Myers merely alleges that he disagrees with Unum Group's and Provident's opinion as to Myers's entitlement to total disability benefits and, under Florida law, opinions and disagreements cannot form the basis for a fraud action. Doc. 56 at 28. However, Unum Group and Provident fail to explain the basis for classifying the allegations in support of this claim as "opinions and disagreements."

that were misleading as a result of these omissions. Indeed, this claim under Count 7 lacks any allegations concerning a false statement or omission of material fact, knowledge of that statement's falsity, an intent to induce reliance, or an injury from the reliance upon the statement. Rather, Myers broadly alleges omissions and only generally alleges knowledge of the scheme and Myers's resulting injury. As Unum Group and Provident point out, the only allegation concerning reliance within the claim under Count 7 is Myers's identical allegation from the claim under Count 6 that he relied upon "the statements made by Provident"—seemingly a reference to "Provident's previous statements to [Myers] regarding his coverage"—because he forewent looking for other insurance policies from other companies, purchased additional coverage, and renewed his Policy each year." Doc. 47 ¶294. And Myers's assertion that he relied upon Provident's statements as a result of Provident's and Unum Group's material omissions as to the nature and quality of his Policy—the subject of the fraud claim under Count 6—further muddles the claim.

In his response to the motion, Myers argues that he has "met the higher pleading standard for fraud because he has specifically described all of the communications to him in which [Unum Group and Provident] undertook their fraudulent CPT code analysis, and the resulting harm to him due to Unum's shift in its claim handling on behalf of Provident, through which he effectively had less or no coverage." Doc. 65 at 21. Myers then references numerous paragraphs in the amended complaint. *Id.* Oddly, this argument assumes that Myers pleads the elements of a fraud claim, without addressing if he does so, and focuses only Rule 9(b)'s particularity requirement.

But once again, the referenced paragraphs do not assist Myers in alleging a claim for fraud. For example, Myers alleges that Richmond requested CPT codes in the May 5, 2009 letter when Unum Group and Provident knew that using CPT codes to determine occupation was improper and that Richmond did not inform Myers that using CPT codes to determine his occupation and determine whether he could perform the substantial and material duties of that occupation was improper. Myers does not allege that this statement was a false statement or an omission of material fact or that it was intended to induce Myers's reliance. Similarly, Myers alleges that Richmond "materially omitted the fact" that using CPT codes to determine a claimant's occupation was improper from the October 6, 2009 letter, in which Richmond advised that the CPT code analysis showed that the restrictions and limitations did not have an impact on Myers's ability to perform the duties of his occupation. Doc. 47 ¶¶48–49. Placing aside the recognition that "materially omitt[ing]" a fact is distinct from omitting a material fact, Myers does not allege an intent to induce his reliance.[10] As a third example, Myers alleges that Walsh testified in January of 2015 that CPT codes should not be used as the sole basis to determine occupation, yet she "materially omitted this fact" in the October 21, 2014 letter to Myers. *Id.* at ¶66. Again, placing aside the recognition that "materially omitt[ing]" a fact is distinct from omitting a

---

[10] Also, even assuming that these allegations satisfy the first three elements of a fraud claim, any injury resulting from Myers's alleged reliance is unclear, as Myers alleges that he received the payments, albeit for total disability resulting from sickness, only after submitting the requested CPT codes.

material fact, Myers does not allege an intent to induce his reliance. Notably, Myers's allegation that his attorney informed Unum Group earlier in 2014 that using CPT codes to determine Myers's occupation was improper undercuts any alleged reliance here. *See Carrousel Int'l Corp. v. Auction Co. of Am.*, 674 So. 2d 162, 162 (Fla. 3d DCA 1996) (holding that a jury could not have lawfully found against the defendant on the plaintiff's theory of fraudulent misrepresentation where the record demonstrated that the plaintiff knew about the false misrepresentation before incurring any expenses in reliance upon the misrepresentation). Finally, many of these allegations reference Unum Group's actions, even though Myers brings the claim again Unum Group and Provident.[11]

Therefore, because Myers fails to plead a fraud claim, this claim will be dismissed.

## V.    CONCLUSION

The RICO claims will survive, but the bad-faith claim and the fraud claims are due to be dismissed. "[D]istrict courts have broad discretion to allow pleading amendments even when a party does not formally request leave." *Pinnacle Adver. & Mktg. Grp., Inc. v. Pinnacle Adver. & Mktg. Grp., LLC*, 7 4th 989, 1000 (11th Cir. 2021) (citing *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002)). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

---

[11] Myers's counsel cited to additional paragraphs of the amended complaint during oral argument, but these paragraphs suffer from similar defects or Rule 9(b) deficiencies.


amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

Provident and Unum Group argue that the Court should dismiss the claims with prejudice. Doc. 56 at 2. Myers did not request leave to amend any of his claims. The Court explained above that it will dismiss the bad-faith claim with prejudice. As for the fraud claims, Myers has again failed to plead those claims successfully. The Court is not convinced that, if given another bite at the pleading apple, Myers will successfully plead those claims under applicable pleading requirements. As such, the Court will dismiss those claims with prejudice.

Accordingly, it is hereby **ORDERED**:

1. Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 56) is **GRANTED-IN-PART and DENIED-IN-PART**.

2. Count 1 (Bad Faith) of the First Amended Complaint is **DISMISSED WITH PREJUDICE**.

3. Count 6 (Fraud) and Count 7 (Fraud) of the First Amended Complaint are **DISMISSED WITH PREJUDICE**.

4. Defendants' Motion to Dismiss is **GRANTED-IN-PART and DENIED-IN-PART** as to Count 3 (RICO), Count 4 (RICO), and Count 5 (RICO).

The motion is granted to the extent that the racketeering activity is limited to mail fraud.

5. Provident and Unum Group must answer Count 3, Count 4, and Count 5 of the First Amended Complaint within the time prescribed by the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in Tampa, Florida on September 29, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any