# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GENE E. MYERS,

     Plaintiff,

v.                                   Case No: 8:19-cv-724-CEH-CPT

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY and
UNUM GROUP,

     Defendants.

_____

## **ORDER**

This cause comes before the Court on the Motions for Judgment on the Pleadings (Docs. 71, 97) filed by Defendants Provident Life and Accident Insurance Company and Unum Group.  In the first motion, Defendants argue that judgment on the pleadings is warranted in their favor with respect to Count II, breach of fiduciary duty, because there is no fiduciary duty between an insurance holding company and an insured. Doc. 71.  In the second motion, Defendants contend that all remaining counts fall outside the statute of limitations and are therefore time-barred. Doc. 97. Plaintiff has responded in opposition to both motions (Docs. 78, 113), and Defendants have briefly replied (Doc. 116).  The Court heard oral argument on these matters on June 14, 2021, and December 16, 2022. *See* Docs. 83, 125.

Upon full consideration and review of the parties' submissions and arguments, the Court will grant the first Motion for Judgment on the Pleadings and deny the second Motion for Judgment on the Pleadings.

## I.      BACKGROUND

### A. Factual Allegations[1]

Plaintiff Gene Myers, a medical doctor, has held a disability income insurance policy from Defendant Provident Life Accident and Insurance Company ("Provident") since 1988. Doc. 47 ¶ 17.  Defendant Unum Group ("Unum") is the insurance holding and parent company for Provident that is responsible for all claim handling. *Id.* ¶ 14.  Unum has been the dominant disability insurer and claim administrator in the country since approximately 1999. *Id.* ¶¶ 12-13, 15, 209.

As an "own occupation" policy, Plaintiff's disability insurance policy advertised that it would provide him with coverage if he became unable to practice his medical specialty. *Id.* at ¶¶ 20-21.  Plaintiff's medical specialty is interventional cardiology, a type of surgery that requires practitioners to stand for many hours at a time while wearing a heavy leaded gown. *Id.* ¶ 29.  In or around 1998, Plaintiff experienced a back injury while performing surgery that worsened as he continued to practice. *Id.* ¶¶ 30-36.  As a result, he drastically cut back the number of procedures he performed in 2005

---

[1] The facts are derived from the Amended Complaint (Doc. 47), the allegations of which the Court must accept as true in ruling on a motion for judgment on the pleadings. *See Perez v. Wells Fargo*, 774 F.3d 1329, 1335 (11th Cir. 2014).

and ceased practicing interventional cardiology completely in 2009. *Id.* ¶ 36. He filed an insurance claim with Defendants for total disability in February 2009. *Id.* ¶ 37.

To determine Plaintiff's occupation and whether he was able to perform its substantial and material duties, Unum requested his Current Procedural Terminology ("CPT") codes, which are procedure-specific codes used for billing medical services. *Id.* ¶¶ 43-45. It is improper to use CPT codes to determine a claimant's occupation, as Unum knew but Plaintiff did not. *Id.* ¶¶ 46-49, 78. As of at least December 18, 2009, Unum "had enough information to determine that [Plaintiff] was totally disabled from his occupation"— and, indeed, Unum "recognized that he was disabled from performing interventional cardiology." *Id.* ¶¶ 53, 54, 58, 73. Nonetheless, in an April 2010 letter Unum informed Plaintiff that it needed additional CPT codes and financial information to determine his claim. *Id.* ¶ 50. Plaintiff did not provide the information, causing Unum to close his claim. *Id.* ¶ 59.

Plaintiff subsequently obtained new counsel who was "familiar with Unum Group and its affiliated entities' improper use of CPT codes." *Id.* ¶ 62. As a result, in August 2014 Plaintiff requested that Unum reopen his disability claim and analyze it without using CPT codes, a practice he informed them was improper. *Id.* He also filed a Civil Remedy Notice with the Florida Department of Financial Services in which he alleged that Unum and Provident "misrepresented that the policies cover [him] if he became disabled from interventional procedures and used improper claims practices to classify [his] occupation as other than an interventional cardiologist." *Id.* ¶ 63; Doc. 47-2 at 2, 4. In two response letters dated October 21, 2014, Unum "repeatedly

reference[d] CPT codes and attempt[ed] to justify their use to classify [Plaintiff] out of his occupation" and again asked Plaintiff for the CPT codes it had requested in 2010. Doc. 47 ¶¶ 65-66, 77.  Between 2014 and 2015, Plaintiff complied with Unum's continued requests to provide additional documentation—including even more CPT codes—even though he believed the material was irrelevant and the requests improper. *Id.* ¶¶ 84-88.  He also continued to work during this time, exacerbating his medical condition, because his policy would terminate if he stopped. *Id.* ¶¶ 89, 90.

On September 10, 2015, Unum denied Plaintiff's total disability claim as a result of what Plaintiff describes as its "continued fraudulent use of CPT codes" to "classify [him] in and out of his occupation." *Id.* ¶¶ 95-98.  The letter contained false statements and was inconsistent with Unum's concurrent finding under a separate overhead policy that Plaintiff was totally disabled. *Id.* ¶¶ 92-93, 97-98.

Plaintiff then asked Unum to perform a Relative Value Unit ("RVU") analysis of his practice, which Plaintiff believed would have a more favorable result even though it is "still an improper way to determine occupation" because it is based on CPT codes. *Id.* ¶¶ 100-101.  Unum consented to this request in a letter dated February 12, 2016. *Id.* ¶¶ 101-102.  However, after many unexplained delays, Unum denied his claim again on October 20, 2017—this time determining that he was totally disabled but that the disability was caused by sickness instead of illness, a fraudulent conclusion that resulted in significantly reduced benefits. *Id.* ¶¶ 104-116.  Although Plaintiff appealed, his claim was denied for the final time on February 8, 2018. *Id.* ¶¶ 121-127.

**B. Procedural History**

Plaintiff filed suit against Unum and Provident on March 25, 2019. *See* Doc. 1.
He alleged breach of contract, bad faith under Florida Statutes § 624.155, breach of
fiduciary duty, fraud, intentional infliction of emotional distress, and violations of the
Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.*

In an Order dated July 13, 2020, the Court dismissed the majority of Plaintiff's
claims. Doc. 44.  The Court concluded that the breach of contract claims were time-
barred because the allegations and requests for relief were all tied to Defendants' denial
of Plaintiff's claim for total disability on April 29, 2010, irrespective of the subsequent
events that were triggered by Plaintiff's resubmission of the same claim four years later.
*Id.* at 16-21.  The Court also dismissed the claim of intentional infliction of emotional
distress with prejudice and dismissed most of the other claims without prejudice. *Id.* at
22-26, 35-48.  After Plaintiff filed an Amended Complaint, *see* Doc. 47, the Court
dismissed the fraud and bad faith claims with prejudice. Doc. 88 at 14-22, 42-53.

The remaining claims are Counts II, III, IV, and V.  Count II, brought against
Unum only, alleges that Unum breached the fiduciary duties it owed to Plaintiff,
including the duty of ethical claims handling and the duty to disclose all facts under
which benefits could be available and all facts known to Unum that would support a
finding of benefits coverage. Doc. 47 ¶¶ 192-199.  Counts III, IV, and V are the RICO
claims. *Id.* ¶¶ 200-273.  Plaintiff alleges that Provident and Unum engaged in a
racketeering scheme in which they used fraudulent claims handling practices to deny
otherwise valid claims and thereby profit. *Id.* ¶ 129.  As part of the company-wide

scheme, initiated in 1995, Defendants targeted certain claims for denial by using CPT code analysis to classify specialist-physicians and surgeons out of their occupations. *Id.* ¶¶ 130, 144(c). Plaintiff's claim was targeted in exactly this manner. *Id.* ¶¶ 154, 164-166. Moreover, they continued to charge him the same premiums without disclosing their improper claim practices or what amounted to a lack of coverage. *Id.* ¶¶ 167-170. Defendants used the profit from their scheme to acquire other insurance companies and dominate the market, which prevented Plaintiff from considering doing business with a wider variety of disability insurers to choose from, including insurers that would have honored their contractual obligations. *Id.* ¶¶ 209, 222.

Defendants now move for judgment on the pleadings as to all remaining counts. *See* Docs. 71, 97. In Defendants' first motion, they argue that they are entitled to judgment in their favor as to Count II because Florida does not impose a fiduciary duty on an insurance company or an insurance holding company responsible for claim administration. Doc. 71. Plaintiff responds that the unique circumstance of this action, including the seven-year claim administration process in which Unum repeatedly requested information and provided partial benefits and the fact that Unum held his premium payments, created a fiduciary relationship between Unum and Plaintiff rather than the usual arms-length transaction between an insurer and insured. Doc. 78.

In the second motion for judgment on the pleadings, Defendants argue that all remaining claims are time-barred because the four-year statute of limitations that applies to each cause of action began to run when Plaintiff's claim was denied on April

29, 2010, just as the Court determined in its earlier Order. Doc. 97.  At the latest, it began to run on August 27, 2014, when Plaintiff filed his Civil Remedy Notice, because the notice demonstrated his awareness of his alleged injury. *Id.*  In response, Plaintiff argues that the 2010 denial is the injury date for the breach of contract claims but not the remaining claims. Doc. 113.  The injuries Plaintiff experienced for the RICO claims and the breach of fiduciary duty occurred between 2015 to 2017 when Defendants made substantive claim decisions using the fraudulent practices. *Id.*  In any event, even if the claims would fall outside the statutes of limitations, equitable tolling and estoppel apply because Defendants' 2015 misrepresentation that it would conduct a full and fair evaluation of his claim persuaded him to continue cooperating instead of suing. *Id.*

## II.   LEGAL STANDARD

When resolving a motion for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., the Court must consider all of the pleadings: the complaint, the answer, and any documents attached as exhibits. *Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1319 (S.D. Fla. 2014).  "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. Dist. Attorney's Office for Escambia Cnty.*, 592 F.3d 1237, 1255 (11th Cir. 2010) (internal quotation marks omitted).  "In determining whether a party is entitled to judgment on the pleadings, [a court must] accept as true all material facts alleged in the non-moving party's pleading and . . . view those facts in the light most favorable to the non-moving

party." *Perez v. Wells Fargo*, 774 F.3d 1329, 1335 (11th Cir. 2014); *Cunningham*, 592 F.3d at 1255. "If a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." *Perez*, 774 F.3d at 1335. "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018).

## III.   DISCUSSION

Defendants argue they are entitled to judgment on the pleadings as to all remaining counts of the Amended Complaint. As to Count II, the Court concludes that the Amended Complaint does not plausibly allege the existence of a fiduciary duty; therefore, Defendants' first motion is due to be granted. As to the RICO counts, however, the Court finds that, at this stage, based on the pleadings, the claims are not time-barred and Defendants' second motion is due to be denied.

### A. Fiduciary Duty

In Count II of the Amended Complaint, Plaintiff alleges that Unum breached the fiduciary duty it owed to him. Specifically, it breached its duty of ethical claims handling, "including the duty to disclose to the insured all facts under which benefits could be available and all facts known to Unum Group that would support a finding of benefits coverage on Plaintiff's behalf." Doc. 47 ¶¶ 196, 199. He further alleges that a fiduciary relationship between he and Unum "arose from dealings that are separate and apart from Provident's contractual relationship" with him. *Id.* ¶ 194. Unum "stood in a special relationship of trust and confidence," he alleges,

> [b]y virtue of Unum Group's representations to the public and to Plaintiff, and by virtue of its position as administrator of claims, and by virtue of Unum Group, through Provident, having accepted Plaintiff's premium payments for disability insurance coverage, and in light of its responsibility to administer claims for benefits fairly[.]

*Id.* ¶ 193.

Defendants argue that they are entitled to judgment on the pleadings because there is no fiduciary relationship between an insurance holding company and an insured under Florida law. Doc. 71.  Plaintiff concedes that a fiduciary relationship does not exist in most cases. Doc. 78 at 2, 18.  Although insurers are statutorily obligated to act in good faith, *see* Fla. Stat. § 624.155,[2] they otherwise act at arm's length absent a "special relationship of trust and confidence between the parties." *Asokan v. Am. Gen. Life Ins. Co.*, 302 F.Supp.3d 1303, 1317 (M.D. Fla. 2017).  Plaintiff alleges that Unum, as the insurance holding company for Plaintiff's policy, took on such a relationship during the claim process.

Fiduciary relationships are distinct from normal business interactions, in which the parties deal at arm's length.  "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Taylor v. Woodrow Homes Florida, Inc. v. 4/46-A Corp.*, 850 So.2d 536, 540 (Fla. 5th DCA 2003) (quotation omitted).  In contrast, "[w]hen parties deal at arm's length, a fiduciary relationship

---

[2] Plaintiff also brought a bad faith claim against Provident, which this Court dismissed in its prior Order. Doc. 88 at 14-22.

does not exist because there is no duty imposed on either party to protect or benefit the other." *Id.* at 541 (citations omitted).

A fiduciary relationship can be either express, deriving from a contractual obligation, or implied, "based on the circumstances surrounding the transaction and the relationship of the parties." *Akiki v. Bank of America, N.A.*, 632 F. App'x 965, 971 (11th Cir. 2015) (quotation omitted). Whether an implied fiduciary relationship exists is a fact-intensive inquiry. *See Asokan*, 302 F.Supp.3d at 1317, citing *Doe v. Evans*, 814 So.2d 370, 375 (Fla. 2002). However, a plaintiff alleging such a relationship must plead with particularity any special circumstances that give rise to it. *Heyward v. Wells Fargo Bank, NA*, 8:20-cv-572-T33AAS, 2020 WL 10353829, *9 (M.D. Fla. Oct. 6, 2020), citing *Parker v. Gordon*, 442 So.2d 273, 275 (Fla. 4th DCA 1983) ("[I]t would be necessary to state with particularity the facts which purportedly created the duty that was breached, so that the court could determine as a matter of law whether there was such a duty."). A plaintiff who does not do so fails to state a claim for breach of fiduciary duty. *See*, *e.g.*, *Allen v. First Unum Life Insurance Co.*, 2:18-cv-69-JES-KCD, 2020 WL 6203454, *6 (M.D. Fla. Oct. 22, 2020) (dismissing breach of fiduciary duty claim on motion for judgment on the pleadings where plaintiff did not "allege facts which would plausibly establish the existence of a fiduciary relationship"); *Sallah v. BGT Consulting, LLC*, 16-81483-CIV, 2017 WL 2833455, *8 (S.D. Fla. June 30, 2017) (plaintiff failed to state a claim where complaint lacked non-conclusory allegations explaining how defendant fostered plaintiff's confidence and how plaintiff placed trust and reliance on defendant); *Hogan v. Provident Life and Accident Ins. Co.*, 665 F.Supp.2d

1273, 1287 (M.D. Fla. 2009) (dismissing breach of fiduciary duty claim where complaint contained only conclusory allegations that plaintiff placed his trust in defendant and defendant accepted that trust); *cf. Edwards v. Green Tree Servicing, LLC*, 5:15-cv-148-MW/GRJ, 2015 WL 6777463, *8 (N.D. Fla. Oct. 22, 2015) ("From these facts, it is certainly plausible at this stage in the litigation that a fiduciary relationship existed").

A fiduciary relationship cannot be unilateral. "The fact that one party places trust or confidence in the other does not create a confidential or fiduciary relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." *Identity Stronghold, LLC v. Zeidner*, 8:16cv868-MSS-AAS, 2019 WL 12338322, *10 (M.D. Fla. Sept. 11, 2019) (Scriven, J.) (quotations and modifications omitted); *see also Silver v. Countrywide Home Loans, Inc.*, 760 F.Supp.2d 1330, 1339 (S.D. Fla. 2011) ("[O]ne may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created"), *aff'd*, 483 F. App'x 568 (11th Cir. 2012).[3]  Therefore, a party seeking to establish the existence of a fiduciary relationship must allege "some degree of dependency on one side *and* some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Barnett Bank of W. Fla. v. Hooper*, 498 So.2d 923, 927 (Fla. 1986) (emphasis added).  For example, the court in *Capital Bank v. MVB, Inc.*, concluded that special

---

[3] Overruled on other grounds by *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Co., Inc.*, 110 So.3d 399 (Fla. 2013).

circumstances transformed a lender/borrower relationship into a fiduciary one where the bank's agent "expressly invited Battaglia's reliance by urging Battaglia to trust him," "fostered Battaglia's perception that the bank was his financial advisor," and "clearly knew of Battaglia's reliance." 644 So.2d 515, 520 (Fla. 3d DCA 1994). Similarly, in *First Nat'l Bank & Tr. Co. of Treasurer Coast v. Pack*, 789 So.2d 411, 415-16 (Fla. 4th DCA 2001), the defendant, a mortgage lender, "assured" the plaintiffs that any construction defects would be corrected and that "it was unnecessary for [them] to have an attorney of their choosing at the closing to advise them of their options or to advise them of actions that should or could be taken prior to completion of the closing." The court therefore affirmed the jury's finding that there was a fiduciary relationship between them. *Id.* at 416.

On the other hand, in *Taylor*, where the parties were negotiating an investment opportunity, the court concluded there was no evidence the defendant agreed to accept plaintiff's trust and to act to protect the plaintiff. 850 So.2d at 542; *see also Freeman v. Amerisure Mut. Ins. Co.*, No. 20-cv-23562-UU, 2020 WL 13368731, *4 (S.D. Fla. Nov. 2, 2020) ("Plaintiff fails to even suggest that Mr. Freeman placed trust in Amerisure and Amerisure accepted that trust"); *Identity Stronghold*, 2019 WL 12338322 at *11 ("Outside of the terms of the agreement, there is no evidence that Defendants agreed to enter a fiduciary relationship with Plaintiff whereby they would place Plaintiff's interests above their own."); *Smith v. Casey*, 1:12-cv-23795-UU, 2014 WL 11878422, *7 (S.D. Fla. Oct. 29, 2014) ("Plaintiff does not allege any facts regarding how the Sunshine Defendants accepted or fostered Smith's trust and confidence").

Here, the Amended Complaint alleges that Unum stood in a special relationship of trust and confidence to Plaintiff that amounted to a fiduciary relationship for four reasons: 1) Unum's "representations to the public and to Plaintiff"; 2) its position as administrator of claims; 3) its "acceptance of Plaintiff's premium payments for disability insurance coverage"; and 4) its responsibility to administer claims for benefits fairly. Doc. 47 ¶ 193.   Plaintiff further explains in his opposition to Defendants' motion that a fiduciary relationship arose from "the length of Unum Group's investigation of Dr. Myers' claim, the information sought during the administration of his claim, and the extensive control which Unum Group exercised over Dr. Myers due to the fact that so long as no determination was made on his claim, Dr. Myers was forced to continue to work in order to maintain his coverage under the terms of the Policy." Doc. 78 at 13.   He also characterizes Unum's willingness to reopen his claim in 2014 as "an extra service that it took on for" him that made "clear that Unum Group wanted Dr. Myers to trust its claims administration process." *Id.* at 14, 16-17

There is no doubt Plaintiff has adequately alleged that he placed his trust in Unum.   Notably missing from the allegations in the Amended Complaint, however, is any indication that Unum induced or accepted Plaintiff's trust, agreeing to enter into a fiduciary relationship with him whereby it would place his interests above its own. *See Identity Stronghold*, 2019 WL 12338322 at *11; *Silver*, 760 F.Supp.2d at 1339. Although Plaintiff alleges conclusorily that Unum's "representations" to him and to the public created a fiduciary duty, Doc. 47 ¶ 193, he cites no specific statement in

which Unum held itself out to be more than a claim administrator or made promises or assurances to him that would indicate it was accepting a fiduciary relationship that went beyond administering his claim.  On the contrary, the communications from Unum contained in the pleadings are consistent with those of an insurance claim administrator conducting an arm's-length business transaction. *See* Doc. 47-3[4]; Doc. 47 ¶¶ 86-122; *cf. Capital Bank*, 644 So.2d at 519 (bank's agent "urged [plaintiff] to trust him and promised that [he] would benefit," later "coax[ing], 'Do it for us…You are part of the Capital One Bank family. You help the bank, we are going to help you.'").

Plaintiff's characterization of certain of Unum's actions as "extra services" and the exercise of "extensive control" is also unavailing.  Courts have held that a lender/borrower relationship may become fiduciary where the lender takes on extra services for a customer, receives any greater economic benefit than from a typical transaction, or exercises extensive control. *Capital Bank*, 644 So.2d at 519.  In *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So.2d 204, 206 (Fla. 3d DCA 2003), on which Plaintiff relies, the defendant took on the role of "advising and guiding" the plaintiff's business dealings, a role that fell outside of the contractual duties in their loan agreement.  The defendant then "pressured" the plaintiff—by threatening to call in a loan that would put the plaintiff out of business—to enter into a contract with a

---

[4] "If at any point in time you wish to submit the previously requested financial documentation, we will be more than happy to review such information in the evaluation of Residual Disability benefits.  We would also need all updated medical records from May 2009 to the present.  Despite our willingness to review such information, we continue to reserve our rights as afforded to us under the policy." Doc. 47-3 at 7.

third party that would be to the defendant's benefit and the plaintiff's detriment. *Id.* The court concluded that those allegations were enough for a breach of fiduciary duty claim to survive a motion to dismiss. *Id.* at 208; *see also Capital Bank*, 644 So.2d at 520 (defendant fostered the perception that the bank was plaintiff's financial advisor, not merely a lender).

Here, in contrast, the only "extra service" Plaintiff alleges is that Unum agreed to reopen his claim after it had been closed—an action that falls squarely within a normal, arms-length claim administration relationship.   Plaintiff does not allege that Unum took on any additional roles besides claim administration. *Cf. First Nat'l Bank*, 789 So.2d at 415-16 (plaintiffs' mortgage lender took on an advisory role and told plaintiffs it was unnecessary to hire an attorney to advise them).[5]  With respect to "extensive control," it is true that Plaintiff was far more dependent on the outcome of the claim administration process than Unum, which likely made him more willing, by necessity, to jump through the many hoops that Unum set up.  However, "the fact that [defendant] stands in a position of greater bargaining power … is not sufficient by itself to impose a fiduciary obligation[.]" *White Const. Co.*, 633 F. Supp.2d at 1324 n.26 (citation omitted).   A power imbalance is not uncommon in an arm's length transaction.  For example, an individual who does not make his mortgage payments

---

[5] Nor can Plaintiff's careful word choice render Unum's role advisory. *See* Doc. 78 at 16 ("Dr. Myers entrusted Unum Group with highly sensitive information because Unum Group *advised* him that this information was required to investigate his claim.") (emphasis added). Notifying a claimant of the information ostensibly necessary to process his claim is a normal part of an arms-length transaction.

may face serious repercussions as well, but charging what is owed does not create a fiduciary duty on the part of the lender.  While Plaintiff draws a comparison to *Susan Fixel* in describing Unum's "pressure" should he stop working or cooperating with the claim process, the Court is not persuaded that Unum's actions are equivalent to an overt threat to put someone out of business, particularly absent *Susan Fixel*'s other indications of a fiduciary relationship. 842 So.2d at 206.  Plaintiff also provides no authority for the contention that requesting additional information, however confidential or even frivolous, in the context of an insurance claim process constitutes the type of "extensive control" that can create a fiduciary duty.  The fact that Plaintiff was represented by counsel during the majority of his interactions with Unum, counsel who was familiar with Unum's practices and who advocated vocally on his behalf, further detracts from his argument that Unum exercised undue influence. *Cf. First Nat'l Bank*, 789 So.2d at 415-16.

Similarly, the length of the claim process is not enough to establish a fiduciary relationship. *Cf.* Doc. 78 at 14, 16.  In *Silver*, the court rejected the plaintiff's argument that a fiduciary relationship developed by virtue of the thirty to forty phone conversations she had with the mortgage lender's agent during her loan, during which the plaintiff alleged they had developed a friendship. 760 F.Supp.2d at 1338-39.  The Eleventh Circuit has also concluded that a longstanding relationship does not render a lender-borrower relationship fiduciary. *Motorcity of Jacksonville, Ltd. v. Southeast Bank, N.A.*, 83 F.3d 1317, 1340 n.21 (11th Cir. 1996) (abrogated on other grounds by *Hess v. FDIC*, 519 U.S. 1087 (1997)), citing *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 422

(Minn. 1972).  Plaintiff has not provided any authority to the contrary.  Indeed, in this case, the allegations suggest that the fact that the claim process stretched out so long beyond the typical 30-day period served to *decrease* Plaintiff's trust in Unum rather than to foster it.  *See* Doc. 47 ¶ 104.

Next, the Court finds that the fact that Unum, through Provident, accepted Plaintiff's insurance premium payments does not plausibly allege the existence of a fiduciary relationship. *Id.* ¶ 193.  "A payment, series of payments, or a business relationship is not enough to create the trust and reliance necessary to form a fiduciary duty." *Traditions Senior Mgmt., Inc. v. United Health Administrators, Inc.*, 8:12-cv-2321-JSM-MAP, 2013 WL 3285419, *3 (M.D. Fla. June 27, 2013); *see also Allen*, 2020 WL 6203454 at *6 (payment of insurance premiums did not create fiduciary relationship); *Abdo v. Sallie Mae, Inc.*, 3:11-cv-111-TJC-JK, 2014 WL 3053172, *2 n.3 (M.D. Fla. July 7, 2014) (student loan payments did not create a fiduciary relationship).  In fact, payment from one party to another is a hallmark of an arms-length business transaction.  Plaintiff's claim at oral argument that accepting payments is equivalent to acting as a money manager is insufficiently established by the factual allegations. *Cf. Traditions*, 2013 WL 3285419 at *2-3 (allegation that defendant "act[ed] as trustee for premium payments" and "was personally responsible for disbursing and handling" plaintiff's payments stated a plausible cause of action that a fiduciary relationship was created); *Hepp v. Paul Revere Life Ins. Co.*, 8:13-cv-02836-EAK-TBM 2014 WL 3865389, *6 (M.D. Fla. Aug. 5, 2014) (Kovachevich, J.) (allegation that Unum "as a holding

17

company was entrusted with the management of Plaintiff's premiums" was sufficient to survive motion to dismiss).[6]

Lastly, Plaintiff relies on Unum's "position as administrator of claims" and its "responsibility to administer claims for benefits fairly" as evidence that a fiduciary duty existed. Doc. 47 ¶ 193. At oral argument, Plaintiff emphasized that Florida Statutes § 624.155 imposes the obligation on insurance companies to administer claims in good faith. While acknowledging that insurance companies typically act at arm's length, he argued that the statute imposes a fiduciary duty on Unum, a separate company that administers Provident's claims.

This argument is unavailing for several reasons. First, it is internally inconsistent. Section 624.155, by its own terms, applies only to an "insurer"—which Plaintiff has gone to great pains to argue Unum is not, citing Fla. Stat. § 624.401(1) ("No person shall act as an insurer…except as authorized"). Plaintiff cannot contend that Unum both was and was not the "functional equivalent" of an insurance company when it administered his claim. *See Hogan v. Provident Life*, 665 F.Supp.2d at 1287

---

[6] The Court questions, however, whether in this action a bare allegation that Unum "managed" Plaintiff's premiums would plausibly allege a fiduciary relationship absent any allegations that Unum did more than simply receive the payments like in any insurer/insured relationship. *See Hogan v. Praetorian Ins. Co.*, 1:17-cv-21853-UU, 2018 WL 8266803, *10 (S.D. Fla. Jan. 11, 2018) (complaint failed to state a claim for breach of fiduciary duty based on allegation that mortgage lender held insurance premiums in escrow to pass on to insurer, absent any allegation that doing so "was itself improper or unusual in the context of servicing a home mortgage," particularly where it was done to protect lender's own collateral); *cf. Drilling Consultants, Inc. v. First Montauk Securities Corp.*, 806 F.Supp.2d 1228, 1232-34, 1237-38 (M.D. Fla. 2011) (Merryday, J.) (plaintiffs sufficiently alleged existence of a fiduciary relationship where defendant insurance agents served as trustees of plaintiff's pension plan and provided tax advice).

(finding that Unum's employees were "functionally equivalent to Provident's employees" and therefore dealt with plaintiff at arm's length).[7]  Moreover, Plaintiff's reasoning would impose a fiduciary duty on any company that administers insurance claims, regardless of the existence of the "special circumstances" that courts have consistently required to establish a fiduciary relationship in what is otherwise an arm's length transaction.  The Court declines to adopt such a broad rule.

Plaintiff also contended at oral argument that the relationship between Unum and Plaintiff could not be arm's-length because Unum was a third party, rather than the insurance company with whom he entered into a business relationship, and that therefore a reasonable person would believe he could trust Unum.  However, aside from the lack of evidence that Unum accepted his trust, this argument overlooks the fact that Unum is the parent company of Provident.  Rather than being a neutral claim arbiter, Unum has just as obvious of a financial stake in the outcome of Plaintiff's claim as Provident itself.  The Court therefore disagrees that Unum's role as the claim administrator created a fiduciary duty, by virtue of either Fla. Stat. § 624.155 or the role itself.

Although the question of whether a fiduciary duty existed is a fact-intensive inquiry, the Amended Complaint fails to plausibly allege facts that would establish any

---

[7] The duty imposed by § 624.155 is enforced via a bad faith action, which encompasses a claim for breach of fiduciary duty. *See Torres v. GEICO Gen. Ins. Co., Inc.*, 13-cv-80583, 2013 WL 12084492, *3 (S.D. Fla. Nov. 21, 2013) (dismissing breach of fiduciary duty claim against insurer as encompassed within first-party bad faith claim); *see also supra* n.2 (noting that Plaintiff's bad faith claim against Provident was dismissed with prejudice in a prior Order).

acceptance of Plaintiff's trust or "undertaking on the other side to advise, counsel, and protect the weaker party" by Defendants, such that a fiduciary relationship could have existed. *Barnett*, 498 So.2d at 927 (Fla. 1986).  Accordingly, Defendant is entitled to judgment on the pleadings as to Count II.

## B. Statute of Limitations

Defendants' second motion for judgment on the pleadings contends that all of the remaining claims are barred by the statute of limitations.  However, because the Court concludes Defendants are entitled to judgment on the pleadings as to Count II for the reasons explained in Section A, *infra*, it will only assess the statute of limitations issue with respect to Counts III, IV, and V.

### 1. Successive Motions Pursuant to Rule 12(g)(2)

As a threshold matter, Plaintiff argues that Defendants' second motion must be denied as to Count II because it is barred by Rule 12(g)(2). Doc. 113 at 7.  This rule prohibits a party who makes a motion under Rule 12 from making a second motion that raises a defense or objection that was available but omitted from its earlier motion. Fed. R. Civ. P. 12(g)(2).  Plaintiff contends that Defendants's statute of limitations argument was available to them when they filed their first motion for judgment on the pleadings, yet they failed to raise it. Doc. 113 at 7-8.  In reply, Defendants rely on the fact that the Court had not decided the first motion at the time Defendants filed the second to argue that it does not fall under the purview of Rule 12(g)(2). Doc. 116 at 2-3.

Plaintiff focuses only on Count II, rather than all of the counts, and contends that the defense is barred only by Defendants' failure to raise it in their first motion for judgment on the pleadings, rather than by their two prior motions to dismiss. However, the Court observes that the statute of limitations defense was available to Defendants, as to all counts, as early as the time of their first motion to dismiss. The Court will therefore consider whether Rule 12(g)(2) bars Defendants' second motion for judgment on the pleadings as to Counts III, IV, and V because of their failure to raise the defense in their three previous Rule 12 motions.

Rule 12(g)(2) states: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Rule 12(h)(2) permits a party to raise several grounds for dismissal in a motion for judgment on the pleadings under Rule 12(c) or at trial. *Id.* at 12(h)(2). One such ground is the failure to state a claim upon which relief can be granted. *Id.* In other words, a motion for judgment on the pleadings based on the failure to state a claim upon which relief can be granted is not barred by Rule 12(g)(2)'s prohibition against successive motions. *See Deerborne Cottages, LLC v. First Bank*, No. 1:11cv178, 2012 WL 4363742 (W.D. N.C. Sept. 24, 2012) (Rule 12(g)'s prohibition of successive Rule 12 motions "does not apply to a motion for judgment on the pleadings based upon a failure to state a claim upon which relief can be granted.").

A statute of limitations defense that is derived solely from the allegations in the complaint is subject to dismissal for failure to state a claim upon which relief may be granted. *See, e.g.*, *AVCO Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494, 495 (11th Cir. 1982) ("[A] statute of limitations defense may be raised on a motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)…when the complaint shows on its face that the limitations period has run[.]"); *see also Jones v. Bock*, 549 U.S. 199, 215 (2007) ("Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract."). Here, Defendants' statute of limitations argument is based entirely on the allegations in the Amended Complaint. Accordingly, it falls within the exception to Rule 12(g)(2) and was not forfeited by Defendants' failure to raise the issue in its 12(b)(6) motions.

Despite Rule 12(g)(2)'s exception for the defense of failure to state a claim, some courts have found that the rule bars a party from filling multiple motions for judgment on the pleadings. *See, e.g.*, *CRST Expedited, Inc. v. TransAm Trucking, Inc.*, No. C16-52-LTS, 2018 WL 2016273, *4-5 (N.D. Iowa March 30, 2018) (a motion to dismiss for failure to state a claim was procedurally barred even if treated as a Rule 12(c) motion because defendant had already filed a Rule 12(c) motion; concluding that permitting piecemeal, successive 12(c) motions would "invite abusive tactics designed to cause delay and increase the cost of litigation"). The Eleventh Circuit has not directly addressed the issue. *But see Skrtich v. Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002)

("Rule 12(g) specifically prohibits a party…from filing a second *pre-answer* motion to dismiss") (emphasis added) (overruled on other grounds by *Pearson v. Callahan*, 555 U. S. 223 (2009)).  The district courts across other circuits are divided.  *Compare CRST Expedited*, 2018 WL 2016273 at *4-5 *with Hencely v. Fluor Corp.*, 6:19-00489-BHH,  2021 WL 3604781, *3 (D. S.C. Aug. 13, 2021) ("The Federal Rules of Civil Procedure provide for successive Rule 12(c) motions, and courts across the country often permit such practice"); *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, *3 (N.D. Ohio April 16, 2021) (concluding that "the weight of persuasive authority permits successive motions for judgment on the pleadings"); *Reilly v. Wozniak*, No. CV-18-03775-PHX-MTL, 2020 WL 1033156, *8-9 (D. Ariz. March 3, 2020) (after surveying the caselaw, permitting a second 12(c) motion—filed before the first motion was decided—to proceed in the absence of any indication that it was filed for the purpose of delay or that it would cause delay).

It is true that it would have been more efficient for Defendants to have combined their motions for judgment on the pleadings rather than filing two successive motions. However, the second motion was filed before the Court decided the first, which now permits the Court to address both motions simultaneously. *See Reilly*, 2020 WL 1033156 at *9; *see also* Doc. 116 at 2-3, citing *Milledge v. McClellan*, 3:20-cv-269-BJD-PDB, 2021 WL 3129381, *1-2 (M.D. Fla. July 23, 2021) (permitting defendants to amend their motion to dismiss to include an exhaustion defense where the Court had not yet ruled on the motions because doing so would "comport[] with the spirit of Rule 12").  There is also no indication that the second motion was filed for the purpose of

delaying the proceedings. *See Pastor Villareal Inc. v. Borderland Traders LLC*, No. CV-19-8381-MWF, 2020 WL 8514834, *4 (C.D. Cal. Dec. 11, 2020) (declining to bar motion to dismiss "based on a hyper-technical reading of Rule 12(g)(2)" where it did not appear to be filed for the purpose of delay); *Hazzouri v. W. Pittston Borough*, 416 F.Supp.3d 405, 413 (M.D. Pa. 2019) (although a "technical reading of Rule 12(g)" would bar defendant's motion to dismiss, denying it on this basis did not serve the interest of judicial economy). Even if a second motion for judgment on the pleadings based on the failure to state a claim is covered under the most technical reading of Rule 12(g)(2), the Court determines in its discretion that it is appropriate to consider Defendants' arguments on the merits.

### 2. The RICO Claims (Counts III, IV, V)

Defendants argue that Plaintiff's RICO claims fall outside the statute of limitations. Doc. 97. Because Plaintiff was put on notice of the injuries he alleges from these violations more than four years before he filed the instant action, the Court agrees that Counts III, IV, and V would be time-barred. However, the allegations in the Amended Complaint do not foreclose a finding of equitable tolling that would render them timely. Accordingly, Defendants' second motion for judgment on the pleadings is due to be denied.

#### a. _The Statute of Limitations Period_

Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156 (1987). The limitations period begins to run on the date that the plaintiff discovers his injury, regardless of

when he discovers the racketeering scheme. *Rotella v. Wood*, 528 U.S. 549 (2000). Moreover, it will begin to run on the date of discovery even if "the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (quotation omitted); *see also Trump v. Clinton*, 22-cv-14102, 2022 WL 4119433, *14 (S.D. Fla. Sept. 8, 2022) (the clock begins to run even if the plaintiff "did not yet appreciate the true extent of his injuries.").   Actual awareness is not required: the limitations period begins once the plaintiff has the "critical facts" to know he was injured, and therefore should reasonably be expected to discover his injury. *Rotella*, 528 U.S. at 556, quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see also Cook v. Deighan L. LLC*, 1:20-cv-00457-CLM, 2021 WL 426215, *4 (N.D. Ala. Feb. 8, 2021) (plaintiffs had reason to know of their injury when they were informed that the fees defendants charged them were excessive); *A.L. v. Shorstein*, 3:15-cv-1181-TJC-PDB, 2017 WL 526618, *3 (M.D. Fla. Feb. 9, 2017) (period began when plaintiff learned she had been defrauded, which put her on notice of her injury even though she did not know she had a cause of action until later); *cf. GolTV, Inc. v. Fox Sports Latin AM., Ltd.*, 16-24431-CIV, 2018 WL 1393790, *23 (S.D. Fla. Jan. 26, 2018) (limitations period only began when defendants were indicted because plaintiffs had no reason to suspect they had been injured until then).

The limitations period will begin for a RICO claim whether or not the racketeering scheme is complete, and it does not restart with each new or continuing predicate act that is committed within the same scheme.  In *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), the Supreme Court rejected the "last predicate act rule," in which

the commission of a new predicate act within the limitations period would permit a plaintiff to recover for any harm caused by all acts that made up the pattern. The court instead held that a plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* at 190; *see also Serpentfoot v. Rome City Comm'n*, 426 F. App'x 884, 887 (11th Cir. 2011) ("But the statute of limitations began to accrue on these claims when Serpentfoot knew or should have known that she suffered the injury that formed the basis of her complaint, not upon the eventual termination of defendants' misdeeds.").

Only the commission of a "separable, new predicate act" within the limitations period that causes "new and independent injury" will allow recovery. *Lehman v. Lucom*, 727 F.3d 1326, 1328 (11th Cir. 2013). This doctrine is known as the "separate accrual rule." *Id.* The Eleventh Circuit has cautioned, however, that to qualify as new and independent the injury must be more than a continuation of the initial injury. *Id.* at 1333, 1337-38. In *Pilkington v. United Airlines*, 112 F.3d 1532 (11th Cir. 1997) (abrogated on other grounds by *Klehr*, 521 U.S. 179), for example, the court concluded that separate acts in one continuing pattern of harassment did not cause independent injuries. Although each act of harassment increased the adverse impact on the plaintiffs' job performance, the resulting injuries were "not unfamiliar, strange, or different." *Id.* at 1538. They were instead "merely recharacterizations and continuations of the same injuries previously alleged to have been suffered since 1986." *Id.; see also Ward v. Dickinson Fin. Corp. II*, 7:14-cv-8 HL, 2015 WL 1020151,

*10-11 (M.D. Ga. March 9, 2015) (although plaintiff was injured each time the bank charged an improper overdraft fee, "each fee is part of a continuous injury resulting from the single fee-collecting scheme").

To determine whether the separate accrual rule applies, courts consider whether any recent injuries "naturally flow from" the original injury caused by the racketeering scheme. *Corcel Corp., Inc. v. Ferguson Enterprises, Inc.*, 12-80896-CIV, 2016 WL 880557, *6 (S.D. Fla. March 8, 2016), *aff'd*, 674 F. App'x 972 (11th Cir. 2017). In *Corcel*, the plaintiff asserted that another party wrongfully received a certification, resulting in the other party being awarded contracts instead of the plaintiff. *Id.* at *6-7. The court rejected the argument that each contract loss was an independent injury, concluding that those losses naturally flowed from the original injury of the wrongful certification. *Id.* Similarly, in *Curtis Inv. Co., LLC v. Bayerische Hypo-Und Vereinsbank*, 1:06-cv-2752WSD, 2007 WL 4564133, *10 (N.D. Ga. Dec. 20, 2007), the statute of limitations began when the plaintiff became aware that the defendant intended to break the promises in their lending agreement, which "was enough to prompt a diligent plaintiff to begin investigating." Because the plaintiff knew at that point that he had lost the tax advantages he expected to gain from the loan, the fact that the IRS did not actually demand the taxes for several more years did not restart the limitations period; the IRS demand was not a new or independent injury. *Id.* at *11. Courts have also found that a defendant's threat to cause harm if the plaintiff exposes the underlying acts is not new and independent of the scheme's original injury; nor is retaliatory conduct that follows the plaintiff's failure to pay a bribe independent from the injury caused by the

original extortion. *See*, *e.g.*, *Youngblood-West v. Aflac Inc.*, 796 F. App'x 985, 991 (11th Cir. 2019); *Continental 332 Fund, LLC v. Albertelli*, 2:17-cv-41-SPC-MRM, 2019 WL 2009369, *6 (M.D. Fla. May 7, 2019).

Here, because Plaintiff filed this action on March 25, 2019, the four-year statute of limitations would bar his claim unless the limitations period began on or after March 25, 2015.  Plaintiff argues that the statute of limitations did not begin to run until 2017. *See* Doc. 113 at 13-18.  He first contends that the adverse claim decisions he received in 2015 and 2017 were predicate acts for the RICO claims and, "[l]ogically, the injury cannot occur before the predicate acts." *Id.* at 14-15.  He further argues that the acquisition and racketeering injuries alleged in the Amended Complaint occurred every year, continuing through 2017. *Id.* at 13, 15-18.  However, these arguments stand in direct contradiction to the caselaw discussed *supra*.  Neither the commission of a new predicate act nor a new injury that is a mere continuation of the original RICO injury will restart or extend the limitations period. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997); *Lehman v. Lucom*, 727 F.3d 1326 (11th Cir. 2013).[8]  The Court concludes that all the RICO injuries Plaintiff alleges first occurred long before the limitations period.  Each will be discussed in turn.

First, the Court finds that the adverse claim decisions in 2015 and 2017 were not new and independent injuries; they were instead mere continuations of the

---

[8] In contrast, Florida law recognizes the continuing torts doctrine, in which the limitations period runs from the date the tortious conduct ceases. *See Sparado v. City of Miramar*, 855 F.Supp.2d 1317, 1330 (S.D. Fla. 2012).

investment and racketeering injuries Plaintiff alleges he experienced when Defendants began using fraudulent claim practices with the goal of denying his claim.  The most prominent fraudulent claim practice alleged in the Amended Complaint is the use of CPT codes. *See* Doc. 47 ¶ 144(c).  Plaintiff asserted at oral argument that Defendants did not actually use the CPT codes to deny his claim until 2015, so he could not have been injured until then.  But the allegations in the Amended Complaint demonstrate that he was injured by Defendants' reliance on CPT codes as early as December 2009—when, according to Plaintiff, Defendants had all the information they needed to determine he was totally disabled from performing interventional cardiology, but they instead requested more CPT codes. *Id.* ¶¶ 54, 58.  Defendants then closed his claim because he did not produce the codes. *Id.* ¶ 59.  These actions forced Plaintiff "to continue working as best he could, exacerbating his injuries." *Id.* ¶ 60.  After Plaintiff asked them to reopen his claim in 2014, Defendants continued requesting and relying on CPT codes in their communications with him. *Id.* ¶¶ 65, 66, 86, 87.  Indeed, the Amended Complaint is replete with the word "continued" to describe Defendants' use of CPT codes leading up to the 2015 denial. *See id.* ¶ 90, 95, 97, 98.  It cannot be said that the 2015 claim decision was new and independent of the same fraudulent practice that had been injuring Plaintiff since 2009.  Rather, as in *Pilkington*, 112 F.3d 1532, the 2015 denial was just another act in a continuing pattern.

Similarly, the 2017 claim decision naturally flows from the same pattern of injury. Although Defendants employed a different reason to deny him full benefits this time, Plaintiff alleges it was just as baseless as the 2015 denial. Doc. 47 ¶¶ 115-128.

Moreover, the 2017 decision was directly connected to the 2015 denial, as it occurred because Plaintiff asked Defendants to reconsider their 2015 denial. *Id.* ¶¶ 99-100. What followed was another set of the same inexplicable delays and frivolous records requests that had characterized the claim administration process since 2009. *Id.* ¶¶ 100-112. The 2017 decision is thus best understood as resulting from the same "abusive and sham claims practices and procedures" in which Defendants set out to "deny legitimate disability claims without regard to merit[.]" *Id.* ¶¶ 130, 143; *see Corcel*, 12-80896-CIV, 2016 WL 880557 at *6; *Curtis*, 2007 WL 4564133 at *10. Here, too, the injury Plaintiff experienced from this latest denial was a "continuation[] of the same injury …alleged to have been suffered" since 2009. *Pilkington*, 112 F.3d at 1538. It was not a new and independent injury that restarted the limitations period.

The allegations in the Amended Complaint also demonstrate that the other racketeering and acquisition injuries alleged in Plaintiff's RICO claims began well before he filed suit. Plaintiff argues that the continuing injuries he experienced, in that he was prevented from doing business with other insurers by Defendants' domination of the market and was forced to continue paying a full premium for reduced or nonexistent coverage, occurred through 2017, thereby extending the limitations period. But he alleges that Provident began using fraudulent tactics in 1995, and Unum implemented the scheme when it merged with Provident in 1999. Doc. 47 ¶¶ 150, 133. As a policyholder since 1988, *id.* ¶ 117, Plaintiff would have experienced the injuries he alleges—the inability to shop around for another insurer and the reduced value of his premiums—since at least the implementation of the scheme. Indeed,

Plaintiff himself alleges that these injuries occurred "from 1988 to date." *Id.* ¶¶ 166-170.  The fact that the same injury continued to occur each year does not extend the limitations period. *See Lehman*, 727 F.3d 1326.  Accordingly, Plaintiff's argument that the limitations period did not start until 2017 for these injuries is unavailing.

Of course, a RICO claim accrues only when the injury is or reasonably should have been discovered. *Rotella*, 528 U.S. 549.  Plaintiff cannot be expected to have been aware of his racketeering and acquisition injuries before he had actually made a claim for benefits.   The Court also disagrees with Defendants' assertion that the date Plaintiff's claim was first closed is the injury discovery date. Doc. 97 at 8-9.[9]  Because he did not know that Defendants' requests for CPT codes were improper, he would have reasonably assumed his claim was closed because he did not provide the required information; therefore, he would not realize he had experienced an injury.

However, Plaintiff's allegations demonstrate that he was put on notice of his injuries more than four years before he filed suit.  At some point in 2014 he retained counsel who explained that Defendants' use of CPT codes was improper. Doc. 47 ¶ 62.  He demonstrated this newfound knowledge through his attorney's August 25, 2014 letter to Defendants, which expressly stated it was improper to use CPT codes. *Id.*  Two days later, he filed a Civil Remedy Notice accusing Defendants of

---

[9] Defendants rely on this Court's prior Order determining that the limitations period for the breach of contract claims began on the 2010 denial date. *See* Doc. 44 at 18.  However—as Defendants acknowledge elsewhere in their motion, *see* Doc. 97 at 11-12—unlike RICO claims, the limitations period for Florida common law claims like breach of contract begins when the last element constituting the cause of action occurs, regardless of the date the injury was discovered. Fla. Stat. § 95.031.

misrepresenting their policies and using improper claims practices to classify him out of his occupation, which further showed his awareness of his injury at that time. Doc. 47-2 at 2, 4. The Court agrees with Defendants that Plaintiff was aware of his injury by August 27, 2014, even if he did not yet know the full extent of his injuries or understand the scheme. *See Wallace*, 549 U.S. at 391; *Trump v. Clinton*, 2022 WL 4119433 at *14; *Rotella*, 528 U.S. 549.

Plaintiff asserted at oral argument that the limitations period did not begin until the claim decision was made in 2015, because Defendants had not actually used a fraudulent CPT code analysis to deny his claim until then. As discussed *supra*, the Court is not persuaded that the 2015 denial was a new and independent injury. For similar reasons, it finds that the 2015 denial is not the date Plaintiff received notice of his injury. Defendants had made clear by their 2009 and 2010 communications that they intended to use improper means to deny his claim: they told him they needed CPT codes in order to decide his claim, and then closed the claim when he did not provide them, despite having all the information they needed to decide it in his favor. Once Plaintiff obtained counsel who informed him this procedure was improper, he received notice. However, to the extent Plaintiff's new counsel doubted whether Defendants would continue the same strategy when the claim was reopened, any uncertainty should have been erased on October 21, 2014, when Defendants responded to Plaintiff's correspondence and made clear that they would continue to rely on CPT codes to decide his claim, regardless of counsel's warning that it was improper. Doc. 47 ¶¶ 65-66, 77. At the latest, then, the limitations period on Plaintiff's

RICO claims began on October 21, 2014. Because Plaintiff did not file suit until March 25, 2019, his RICO claims would be barred by the statute of limitations.

   b. *Equitable Tolling*

Although the statute of limitations period began running more than four years before Plaintiff filed suit, the Court concludes Defendants are not entitled to judgment on the pleadings because the Amended Complaint does not foreclose a finding of equitable tolling during the limitations period that would render the RICO claims timely.

Plaintiff argues that the limitations period was equitably tolled by Defendants' misrepresentations during the claim process. Doc. 113 at 19-20. He also contends they are equitably estopped from raising a statute of limitations defense for the same reason. *Id.* at 18-19. Plaintiff asserts that Defendants' statement that he would receive a "full and fair review" intentionally lulled him into inaction, because he "reasonably believed that the length of time which Defendants took to review his claim" meant they were fulfilling their promise. *Id.* at 19-20; Doc. 113-1 at 2-3 ("To afford him a full and fair review of his eligibility for benefits, we would like to continue our dialogue and continue our exchange of information so that we can afford Dr. Myers a full and fair evaluation of his eligibility for benefits[.]"). He also argues that their partial payment of residual disability benefits for his overhead policy persuaded him to wait for them to complete their investigation, "believing that they could only logically reach the same conclusion regarding total disability" with respect to the main policy. Doc. 113 at 18-19.

In response, Defendants argue that there is no evidence of any affirmative misstatement. Doc. 116 at 3-4. On the contrary, their communications with Plaintiff reminded him that there were timeframes that could impact his claim and made clear that their review was not a waiver of their rights under the policy terms or the law. *Id.* at 4. As such, Defendants argue tolling does not apply. *Id.*[10]

Equitable tolling may extend the statute of limitations to permit the assertion of a RICO claim that would otherwise be time-barred. *Rotella*, 528 U.S. at 560-61. However, it is "an extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993). A plaintiff seeking equitable tolling has the burden of proof, but is not required to make any allegations about tolling in his complaint. *Villareal v. R.J. Reynolds Tobacco Company*, 839 F.3d 958, 971 (11th Cir. 2016). Nonetheless, he may "plead himself out of court by alleging facts that foreclose a finding of diligence or extraordinary circumstances[.]" *Id.*; *see Henderson v. Reid*, 371 F. App'x 51, 54 (11th Cir. 2010) (affirming grant of motion to dismiss where plaintiff was outside the limitations period and failed to plausibly allege any facts showing that he was entitled to equitable tolling).

---

[10] Defendants also point to this Court's previous Order rejecting Plaintiff's equitable estoppel with respect to the breach of contract claims. Doc. 116 at 3 n.1, citing Doc. 44. However, the Court's prior Order concluded Plaintiff did not adequately establish the elements of equitable estoppel under Florida law, observing that he offered little analysis in support of his argument. Doc. 44 at 21. The Court is now applying equitable tolling principles under federal law based upon Plaintiff's arguments in a new filing. Consequently, the prior conclusion has little bearing on the current analysis.

Equitable tolling requires a two-part test: the plaintiff must prove "1) that he has been pursuing his rights diligently, and 2) that some extraordinary circumstance stood in his way and prevented timely filing." *Villareal*, 839 F.3d at 971 (citations omitted). "Courts ordinarily interpret the second prong as requiring extraordinary circumstances that 'are both beyond [the movant's] control and unavoidable even with diligence.'" *Cook*, 2021 WL 426215 at *5, quoting *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006).

The diligence requirement will defeat tolling for a plaintiff who "had notice sufficient to prompt them to investigate, and… had they done so diligently, they would have discovered the basis for their claims[.]" *Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251-51 (11th Cir. 2001), quoting *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999). A plaintiff who fails to investigate when a reasonable person would do so cannot receive the benefit of tolling. *See Pacific Harbor*, 252 F.3d at 1252 (RICO plaintiff "should have pressed harder, investigated more vigorously, drawn more inferences"). In *Villareal*, for example, an employment discrimination case, the court concluded the plaintiff was not diligent when he took no action for two years after submitting his job application, failing to investigate its status. 839 F.3d at 972; *see also Ward v. Dickinson Fin, Corp. II*, 2015 WL 1020151 at *11 ("Plaintiff was on notice to investigate the source and reason" the first time he was charged an overdraft fee; it was not sufficient to contact the local branch on one occasion but then fail to investigate further when he continued to incur fees); *Maale v. Kirchgessner*, 08-80131-CIV, 2010 WL 11506698, *8 (S.D. Fla. July 14, 2010)

("[T]he undisputed facts reveal that Plaintiff was well aware that his legal rights may have been infringed yet sat by and conducted no investigation in order to protect his investments.").

One basis for equitable tolling is fraudulent concealment, which occurs "when a defendant makes affirmative acts or misrepresentations which are calculated to, and in fact do, prevent the discovery of the cause of action." *Fedance v. Harris*, 1 F.4th 1278, 1285 (11th Cir. 2021). Fraudulent concealment will toll the limitations period "where a defendant acts above and beyond the wrongdoing upon which the plaintiff's claim is founded to keep a plaintiff from suing in time." *Id.* at 1286 (quotation omitted). Fraud is common in RICO claims, which often involve "a pattern of predicate acts [that] may well be complex, concealed, or fraudulent." *Rotella*, 528 U.S. at 556. While the *Rotella* court acknowledged that equitable tolling may apply in RICO cases where the scheme "remains obscure in the face of a plaintiff's diligence in seeking to identify it," it cautioned that tolling would remain "the exception, not the rule," 528 U.S. at 556, 560-61. Significantly, the court also declined to begin the limitations period upon the discovery of the racketeering pattern, rather than discovery of the injury, because, as the Eleventh Circuit characterized it, "the occurrence of fraud in RICO patterns is not a good reason to put off the running of the statute." *Pacific Harbor*, 252 F.3d at 1251-51, citing *Rotella*, 528 U.S. at 559-60. The Eleventh Circuit thus held in *Pacific Harbor* that RICO plaintiffs must be held to the same tolling standard that applies to other cases, rather than to a special standard that accounts for defendants' fraud. 252 F.3d at 1252-53.

As a result, fraudulent concealment or misrepresentations will not excuse a plaintiff's lack of diligence.  In *Cook*, 2021 WL 426215 at *5, for example, the court granted defendants' motion to dismiss on statute of limitations grounds.  In doing so, it rejected equitable tolling, concluding it was not reasonable or diligent for the plaintiffs to continue to rely on the defendant's representations once they had been put on notice of their injury:

> The Cooks argue that they had no reason to seek legal assistance following [the notice] because 'they had already put their trust in UpRight' and 'had the right to believe that UpRight would provide services with honesty, good faith, fairness, integrity, and fidelity.' … While the Cooks are blameless for initially hiring UpRight to handle their bankruptcy case, once they knew that the Bankruptcy Administrator was investigating Upright for a shady fee agreement, the Cooks knew that their belief in UpRight was misplaced. … At that point, the Cooks knew or should have known that they needed different (more trustworthy) counsel to discuss their legal options. No "extraordinary circumstance" prevented the Cooks from doing so[.]

2021 WL 426215 at *5.

Further, a defendant's misrepresentations or concealment will not overcome a plaintiff's own knowledge. *See Maale*, 2010 WL 11506698 at *8 (defendants' misleading project updates did not compel equitable tolling where plaintiff viewed the project himself and could see its true status but failed to investigate); *Trump v. Clinton*, 2022 WL 4119433 at *14 (fraudulent concealment doctrine was unavailing where plaintiff's own statements and allegations demonstrated his knowledge of defendants' actions within the limitations period); *see also Youngblood-West*, 796 F. App'x at 991

(tolling was not available where plaintiff had discovered the scheme's underlying activities decades earlier).

Here, although Plaintiff does not use the term fraudulent concealment, the Court understands his argument—that equitable tolling is necessary because of Defendants' alleged misrepresentations during the claim process—to invoke this doctrine.  However, its application is not readily apparent in light of the above principles.  The Court questions whether it was reasonable for Plaintiff to rely on Defendants' promise of a "full and fair review" once he knew Defendants intended to continue using the practices Plaintiff alleges were fraudulent—which they made clear in their October 21, 2014 letters.  The record does not reveal any expressly false statements by Defendants that would persuade a reasonable person he should continue cooperating with them rather than sue.  That is especially true in light of Plaintiff's counsel's "familiar[ity] with Unum Group and [its] improper use of CPT codes." Doc. 47 ¶ 62.  Indeed, Plaintiff's repeated objections to the use of CPT codes and the delays in processing his claim demonstrate that he was well aware Defendants' claim process was improper, yet continued jumping through their hoops. *See Maale*, 2010 WL 11506698 at *8; *Trump v. Clinton*, 2022 WL 4119433 at *14; *Cook*, 2021 WL 426215 at *5.[11]

---

[11] The Court further observes that the limitations period would have permitted him to sue up until August or October 2018, at least six months after the denial of his final appeal to Unum—thereby allowing him to wait to see how the claim process played out before committing to a lawsuit.

However, at this stage, the Court concludes that the allegations in the Amended Complaint do not foreclose a finding that Plaintiff acted with reasonable diligence in the face of extraordinary circumstances.   In particular, the Court is persuaded by Defendants' December 2015 agreement to conduct the alternative claim analysis Plaintiff requested with an outside expert, a process that dragged out until October 2017. Doc. 47 ¶¶ 100-113.   Taken in the light most favorable to Plaintiff, these allegations do not foreclose a finding that it was reasonable for him to rely, at least for some portion of those two years, on a representation that turned out to be fraudulent. As further evidence that he acted with reasonable diligence in cooperating with the claim process, Plaintiff also points to the partial payments he received and Defendants' determination that he was totally disabled under a different policy that employed an identical definition as the main policy.   In all, the Court finds that he has not pleaded himself out of court, *see Villareal*, 839 F.3d at 971, because the pleadings do not foreclose a finding of equitable tolling that would render his RICO claims timely. Defendants' second motion for judgment on the pleadings as to the RICO claims is therefore due to be denied.

Accordingly, it is **ORDERED**:

1. Defendants' First Motion for Judgment on the Pleadings (Doc. 71) is **GRANTED**.  At the conclusion of the litigation, judgment will be entered in favor of Defendants and against Plaintiff as to Count II of the Second Amended Complaint.

2. Defendants' Second Motion for Judgment on the Pleadings (Doc. 97) is

**DENIED**.

3. The stay of this action is lifted.  The Clerk is directed to reopen this case.

4. The parties shall file an amended Case Management Report on or before

February 3, 2023.

**DONE** and **ORDERED** in Tampa, Florida on January 20, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties