## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GENE E. MYERS,

      Plaintiff,

v.                                    Case No: 8:19-cv-724-CEH-CPT

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY and
UNUM GROUP,

      Defendants.

_____

## <u>ORDER</u>

This matter comes before the Court on Defendants', Provident Life and Accident Insurance Company and Unum Group, Motion for Summary Judgment (Doc. 203), Plaintiff Gene E. Myers' response in opposition (Doc. 132), and Defendants' reply (Doc. 211).  Also before the Court is Plaintiff's Motion for Collateral Estoppel (Doc. 201), and Defendants' response in opposition (Doc. 208).

In this action, Plaintiff challenges Defendants' claims handling practices with respect to his disability income insurance policy.  Defendants now move for summary judgment, asserting, *inter alia*, that Plaintiff's remaining claims are barred by the statute of limitations and that Plaintiff has not established the applicability of equitable tolling.

Upon review and full consideration, and being duly advised in the premises, the Court concludes that Plaintiff has not met his burden of identifying evidence that raises a genuine issue of material fact as to whether equitable tolling should apply.  He does

not dispute that his claims are otherwise time-barred.  As a result, the Court need not reach the remaining arguments in Defendants' Motion for Summary Judgment or Plaintiff's Motion for Collateral Estoppel.   Defendants' Motion for Summary Judgment is due to be granted.

## I.    BACKGROUND[1]

### A. Initial and Renewed Disability Claim

Plaintiff Gene Myers is a medical doctor who practiced as an interventional cardiologist. Doc. 217 ¶ 3.  He maintained disability insurance through Defendants. *Id.* ¶ 1.  Plaintiff filed a disability claim on February 13, 2009, while represented by a prior attorney. *Id.* ¶ 4.  In his claim, he explained that he was suffering from progressive back pain that began about 15 years earlier. Doc. 202-2 at 67.  By the time of his application it was impacting his ability to perform the duties of his profession. *Id.* at 54, 72.

Defendants requested that Plaintiff provide Current Procedural Terminology ("CPT") codes for the medical services he billed in his practice, in order to assist in determining his occupational duties. Doc. 217 ¶ 5.  Plaintiff complied. *Id.*  Based upon their review of his CPT codes from 2007 to 2009, Defendants explained that it did not appear that Plaintiff had a reduction in his occupational duties during that time frame;

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, and the Joint Stipulation of Agreed Material Facts (Doc. 217).  For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

as a result, they asked to review CPT codes and financial information from 2004 to 2006 as well. *Id.* ¶ 6; Doc. 47 ¶¶ 48, 50.  Plaintiff did not provide the requested information, and Defendants closed his claim. Doc. 217 ¶ 7.

In 2013 and 2014, the law firm of Plaintiff's current counsel sent advertisements to Florida doctors explaining their belief that Defendants were denying doctors' disability claims for improper reasons, and suggesting that the recipient consult with the firm if Defendants had denied his or her disability claim. Doc. 176-2 at 1073-74, 1075-76.  Plaintiff's counsel has represented doctors in lawsuits against Defendants since at least 2003. *Id.* ¶ 9; Doc. 176-1.  The prior suits have alleged the same or similar theories that Plaintiff alleges in the instant case. *See generally* Doc. 176-2.[2]  After viewing counsel's advertisement, Plaintiff retained the firm to represent him in his disability claim. Doc. 179-1 at 146-47; Doc. 217 ¶ 8.

On August 25, 2014, Plaintiff's counsel sent a letter to Defendants in which they provided notice of their representation of Plaintiff and requested a renewed evaluation of his claim. Doc. 202-10 at 27-28.  Counsel enclosed the previously requested CPT codes from 2004 to 2006, while cautioning Defendants that it would be improper to determine Plaintiff's occupation based solely upon CPT codes. *Id.*

Two days later, Plaintiff filed a Civil Remedy Notice of Insurer Violation ("CRN") with the Florida Department of Financial Services. *Id.* at 116-117.  The CRN

---

[2] In one of the prior suits, Plaintiff's counsel accepted Defendants' offer to reassess the client's claim, and obtained an agreement to toll the statute of limitations while the reassessment occurred. Doc. 176-2 at 75-94.  It is undisputed that Plaintiff did not seek such an agreement in the instant case. Doc. 176-1 ¶ 42.

alleged that Defendants "misrepresented that the policies cover Dr. Myers if he became disabled from interventional cardiology and used improper claims practices to classify Dr. Myers' occupation as other than an interventional cardiologist." *Id.* at 117.

Defendants responded to the CRN on October 21, 2014. Doc. 202-11 at 37-43. They stated that the information Plaintiff had failed to provide in 2010, which had resulted in the closing of his claim, had encompassed more than just CPT codes. *Id.* Based upon the CPT codes counsel had just provided, however, they determined that his claim for total disability was due to be denied: the codes demonstrated he was both an invasive and an interventional cardiologist, and he was still performing both invasive and interventional procedures through 2007. *Id.* at 40-41.  Nonetheless, they thought he might be eligible for residual disability benefits, which are provided when a disability results in a reduction in monthly income. *Id.* at 41; Doc. 202-13 at 79. Defendants therefore invited Plaintiff to submit the rest of the information they had requested in 2010, along with updated medical records, and they offered to review it to determine if he could receive residual disability benefits. Doc. 202-11 at 41-42.  They stated, however, that "despite our willingness to review such information, we continue to reserve our rights as afforded to us under the policy." *Id.* at 42.  Defendants reminded him of the policy provision that a claimant must provide written proof of loss within 90 days after either the loss or the end of each period for which he claims

a periodic payment, or no later than one year from the time specified. *Id.* at 43.   In response, Plaintiff provided the requested information. *Id.* at 58-708.[3]

On March 10, 2015, Defendants updated Plaintiff on the status of their review. Doc. 202-11 at 948-958.  They maintained their previous determination that he was not totally disabled, but invited him to submit additional information "to allow him a full and fair review of his eligibility for benefits." *Id.* at 949-50.  The additional information included CPT codes from 2009 to 2014, along with "any additional documentation to show what procedures Dr. Myers performed" during that time. *Id.* at 953.  Defendants also determined that Plaintiff was eligible for residual disability benefits, and requested additional financial documentation to allow them to calculate the amount. *Id.* at 950-52.  Plaintiff provided the information on April 24, 2015. *Id.* at 980-81.

Defendants requested more financial information for their calculation of the residual disability benefits on June 5, 2015. Doc. 202-12 at 273-75.  They also noted that the medical records indicated Plaintiff would have been restricted from certain interventional procedures since April 2005, but that the CPT codes demonstrated he

---

[3] After a phone call between Defendants and Plaintiff's counsel, Defendants sent Plaintiff a follow-up letter on October 21, 2014, the same day as the first letter. Doc. 202-11 at 49, 51. The second letter requested specific financial information, updated medical records, and the date Plaintiff stopped working. *Id.*  The Amended Complaint alleges that the second letter requested more CPT codes; however, this request is not contained in the letter. *Compare* Doc. 74 ¶ 66 *with* Doc. 202-11 at 51.

Additionally, although the Joint Stipulation of Agreed Material Facts states that Plaintiff provided the CPT codes that were first requested in 2010 on November 20, 2014, Doc. 217 ¶ 12, the claim file demonstrates that counsel provided the CPT codes in August 2014. *See* Doc. 202-10.

continued performing those procedures through 2013. *Id.* at 273-74.  In response, while providing the additional financial information, Plaintiff objected to Defendants' continued use of CPT codes, and asserted that he should be considered totally disabled beginning in 2005 based on Defendants' finding that he was medically restricted from performing interventional procedures. *Id.* at 282-83.  Plaintiff suggested that any CPT codes showing him performing interventional procedures after 2009 must have been incorrectly coded or billed to the wrong doctor. *Id.*  Further, he asserted that he had only continued working after the onset of his disability because Defendants denied his disability claim and he needed to support his family. *Id.*

Defendants announced their claim decision on September 10, 2015. Doc. 202-13 at 69-86.  They awarded residual benefits to Plaintiff for two periods between 2005 and 2011 in which his income was more than 20 percent lower than the previous month because of his disability. *Id.* at 74-77.  However, they did not find that he was totally disabled at any point between 2005 and 2011, because he had continued performing both interventional and invasive procedures during that time. *Id.*  They further explained that no benefits could be issued under the individual disability policy after 2011 because he had reached his maximum benefit period, a cap that is based on age at the time of onset. *Id.* at 77, 80-81.  On the other hand, Defendants found him totally disabled as of January 1, 2012 with respect to a separate Overhead Expense Disability policy, and issued him the maximum benefits under that policy.[4] *Id.* at 77.

---

[4] In a subsequent letter, Defendants explained the difference between the disparate findings of total disability between the two policies. Doc. 202-15 at 54.  They had found that Plaintiff

Addressing Plaintiff's contention that their use of CPT codes was improper, Defendants disputed that their analysis of his occupation was limited to CPT codes; on the contrary, they had reviewed all the information Plaintiff had provided, not just CPT codes, and he had never suggested a different methodology. *Id.* at 72.  Nor, until the last letter, did Plaintiff correct Defendants' stated belief that all his CPT codes reflected his own work, nor indicate that he had been totally disabled since 2005. *Id.* at 71-72.  Defendants also asserted that their analysis was significantly hampered by Plaintiff's four-year delay in pursuing his claim. *Id.* at 72-73.  They further stated, "Although your client was late in providing proof of loss, we are making these [ ] payments as a courtesy and without intending to waive rights under any applicable policy provisions or any applicable law." *Id.* at 70.

## B. Request for Reconsideration and Appeal

On December 16, 2015, Plaintiff requested that Defendants reconsider their denial of his claim of total disability and determine that he was totally disabled from either 2005 or 2009. Doc. 202-14 at 48-53.  He repeatedly asked Defendants to speak to an interventional cardiologist and a vocational review consultant to better understand: the duties and qualifications of an interventional cardiologist, that Plaintiff's occupation before his disability was interventional cardiology, and that the

---

was totally disabled beginning on January 1, 2012. *See* Doc. 202-13 at 70.  But Plaintiff had met the maximum benefit period of the individual disability policy by September 2011, so Defendants did not reach 2012 in their analysis under that policy. Doc. 202-15 at 54.  In contrast, he did not meet the maximum benefit period for the overhead policy until the end of 2012. *Id.*

restrictions Defendants already concluded he had rendered him totally disabled from interventional cardiology. *Id.* at 50-53. [5]   Plaintiff argued that he should not be precluded from benefits because he continued performing interventional procedures until 2009, against medical advice, in order to support his family. *Id.* at 50.  He also provided records that he argued showed that any interventional procedures after 2009 were performed by a different doctor. *Id.* at 51.  In addition, Plaintiff corrected other factual errors in Defendants' letter, submitted additional medical records as evidence of the deterioration in his condition, and challenged Defendants' assertion that they were prejudiced by his late submission. *Id.* at 48-52.  While criticizing Defendants' continued reliance on CPT codes, Plaintiff stated, "I ask that you have a vocational consultant perform an RVU analysis to get a better picture of the value of the interventional procedures to the practice." *Id.* at 52.  RVUs, or relative value units, are a measure of value for physician compensation that "reflect the skill and time required to perform a procedure." Doc. 202-15 at 45.

Defendants submitted the additional evidence Plaintiff provided to their medical and vocational experts. *Id.* at 42-45.  The medical consultant did not change his previous opinion that Plaintiff was not totally disabled during the relevant period,

---

[5] Plaintiff explained the difference between interventional and invasive cardiology to illustrate that Myers was totally disabled from being an interventional cardiologist despite being able to perform invasive procedures. *Id.* at 50, 53.  Interventional cardiology requires more schooling than invasive cardiology to become qualified to perform interventional procedures in addition to invasive procedures. *Id.*  An interventional cardiologist who can no longer perform interventional procedures, like Myers, essentially reverts to being an invasive cardiologist. *Id.*

relying on the fact that Plaintiff was still able to perform some interventional procedures despite the medical records' indication that he was impeded from doing so.[6] *Id.* at 43.  The vocational consultant found that the new records did not confirm that Plaintiff had not performed all the interventional procedures listed in the CPT reports, and stated that more information was needed to verify his work activity. *Id.* at 45.

Defendants relayed this information to Plaintiff in a February 12, 2016 letter. *Id.* at 54-56.  They shared their continued disagreement with him about the significance of the fact that he continued performing interventional procedures after 2005. *Id.* at 55. They also explained that the data he provided was incomplete and did not allow them to verify his work activity and perform an analysis of his RVUs for 2004 to 2011. *Id.* Defendants then announced: "we would like, at our expense, to engage an independent consultant to gather relevant records and information during a site visit to Dr. Myers' office, and to perform an analysis of this data." *Id.* at 56.  Plaintiff's counsel and Defendants discussed the contents of the letter in a phone call on February 17, 2016. *Id.* at 57.  Defendants shared the anticipated identity of the independent consultant, with whom counsel was familiar from prior cases. *Id.*; Doc. 217 ¶ 15. Counsel also provided some additional records demonstrating that post-2009 procedures attributed to Plaintiff on the CPT report had not been performed by him. Doc. 202-15 at 57-59.

---

[6] The consultant also noted that Plaintiff remained able to ride his bicycle to work every day and perform many of his usual work activities through at least 2012. *Id.*

Defendants retained accountant Ernie Smith to conduct the independent review, as anticipated. *See*, *e.g.*, Doc. 202-17 at 44. On March 14, 2016, Plaintiff wrote to Defendants to express his belief that Defendants have "taken far too long in [their] evaluation on this case" and to request that Smith complete his review "as quickly as possible." *Id.* at 29-30. Plaintiff further noted that "an RVU analysis is also not a proper way to determine occupation when addressed in a vacuum"; he went on to explain the aspects of Defendants' determination with which an RVU analysis would not assist. *Id.* at 30.

After reviewing Plaintiff's file, Smith generated a long list of additional documents that he needed to conduct an RVU analysis. *Id.* at 61-62. He noted that some of the information he was requesting was necessitated by Plaintiff's prior representations that reports incorrectly listed the doctor who performed the procedures. *Id.* at 61. Plaintiff's March 14, 2016 letter had included another such representation about the true identity of the doctor who performed post-2009 procedures in a report Plaintiff had recently provided. *Id.* at 29. In a letter dated April 29, 2016, Defendants stated that this type of discrepancy "was an example of why we believe further review of Dr. Myers' personal and office production by an independent consultant is appropriate for our evaluation of the claim." *Id.* at 68. They also stated that they were not limiting their evaluation to CPT codes and RVU information, and would continue to consider all information Plaintiff submitted to them. *Id.* Smith followed up with a letter to Plaintiff's counsel on May 6, 2016, requesting the

additional documents he had identified and asking to schedule a field visit to Plaintiff's office to obtain them. *Id.* at 75-79.

Smith and Plaintiff's counsel spoke on the phone once in early July. *Id.* at 113. However, by August 12, 2016, counsel had not yet provided the requested data or scheduled the in-person visit to Plaintiff's office. *Id.* at 114-17. Defendants wrote to Plaintiff's counsel on that date to ask him to respond to Smith's requests within 30 days. *Id.*

Plaintiff's counsel responded via letter on September 9, 2016. *Id.* at 134-136. He disputed Defendants' characterization of his communication history with Smith, labeled Smith as "biased," and described the information Smith requested as "grossly inappropriate." *Id.* at 134. He enclosed Plaintiff's curriculum vitae, and stated that the remaining information Smith requested either had already been given to Defendants or was protected patient information. *Id.* at 134-36. Counsel further stated, "Unum has never conducted RVU analysis in its claims and thus it is clear that one is not required to determine occupation." *Id.* at 134.

Defendants responded to the letter on October 17, 2016, expressing disagreement with its contentions and concern about its accusatory tone. *Id.* at 174-77. They gave Plaintiff an additional 30 days to submit the requested information and coordinate the field visit. *Id.* at 176. After receiving multiple extensions, Plaintiff provided the information on December 15, 2016. Doc. 202-18 at 1. Coordination of the field visit occurred in January and February, and it took place at the end of March 2017. Doc. 202-23 at 116, 118, 124, 129. Smith then requested copies of additional

11

documents that were shown to him during the field visit. *Id.* at 133, 138-39. By April 19, 2017, Smith had received everything he requested and expressed his ability to proceed with the analysis. *Id.* at 176-77, 181. However, in July he announced that he needed more documents, which Plaintiff promptly provided. *Id.* at 190, 192, 205.

Smith completed his report on September 12, 2017, and sent a corrected version to Defendants several days later. Doc. 202-24 at 117; *see* Doc. 202-28. During August and September, Defendants had followed up with him multiple times and expressed displeasure that he had not yet completed the report. Doc. 202-24 at 103-05. Plaintiff's counsel had expressed similar sentiments in a call on June 27, 2017, and a letter on August 10, 2017. Doc. 202-23 at 187; Doc. 202-24 at 97-98. In the letter, counsel described the RVU analysis as follows:

> Instead, to find ways to continue to deny the claim, you engaged an outside CPA firm who has been Unum's litigation expert for 20 years to compile a report of CPT codes in order to run an RVU analysis. You should be well aware that while an RVU analysis may give a better idea of the time and procedures involved with Dr. Myers' practice than a mere CPT code analysis, it does not and cannot provide an accurate method to determine one's occupation. For this reason, Unum does not ever use RVU analysis and in fact this may well be the first one you have ever asked someone to compile in a claim investigation. Such are the lengths Unum will go to deny a claim when all it should do is ask an interventional cardiologist how Dr. Myer's restrictions and limitations would impact the occupation.

*Id.* at 98.

On October 20, 2017, Defendants notified Plaintiff of the result of their reevaluation. Doc. 202-28 at 44-51. They determined that he was residually disabled in 2005, and totally disabled as of January 1, 2006. *Id.* at 45. The total disability finding

12

resulted from Smith's RVU analysis, which revealed a significant decrease in interventional RVUs beginning in 2006. *Id.* at 46. However, although Defendants found Plaintiff totally disabled, they classified his disability as one due to sickness, rather than injury. *Id.* at 47-48. This distinction, which had never been discussed before, resulted in a limit on his benefits eligibility instead of providing lifetime benefits. *Id.* at 47-48. As in their 2015 determination letter, Defendants noted that they were making their claim payments despite Plaintiff's belated provision of proof of loss, "without intending to waive rights under any applicable policy provisions or any applicable law." *Id.* at 49.

Plaintiff promptly appealed the decision, and his appeal was denied on November 9, 2017. *Id.* at 73-76; Doc. 217 ¶ 20. On December 4, 2017, he wrote to the Appeals Unit to request a reevaluation of the determination that his total disability was due to sickness instead of injury, in light of new evidence from a chiropractor who treated him in 1998 or 1999. *Id.* ¶ 21. The letter indicated that Defendants had "never inquired as to the origin of Dr. Myers' total disability[.]" Doc. 202-28 at 99.

Defendants, for their part, stated that Plaintiff's assertion that his disability was the result of an injury was being made "for the first time ever," *id.* at 121, but agreed to evaluate whether the medical records supported "an injury causation or a progressive sickness." *Id.* at 122, 124. A medical consultant who reviewed his records found that "the weight of the medical evidence…supported causation resulting from chronic age-related degenerative processes, likely exacerbated by the condition of obesity/elevated BMI, and constituting a sickness/disease…rather than an acute

injury." *Id.* at 145.  Accordingly, Defendants notified Plaintiff on February 8, 2018, that the decision was unchanged. *Id.* at 153-158; Doc. 202-29 at 1-4.

### C. Statute of Limitations

Plaintiff filed the instant action on March 25, 2019. Doc. 1.  His wife and office manager testified at her deposition that they did not file suit earlier "[b]ecause Unum continued conversation with us, continued asking for information, sending specialists, Mr. Smith, and then paying us, so we did not feel it was advantageous to file a lawsuit while they were still cooperating or seemingly cooperating." Doc. 214-1 at 69.

In the Amended Complaint, Plaintiff alleges claims of breach of contract, bad faith under Florida Statutes § 624.155, breach of fiduciary duty, fraud, intentional infliction of emotional distress, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Doc. 47.  The Court's prior Orders dismissed all claims except Counts III, IV, and V, the RICO counts. *See* Docs. 44, 88, 126.

The RICO claims allege that Defendants used the mail to engage in a fraudulent scheme to deny legitimate disability claims to increase profitability. Doc. 47 ¶¶ 200-273.  The scheme consisted of "solely and improperly using CPT codes to classify a medical specialist out of their occupation so that Defendants can claim such medical specialist is not disabled from his or her occupation." *Id.* ¶ 211.  As part of the scheme, Defendants steered claimants away from total disability and towards residual disability, and informed them that they were not totally disabled even before making an (improper) determination of their occupation. *Id.* ¶¶ 212, 213.  With respect to Plaintiff, Defendants allegedly denied his disability claim "in part by using CPT codes

to classify Plaintiff out of his medical specialty and claim he was not disabled," and by "fraudulently classifying Plaintiff's back injuries as a sickness." *Id.* ¶¶ 228, 229.

Defendants moved for judgment on the pleadings on statute of limitations grounds. Doc. 97.  In an Order dated January 20, 2023, the Court denied Defendants' motion as to the RICO claims. Doc. 126.  The Court determined that the four-year statute of limitations period for Plaintiff's RICO claims began running on October 21, 2014, "at the latest." Doc. 126 at 32-33.  Because Plaintiff did not file suit until March 25, 2019, the claims would be barred by the statute of limitations. *Id.* at 33.  However, the Court found that the allegations of the Amended Complaint did not foreclose a finding of equitable tolling that would render the claims timely. *Id.*  Discussing the allegations, the Court stated:

> The Court does not agree that it was reasonable for Plaintiff to rely on Defendants' promise of a "full and fair review" once he knew Defendants intended to continue using the practices Plaintiff alleges were fraudulent—which they made clear in their October 21, 2014 letters.  The record does not reveal any expressly false statements by Defendants that would persuade a reasonable person he should continue cooperating with them rather than sue.  That is especially true in light of Plaintiff's counsel's "familiar[ity] with Unum Group and [its] improper use of CPT codes." Doc. 47 ¶ 62.  Indeed, Plaintiff's repeated objections to the use of CPT codes and the delays in processing his claim demonstrate that he was well aware Defendants' claim process was improper, yet continued jumping through their hoops. …
>
> However, at this stage, the Court concludes that the allegations in the Amended Complaint do not foreclose a finding that Plaintiff acted with reasonable diligence in the face of extraordinary circumstances.   In particular, the Court is persuaded by Defendants' December 2015 [sic] [7] agreement to conduct the

---

[7] As discussed in Section I(B), *supra*, Defendant's agreement occurred in February 2016.

> alternative claim analysis Plaintiff requested with an outside
> expert, a process that dragged out until October 2017. Doc. 47 ¶¶
> 100-113.   Taken in the light most favorable to Plaintiff, these
> allegations do not foreclose a finding that it was reasonable for him
> to rely, at least for some portion of those two years, on a
> representation that turned out to be fraudulent.   As further
> evidence that he acted with reasonable diligence in cooperating
> with the claim process, Plaintiff also points to the partial payments
> he received and Defendants' determination that he was totally
> disabled under a different policy that employed an identical
> definition as the main policy.   In all, the Court finds that he has
> not pleaded himself out of court…because the pleadings do not
> foreclose a finding of equitable tolling that would render his RICO
> claims timely.   Defendants' second motion for judgment on the
> pleadings as to the RICO claims is therefore due to be denied.

Doc. 126 at 37-38.

The Court subsequently denied Defendants' motion for reconsideration.  Doc. 139.  The Court emphasized that the January 20, 2023 Order had ruled only "that a finding regarding the actual applicability of equitable tolling [was] premature" at the motion for judgment on the pleadings stage, in which the Court was evaluating only whether Plaintiff had "pleaded himself out of court." Doc. 139 at 4.   After all, a plaintiff is not required to negate an affirmative defense in his complaint. *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024) (citation omitted).

Defendants now move for summary judgment. Doc. 203.   Neither party disputes the Court's prior finding that Plaintiff's claims would be time-barred if the statute of limitations was not equitably tolled. *Id.*; Doc. 211.  Defendants argue that the evidence does not support a finding of equitable tolling, because it does not establish that Plaintiff was pursuing his rights diligently in the face of extraordinary circumstances. Doc. 203 at 11-23.  With respect to diligence, Defendants note that

Plaintiff's counsel has been asserting the same claims against Defendants in other cases since at least 2003. *Id.* at 12-13.  In one such case, counsel obtained an agreement to toll the statute of limitations while Defendants reassessed their denial of the plaintiff's claim; he did not do so here. *Id.* at 13-14, 22.  Defendants further assert that Plaintiff was the one who was responsible for causing significant delays in the RVU analysis Defendants agreed to do. *Id.* at 17-20.  Finally, they argue that Plaintiff had ample opportunity to file a timely lawsuit even after receiving a final decision, but failed to do so. *Id.* at 18, 22-23.

Plaintiff responds that he was diligent in pursuing his disability claim. Doc. 211 at 2-3.  In support, he points to several letters his counsel sent to Defendants complaining about how long it was taking them to resolve his claim. *Id.*  He then asserts that his "diligence paid off," because Defendants agreed to conduct an RVU analysis, which resulted in a finding that he was totally disabled. *Id.* at 4.  Defendants do not routinely use an RVU analysis, but for Plaintiff they agreed "to use CPT codes in a manner *differently* than that which they had ever done." *Id.* at 3, 6 (emphasis in original).  Plaintiff argues that his counsel's knowledge of Defendants' improper use of CPT codes in other cases is irrelevant, because he could not have known whether Defendants would use CPT codes improperly in his case, via the RVU analysis, until after the claims administration process was complete in 2017. *Id.* at 4-6.

In reply, Defendants point out that Plaintiff did not identify an extraordinary circumstance that prevented him from timely filing. Doc. 215 at 2-3.  On the contrary, his wife testified that they chose not to sue while the claim was pending in the hope of

obtaining a better outcome. *Id.* at 3-4.  Defendants also continue to challenge Plaintiff's claim that he was diligent. *Id.* at 4-5.  They note that it is Plaintiff's diligence with respect to the RICO claims that matters to the tolling analysis, not his diligence with respect to his disability claim. *Id.* at 4 n.2.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).  In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).  Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  "Only when that burden has

been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020), citing *Anderson*, 477 U.S. at 249-50. "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770, quoting *Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

The doctrine of equitable tolling "allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims." *Arce v. Garcia*, 434 F.3d 1254, 1261. When facing a motion for summary judgment on timeliness grounds, a plaintiff who relies on the doctrine of equitable tolling bears the burden of identifying evidence that raises a genuine issue of material fact as to whether the statute should be suspended. *Chang v. Carnival Corp.*, 839 F.3d 993, 997-98 (11th Cir. 2016), citing 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2734 (2d ed. 2015); *see also*, *e.g.*, *Dotson v. United States*, 30 F.4th 1259, 1269-71 (11th Cir. 2022) (affirming grant of summary judgment for defendant where plaintiffs failed to meet their burden to show entitlement to equitable tolling). The plaintiff's task of

demonstrating entitlement to equitable tolling is a "difficult burden." *Diaz v. Sec'y for Dep't of Corr.*, 362 F.3d 698, 701 (11th Cir. 2004). Indeed, "[t]he Supreme Court has made clear" that tolling is an "extraordinary remedy which should be extended only sparingly." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993), citing *Irwin v. Veterans Administration*, 498 U.S. 89, 96 (1990).

Equitable tolling should be employed where: 1) the plaintiff was pursuing his rights diligently, and 2) some extraordinary circumstances stood in his way to prevent timely filing. *See Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (citations omitted). The plaintiff's diligence is "a necessary, though not sufficient, prerequisite that a plaintiff must satisfy." *Chang*, 839 F.3d at 996. He must also establish the existence of extraordinary circumstances that are both beyond his control and unavoidable even with diligence. *Id.*; *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999).

Here, as Defendants correctly observe, Plaintiff does not make any arguments regarding extraordinary circumstances; his response in opposition refers only to diligence. Generously construing his response, however, he may be asserting that Defendants' agreement to conduct an RVU analysis was an extraordinary circumstance. *See* Doc. 211 at 3, 6 (emphasizing that Defendants had never conducted an RVU analysis before); *see also* Doc. 126 at 38 (referring to RVU analysis). While Plaintiff does not identify the evidence supporting his statement that Defendants' agreement to pay an outside consultant to perform an RVU analysis had never

occurred before,[8] it does have some evidentiary support: Defendants' disability specialist who analyzed Plaintiff's claim testified that she had never done an RVU analysis before and could not recall previously retaining an outside consultant. Doc. 202-1 at 246-49.

Nonetheless, Plaintiff has not established that the agreement to conduct an RVU analysis, while unusual, was an extraordinary circumstance that was beyond Plaintiff's control and unavoidable even with diligence. *See Sandvik*, 177 F.3d at 1271. Therefore, even assuming, *arguendo*, that Plaintiff was diligent, he cannot establish tolling. *See Chang*, 839 F.3d at 996.

Courts have held plaintiffs attempting to identify an extraordinary circumstance to a high standard. Attorney errors or neglect, for example, do not qualify. *See, e.g.*, *Maples v. Thomas*, 565 U.S. 266, 282 (2012). Nor is it sufficient for a circumstance to be unanticipated to qualify as extraordinary. In *Sandvik*, 177 F.3d at 1272, the court rejected the plaintiff's argument that an unusual delay by the post office was unavoidable even with diligence: "While the inefficiencies of the United States Postal Service may be a circumstance beyond Sandvik's control, the problem was one that Sandvik's counsel could have avoided by mailing the motion earlier or by using a private delivery service or even a private courier." The Eleventh Circuit has also considered whether there was time remaining in the limitations period after the

---

[8] *See* Fifth Amended Case Management and Scheduling Order, Doc. 128 at 7 ("Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.").

impediment to filing had been lifted, such that the plaintiff could have timely filed his claim. *See Akins v. United States*, 204 F.3d 1086, 1089-90 (11th Cir. 2000) (plaintiff failed to demonstrate that prison lockdowns and misplaced legal papers—circumstances out of his control—were extraordinary circumstances that tolled the limitations period, given that he did not explain why he did not file in the period of "at least seven months" that remained to him afterward).

Additionally, a defendant's offer to engage in pre-suit settlement negotiations does not equitably toll a claim.  In *Dotson*, 30 F.4th at 1263, the plaintiffs alleged that opposing counsel told their attorney that "if he were to forward reasonable updated demands to him that all three…claims could possibly be settled."  The plaintiffs then spent time gathering records to support their updated demands, but when the records were presented to opposing counsel, the defendant declined to negotiate until the plaintiffs filed suit. *Id.*  In the meantime, the limitations period had lapsed. *Id.* Describing the defendant's actions as "gotcha tactics," the plaintiffs asserted that they would have promptly filed suit if the defendant had not expressed interest in negotiating. *Id.* at 1269.  However, the Eleventh Circuit affirmed the dismissal of the suit as time-barred, observing that the defendant neither told the plaintiffs not to file suit while they prepared updated demands, nor guaranteed that the claim would settle. *Id.* As a result, there was no basis for equitable tolling. *Id.*

Likewise, the statute of limitations was not equitably tolled in *Raziano v. United States*, 999 F.2d 1539 (11th Cir. 1993).  The plaintiffs first filed an administrative claim with the Coast Guard, who engaged in correspondence with them and requested more

information. *Id.* at 1540.  One month after the limitations period lapsed, the Coast Guard informed them that it was not interested in settling the case and would deny their claim. *Id.*  The Eleventh Circuit found that the plaintiffs' subsequent lawsuit was time-barred and reversed the district court's finding of tolling. *Id.* at 1241.  The court reasoned that the Coast Guard had not indicated that the limitations period would be tolled or waived during administrative negotiations, nor otherwise misinformed them about the statute of limitations, nor had it represented that it would pay the plaintiffs' claim. *Id.*  Therefore, its request for more information "did not amount to inducement or trickery." *Id.*; *see also Regions Bank v. Old Republic Union Ins. Co.*, No. 2:14-cv-517, 2016 WL 11622129, *10 (N.D. Ala. Jan. 20, 2016) (collecting cases, observing that "courts have generally agreed that settlement negotiations or statements expressing interest in settlement are insufficient to give rise to a claim that a defendant is equitably estopped from asserting" a statute of limitations defense).[9]

---

[9] Plaintiff asserted the related doctrine of equitable estoppel in his response in opposition to Defendants' motion for judgment on the pleadings, along with equitable tolling. Doc. 113 at 12-13, 18-19.  In his response in opposition to Defendants' motion for summary judgment, he asserted only equitable tolling.  Even if Plaintiff had invoked the doctrine of equitable estoppel at the summary judgment stage, however, it would be unavailing for similar reasons as equitable tolling.

A defendant who misleads a plaintiff into delaying suit by an affirmative misstatement about the length of the limitations period, promises to make a better settlement if plaintiff does not bring suit, or comparable representations or conduct, will be equitably estopped from asserting a statute of limitations defense. *Keene v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1324 (11th Cir. 1989) (citations and quotations omitted).  In *Keefe*, for example, the defendant falsely stated to the plaintiff's attorney that it had secured a release of liability from the plaintiff and paid her medical bills, resulting in confusion and delay that caused her claim to be filed late. 867 F.2d at 1324; *see also American Prof. Assocs., LLC v. Citizens Ins. Co.*, No. 1:20-cv-1305, 2022 WL 1669467 (N.D. Ga. March 28, 2022) (question of fact existed as to estoppel where plaintiff was misled by defendant's statement that the limitations period was longer than it was).  In contrast, in *Zalimeni v. Cooper Marine and Timberlands Corp.*, 438 F.Supp.3d 1331,

Applying these principles to the evidence at hand, it is clear that Defendants' agreement to conduct an RVU analysis does not constitute an extraordinary circumstance.  First, as in *Akins*, 204 F.3d at 1089-90, the four-year limitations period had not yet expired by the time Defendants provided Plaintiff with the result of the RVU analysis and their reconsideration of his claim denial.  Indeed, several months remained even after Plaintiff unsuccessfully appealed and obtained another reevaluation.  Even if the RVU analysis were out of his control, then, missing the filing deadline was not unavoidable.  Of similar significance is Plaintiff's failure to obtain, or even seek, an agreement to toll the limitations period while Defendants reevaluated his claim, even though his attorney had obtained such an agreement from Defendants in another case.  Again, he has not demonstrated that it was unavoidable for him to miss the filing deadline as a result of Defendants' agreement to conduct the unusual analysis. *See Sandvik*, 177 F.3d at 1272.

---

1339 (S.D. Ala. 2020), equitable estoppel did not apply where the defendants had promised to help the plaintiff recover, paid his medical expenses, and continued settlement discussions. The court emphasized that the defendants made no false statements, and their conduct did not induce or trick the plaintiff into letting the filing deadline pass. *Id.* The plaintiff:

> failed to point to any specific promises made by Defendants.  Rather, [he] chose not to engage an attorney because he did not feel it was in his best interest.  He also had faith in his employer that they wanted to help him until he could get back to work, apparently no matter how long it took.  And while that faith may have been misplaced, Defendants did not engage in any actions that would warrant equitable estoppel.

*Id.* at 1339-40.

Here, as in *Zalimeni* and as discussed more fully in this Section, Plaintiff has not demonstrated that Defendants made any false statements or promises that lulled him into inaction.  Rather, he did not feel that a lawsuit was in his best interest while Defendants were continuing to reevaluate his claim and making payments.  Therefore, he has not met his burden of identifying evidence that raises a genuine issue of material fact as to whether equitable estoppel should apply.

Defendants' agreement to conduct an RVU analysis while reevaluating Plaintiff's claim is comparable to the defendants' offers to engage in settlement negotiations in *Dotson* and *Raziano*. As in those cases, Defendants did not promise that the analysis would lead to Plaintiff's desired result, tell him not to file suit, or represent to him that the limitations period was not running. On the contrary, they continued to bring up the belated nature of Plaintiff's claim and stated they were not waiving their rights under the policy or applicable law.

Plaintiff also refers to the residual disability payments Defendants offered and their finding that he was totally disabled under a different policy before they agreed to conduct the RVU analysis—factors that he previously argued "lulled" him into continuing to wait for Defendants to complete their investigation. Doc. 211 at 3; *see* Doc. 113 at 18-19. To the extent he relies on them now, *Dotson* and *Raziano* make clear that these actions are not sufficient absent false or misleading representations.[10]

---

[10] *See also* n.8, *supra*. In any event, the record evidence, even viewed in the light most favorable to Plaintiff, does not support his view of Defendants' actions as amounting to "pernicious lulling." *See Zalimeni*, 438 F.Supp.3d at 1339. First, the evidence reveals that there was no inherent contradiction in Defendants' finding of total disability for the overhead policy but not the individual policy—contrary to the allegations in the Amended Complaint and the arguments in Plaintiff's response in opposition to the motion for judgment on the pleadings, which focused on the fact that the definition of total disability was the same in both policies. Doc. 47 ¶ 93; Doc. 113 at 18-19. Defendants made a finding that Plaintiff became totally disabled as of January 1, 2012, which was a date that their analysis of the individual disability policy did not reach. *See* n.4, *supra*. This finding was consistent with records that appeared to show him continuing to perform interventional procedures until then, as well as Plaintiff's position that his condition was worsening during this time frame. As to the payments Defendants made in conjunction with their finding of residual disability for the previous years, Defendants made no representations that they were providing "partial benefits while their review of his total disability claim was still pending," as Plaintiff characterized them. Doc. 113 at 18-19.

In addition, Defendants never represented to Plaintiff that they would take the action he most preferred: that they would speak to an interventional cardiologist and determine his total disability claim based solely on the restrictions and limitations his medical condition would be expected to cause, without considering the procedures he was actually performing.   Plaintiff repeatedly asked them to take this action, even while the RVU analysis was occurring.   In fact, he asked them to do so *in lieu of* the RVU analysis, which he criticized as an inaccurate method of determining a doctor's occupation. *See* Doc. 202-24 at 98; 202-15 at 30.   Even in the letter in which he asked them to conduct the RVU analysis, his request for them to speak to an interventional cardiologist was far more prominent than his brief reference to an RVU analysis. Doc. 202-14 at 52.   Plaintiff also knew early on that Smith was likely to be the accountant performing the RVU analysis, and he complained that Smith was biased based on his past work for Defendants.   To say that Defendant's agreement to conduct the RVU analysis unavoidably prevented him from timely filing this suit is not a reasonable view of the evidence, even when considered in the light most favorable to Plaintiff.

The evidence also reveals that Plaintiff caused a substantial delay in the completion of the RVU analysis by his failure to timely schedule a field visit and produce the documents Smith identified.   Smith made these requests on May 6, 2016, but the documents were not produced until December 15, 2016, and the field visit did not occur until late March 2017.   Although Smith also contributed to the delay by taking several months to complete his report after receiving everything he needed, the length of time it took to conduct the analysis was not attributable to Defendants alone.

This factor also weighs against a finding that the promise of an RVU analysis constitutes a circumstance that was beyond Plaintiff's control and unavoidable even with diligence.

In asserting that Plaintiff did not act with diligence, Defendants point out that his counsel was aware of Defendants' allegedly fraudulent tactics from prior cases. Plaintiff responds that his counsel's prior knowledge of Defendants' alleged scheme is irrelevant because he "had no way of knowing *how* Defendants used the CPT codes until after the fact when the claims administration process was complete in 2017." Doc. 211 at 4 (emphasis in original). In the other cases, Defendants had used CPT codes in a different, more fraudulent manner than the RVU analysis they performed in Plaintiff's case. *Id.* at 4-5. Plaintiff therefore challenges Defendants' assertion, according to Plaintiff, that he "should have sued immediately because [ ] counsel should have known that [Defendants were] going to act fraudulently." *Id.* at 4.

Plaintiff's current argument contradicts the evidence, the allegations in the Amended Complaint, and the Court's prior findings. The Amended Complaint alleges that Defendants have engaged in the same improper and fraudulent use of CPT codes since 2000, including in Plaintiff's claim beginning in 2009. *See, e.g.*, ¶¶ 46, 48-51, 62-63, 65, 74, 208, 211, 213 in Doc. 47. The Civil Remedy Notice Plaintiff filed in August 2014 alleges the same improper use of CPT codes. Doc. 47-2 at 2; Doc. 47 ¶¶ 63-65. And Plaintiff's counsel has made the same claims in his other cases against Defendants. *See* Doc. 217 ¶ 9; Doc. 176-1. The Court previously found that Defendants' October 21, 2014 letter gave Plaintiff sufficient notice that they would

continue to use CPT codes in the same allegedly improper way when they reopened his claim as they had done in 2009 and 2010. Doc. 126 at 32.  For this reason, the Court concluded that the limitations period for the RICO claims began, at the latest, on October 21, 2014. *See id.* at 24-33.  The evidence presented on summary judgment substantiates this finding, and Plaintiff does not challenge it here.  That means, in contrast to Plaintiff's current argument, that by the time Defendants agreed to conduct the RVU analysis in 2016, the allegedly fraudulent use of CPT codes had already occurred—and Plaintiff was well aware of it.  The only remaining question is whether Defendants' agreement to conduct the RVU analysis constitutes an extraordinary circumstance that tolled the limitations period.  As discussed *supra*, it does not.

According to Plaintiff's wife, Plaintiff chose not to sue earlier because he "did not feel it was advantageous to file a lawsuit while [Defendants] were still cooperating or seemingly cooperating." Doc. 214-1 at 69.  This explanation does not establish the existence of an extraordinary circumstance that entitles Plaintiff to the "extraordinary remedy" of equitable tolling. *See Justice*, 6 F.3d at 1479.  Because Plaintiff has not identified evidence that raises a genuine issue of material fact as to whether equitable tolling should apply his RICO claims are time-barred and Defendants are entitled to summary judgment.

Accordingly, it is **ORDERED**:

1. Defendants', Provident Life and Accident Insurance Company and Unum Group, Motion for Summary Judgment (Doc. 203) is **GRANTED**.

2. Plaintiff's Motion for Collateral Estoppel (Doc. 201) is **DENIED as moot**.

3.  The Clerk is directed to terminate all pending motions and enter judgment in favor of Defendants Provident Life and Accident Insurance Company and Unum Group.

4.  The Clerk is further directed to **CLOSE** this action.

**DONE** and **ORDERED** in Tampa, Florida on December 9, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties